**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

**ANDOWAH NEWTON,**                                    **Case No. 23-cv-10753**

                          **Plaintiff,**                    <u>**COMPLAINT**</u>

          -against-                                  *Jury Trial Demanded*

**LVMH MOËT HENNESSY LOUIS VUITTON**
**INC. and RODNEY C. PRATT,**

                          **Defendants.**
------------------------------------------------------------------------X

      Plaintiff Andowah Newton ("Ms. Newton"), by her attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, Charny & Wheeler P.C., whose offices are located at 42 West Market Street, Rhinebeck, New York 12572, and Bergstein & Ullrich, whose offices are located at 5 Paradise Lane, New Paltz, New York 12561, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

<u>**INTRODUCTION**</u>

      1.    For years, Ms. Newton, Vice President of Legal Affairs at Defendant LVMH Moët Hennessy Louis Vuitton Inc. ("Defendant Louis Vuitton," the "Company" or "Defendant"), suffered sexual harassment and an incident of assault at the hands of Defendant Louis Vuitton Director of Property and Facility Operations, Lloyd Doran ("Harasser Doran"). When repeated informal reports and requests for help to Defendant Louis Vuitton's in-house employment counsel fell on deaf ears, Ms. Newton, pursuant to the instructions of Defendant Louis Vuitton's Employment Counsel, Frank Martinez ("Employment Counsel Martinez") sent Harasser Doran an email asking him to stop harassing her.

2.     Instead of apologizing and, more importantly ceasing the harassment, Harasser Doran stunningly reported Ms. Newton to Defendant Louis Vuitton, immediately forwarding the email to his supervisor. And then came the retaliation.  Defendant Louis Vuitton did everything it could to intimidate Ms. Newton into not pursuing her claims and convince Ms. Newton that the harassment was just a byproduct of being an "attractive woman" who works at a company with a French culture, and thus should simply be tolerated.  Defendant Louis Vuitton even chastised Ms. Newton for sending the email, suggested that she apologize to Harasser Doran, and promoted Harasser Doran to an even higher position.

3.     Shocked that Defendant Louis Vuitton had turned the tables on her and was engaging in victim blaming, Ms. Newton filed a formal complaint with Human Resources and requested that they hire an external third party to conduct an investigation. Defendant Louis Vuitton eventually and reluctantly agreed, but the truncated investigation was merely an extension of Defendant Louis Vuitton's campaign to intimidate Ms. Newton into silence amidst allegations that might tarnish its public image.

4.     Prior to reporting sexual harassment, Ms. Newton had received nothing but outstanding, stellar reviews for her performance year in and year out. She had been recently promoted for achieving "excellent results" and being someone who "continues to build confidence in our maisons as she handles what are stressful (and often costly) matters with aplomb." Ms. Newton's supervisor further stated that Ms. Newton "reflects the highest degree of honesty and ethics in all she does."  She was valued externally and internally for her "intellect, ability and personal approach."  But that changed once Ms. Newton filed her sexual harassment complaint. Ms. Newton was criticized for some of the very same things that had won her praise in the past.

5.      Ms. Newton's "fall from grace" lasted throughout the rest of her employment at Defendant Louis Vuitton. She was increasingly outcast and othered from her team thereafter and it was clear that Defendant Louis Vuitton, aware that it would be unlawful to fire her, instead hoped to pressure her into quitting.

6.      Sickened—literally and figuratively—by the way in which Defendant Louis Vuitton weaponized its forced arbitration agreement by subjecting her to such hostility, discrimination, and retaliation for reporting sexual assault and harassment, Ms. Newton attempted to seek accountability and redress for what she had endured, and to prevent other employees—particularly the interns—from having to endure the same,  and felt that she had no other choice but to engage in the protected activity of filing a lawsuit about the sexual harassment, assault, and retaliation. In response to Ms. Newton's lawsuit, Defendant Louis Vuitton ramped up the retaliatory hostile work environment against her: Defendant Louis Vuitton's CEO made the unprecedented and outrageous step of sending an email to all employees essentially calling Ms. Newton a liar and directing them to "continue business as usual…" which for Ms. Newton meant enduring continued intense hostility and retaliation against her.

7.      While she continued to be employed at Defendant Louis Vuitton and was continually subjected to the ongoing retaliatory hostile work environment in response to her reports of sexual harassment and assault, Congress subpoenaed Ms. Newton to testify in support of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").

8.      Despite continually being subjected to a retaliatory hostile work environment, and fearing more retaliation, Ms. Newton did her civic duty and publicly testified about the sexual

harassment and assault, and the way that she was retaliated against for reporting sexual harassment, assault, and retaliation at Defendant Louis Vuitton. She also testified about how Defendant Louis Vuitton gaslit her and inferred that the sexual assault and harassment she endured were figments of her imagination.[1]

9.      In retaliation for engaging in the protected activity of objecting to the sexual harassment and the ongoing retaliatory hostile work environment she was subjected to at Defendant Louis Vuitton, this Defendant further retaliated against her by denying her reasonable accommodation request to work remotely and refusing to engage in an interactive process to accommodate her PTSD.

10.     As a result of Ms. Newton and other brave women's efforts, Congress banned forced arbitration for survivors of sexual assault and harassment in February 2022. The President signed the EFAA into law on March 3, 2022. Thereafter, Ms. Newton continued to work as an in-house attorney for Defendant Louis Vuitton.

11.     Following the enactment of the EFAA, Defendant Louis Vuitton continued to retaliate against Ms. Newton and subject her to a worsened ongoing retaliatory hostile work environment, while she continued to perform her job in an exemplary manner.

12.     In retaliation, on or about March 25, 2022, despite requesting and receiving a series of five detailed notes from a medical doctor, Defendant Louis Vuitton inexplicably denied Ms. Newton reasonable accommodation to work remotely in violation of Ms. Newton's rights under the law.

---

[1] The Opening Statement to Ms. Newton's testimony is available at https://youtu.be/qyzJzuZBg4s?si=-5qAfOLAz3DEv5Me. Her full testimony, including Q&A by Congressmembers, is available at https://www.c-span.org/video/?516114-1/sexual-harassment-abuse-victims-testify-forced-arbitrations.

13.    In 2022, even after they knew that the EFAA had gone into effect, Defendant Louis Vuitton continued to subject Ms. Newton to an ongoing retaliatory hostile work environment and made it clear that she was not welcome or wanted.

14.    In summer 2022, Defendant Louis Vuitton hired Defendant Rodney Pratt as its new General Counsel and Ms. Newton's direct supervisor. Ms. Newton was hopeful that the change in leadership would end the retaliation against her so that she could successfully continue her career at Defendant Louis Vuitton. To her great disappointment, a few months after coming on board, Defendant Pratt suddenly pressured Ms. Newton—his direct report, through her attorneys, to have a "one on one negotiation" with him about settling her sexual harassment, assault, and retaliation claims against Defendant Louis Vuitton.

15.    To make matters worse, Defendant Pratt insisted that such "settlement talks" be between him and Ms. Newton only, without attorneys present, even though both Defendant Louis Vuitton and Ms. Newton had long been represented by counsel. Ms. Newton was stuck with a terrible ultimatum: subject herself to a "settlement talk" with her new boss, without representation, or refuse his "request." Fearful about angering her new boss, Ms. Newton declined Defendant Pratt's "invitation" to enter into the one-on-one "settlement talks" because of the inherent imbalance and unfairness of such discussions.

16.    When Ms. Newton refused to engage in the "one-on-one settlement negotiations" with her boss and continued to engage in the protected activity of litigating her claims against Defendant Louis Vuitton, Defendants retaliated against her in numerous ways, and publicly and humiliatingly fired her in December 2022, effective January 2023.

17.    Defendant Louis Vuitton's retaliation has continued unabated from the time that she formally reported sexual harassment and assault, through the present.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

18.     Jurisdiction of the Court is proper under 42 U.S.C. § 2000e *et seq*., and 28 U.S.C. §§ 1331 and 1343.

19.     The Court has supplemental jurisdiction over the claims of Ms. Newton brought under State law pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in the District pursuant to 28 U.S.C. § 1391(b), as the acts complained of herein occurred within the Southern District of New York.

21.     All conditions precedent to filing the instant action have been fulfilled. On or about May 19, 2023, Ms. Newton timely filed a Charge of Discrimination with the New York district office of the Equal Employment Opportunity Commission ("EEOC"). On or about November 24, 2023, the EEOC issued Ms. Newton a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## PARTIES

22.     Ms. Newton was a dedicated and hardworking Black and Afro-Latina female employee of Defendant Louis Vuitton.  Ms. Newton worked at Defendant Louis Vuitton's headquarters in New York County.  Ms. Newton was at all relevant times, and continues to be, a resident of the County of New York in the State of New York.

23.     At all times relevant to this case, Defendant Louis Vuitton was Ms. Newton's employer and the employer of the individual who harassed Ms. Newton under the New York State Human Rights Law, New York Executive Law §§ 290, et seq. ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code §§ 8-101, et seq. ("NYCHRL").  Defendant Louis Vuitton is a foreign business corporation authorized to do business in New York State with its corporate headquarters at 19 East 57th Street, New York, New York 10022, New York County.

24.    Defendant Louis Vuitton is the United States subsidiary of the French multinational luxury goods conglomerate, LVMH Louis Vuitton Moët Hennessy SE, which sells, among other items, wines and spirits, fashion and leather goods, perfumes and cosmetics, watches and jewelry. Defendant Louis Vuitton's subsidiaries, brands, and affiliates include Defendant Louis Vuitton, Christian Dior, DFS, Le Bon Marché, La Grande Épicerie, Fendi, Marc Jacobs, Fenty Beauty by Rihanna, Givenchy, Sephora, Starboard Cruise Services, Berluti, Charles & Keith, Bulgari, Céline, Emilio Pucci, House of Bijan, Kenzo, Loewe, Loro Piana, Moynat, Nicholas Kirkwood, Rimowa, Chaumet, FRED, Guerlain, Kenzo, Fresh, Make Up For Ever, Hublot, TAG Heuer, Zenith, Acqua di Parma, Benefit Cosmetics, Givenchy Parfums, Kenzo Parfums, Parfums Christian Dior, Perfumes Loewe, Maison Francis Kurkdjian, Marc Jacobs Beauty, Kat Von D Beauty, Cheval Blanc (hotels), Caffe-Pasticceria Cova, Feadship, Les Échos, Hennessy, Belvedere, Veuve Clicquot, Dom Pérignon, Krug, Ruinart, and Moët & Chandon, among others.

25.    Defendant Rodney Pratt ("Defendant Pratt"), General Counsel, was at all relevant times relevant, an employee of Defendant Louis Vuitton who retaliated against Ms. Newton and subjected her to a hostile work environment and who, at all relevant times, had the ability to affect the terms and conditions of Ms. Newton's employment. As such, Defendant Pratt is Ms. Newton's employer under the NYSHRL and NYCHRL and is liable under the NYSHRL and the NYCHRL.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND

### *Ms. Newton Joins and Excels at Defendant Louis Vuitton in New York as Director, Litigation Counsel*

26.     Ms. Newton has worked at the top of her industry as both an accountant and now an attorney for twenty years.

27.     Ms. Newton is a Black and Afro-Latina woman who graduated from Georgetown University with a Bachelor of Science in Business Administration with a minor in French. She also received a diploma for her studies in Business from Université de Lyon III (Jean Moulin) in Lyon, France. During college, Ms. Newton interned at Johnson & Johnson, including in its Paris offices.

28.     After college, Ms. Newton earned her license as a Certified Public Accountant and worked as a Senior Associate and Auditor for PricewaterhouseCoopers—the second largest professional services firm in the world—and as an Internal Control Analyst and Auditor at Estée Lauder—one of the world's leading manufacturers and marketers of luxury skin care, makeup, fragrance and hair care products.

29.     Ms. Newton then went on to receive dual law degrees in U.S. and French law from Cornell Law School and Université de Paris I Panthéon-Sorbonne a.k.a. La Sorbonne. During law school, Ms. Newton interned at the Paris office of a top U.S. law firm. After law school, she clerked for the First Vice President Judge Akua Kuenyehia at the International Criminal Court.

30.     Ms. Newton is fluent in French. In total, she studied and worked in France for two years, and has visited numerous times for extended periods since.

31.     After clerking, Ms. Newton spent eight years as an attorney at major law firms in the United States before joining Defendant Louis Vuitton as Director, Litigation Counsel in 2015.

32.     In her role, Ms. Newton managed litigations and legal disputes for more than 25 luxury brands within the Defendant Louis Vuitton umbrella.  Ms. Newton directed legal strategy and advised senior executives and general counsel in the United States, Europe, and Asia on legal disputes and litigations.

### Ms. Newton Receives Exemplary Reviews and Praise for Her Performance and is Promoted

33.     Ms. Newton was successful in her role and received universal praise from her supervisors for her judgment and effectiveness.

34.     Shortly after starting her employment with Defendant Louis Vuitton, Ms. Newton suffered a personal tragedy when her baby brother, who was more like a son to her because of their vast age difference, passed away unexpectedly at the age of 25. The events left Ms. Newton distraught and vulnerable. This personal tragedy notwithstanding, Ms. Newton was able to continue to be effective at her job.

35.     Ms. Newton's supervisor, General Counsel Louise Firestone ("General Counsel Firestone") of Defendant Louis Vuitton, initially described Ms. Newton as "a client's dream; she is attentive to their needs, handles all matters efficiently and with a calm demeanor, yet she is tough with outside counsel on her clients' behalf."[2]  Ms. Newton's supervisor further stated that Ms. Newton "reflects the highest degree of honesty and ethics in all she does."

---

[2] In the context of these comments, Ms. Newton's "clients" were C-suite executives and colleagues at LVMH's various brands and subsidiaries.

36.     In March 2017, Ms. Newton was promoted to Vice President, Legal Affairs, in recognition of her outstanding performance.

37.     Ms. Newton continued to go above and beyond in her role, managing all non-employment litigations on behalf of Defendant Louis Vuitton and most of its U.S. affiliates, achieving significant positive results in her matters, and developing strong relationships among Defendant Louis Vuitton's various groups.  Ms. Newton was also selected by her supervisor to create and spearhead Defendant Louis Vuitton's first pro bono initiative, which was a resounding success.

***Ms. Newton is Warmly Received by the Legal Team and Befriended by Employment Counsel Martinez***

38.     Due to a shared love of singing opera and classical music, Ms. Newton and Employment Counsel Martinez quickly bonded and often relied on and confided in each other at work. They attended each other's musical performances, gave feedback on performance preparation and supported each other's arts-related efforts.

39.     As Employment Counsel, Martinez regularly handled internal employees' complaints of employment discrimination, and he routinely complained about Defendant Louis Vuitton and its brands' employees who reported discrimination, constantly suggesting that their claims were manufactured and exaggerated.  He also routinely shared confidential employee information with Ms. Newton.

40.     Ms. Newton also became friendly with the Vice President of Legal Affairs, Real Estate Counsel (referred to herein as "Real Estate Counsel Doe").

***Ms. Newton, the Only Black Executive, is both Undertitled and Underpaid***

41.     From February 2015 when Ms. Newton joined Defendant Louis Vuitton, through summer 2015, Defendant Louis Vuitton gave the two Black attorneys (both female) in the legal

department, including Ms. Newton, lower titles (Director) than those given to the two non-Black attorneys (Vice President), which *inter alia*, significantly impacts compensation and benefits employees receive.

42.     From spring 2015, after the departure of the other Black female attorney in or around spring 2015, through fall 2020, Ms. Newton was the only Black employee at the Director level or above at Defendant Louis Vuitton.

43.     When hiring an attorney to replace the other Black attorney in the legal department, Defendant Louis Vuitton granted that attorney (Real Estate Counsel) the title of VP.

44.     Thereafter, all three of Ms. Newton's Non-Black attorney colleagues (and her non-Black predecessor) had Vice President titles; but she did not.

45.     Upon information and belief, beginning in February 2015 when she joined Defendant Louis Vuitton, Ms. Newton was underpaid by at least $40,000-$60,000 compared to her non-Black colleagues (and her non-Black predecessor) even though she was charged with at least the same level of responsibilities and tasks, if not more.  That gap only widened each year after 2015.

46.     Defendant Louis Vuitton maintained Ms. Newton at a title (Director) that was lower than that of the other 3 non-Black attorneys in the Legal Department (Vice President) and lower than that possessed by Ms. Newton's Non-Black predecessor (Vice President).

47.     It was only after Ms. Newton's repeated pleadings, based on the duties, responsibilities, and performance with which she was charged, to change her title that Defendant Louis Vuitton finally acquiesced to her requests in March 2017.  Her compensation, however, remained significantly lower than her fellow attorneys' in the Legal Department and significantly lower than the male attorneys in the Legal Department.

48.     On information and belief, Ms. Newton was the highest titled Black employee within Defendant Louis Vuitton's holding company from 2015 to 2020, and no Black employee possessed that title or higher in Defendant Louis Vuitton's entire history.

49.     On information and belief, another Black former employee in a different department brought claims against Defendants for racial discrimination.

**II.     THE CAMPAIGN OF SEXUAL HARASSMENT AGAINST MS. NEWTON**

50.     Shortly after Ms. Newton began working at Defendant Louis Vuitton, Harasser Doran began to engage in a persistent and invasive campaign of sexual harassment against Ms. Newton. That harassment continued for years.

51.     In or around May 2015, Ms. Newton had her first encounter with Harasser Doran.

52.     Harasser Doran came to Ms. Newton's office to discuss making repairs and hanging framed artwork.  Before leaving Ms. Newton's office, he lingered in the doorway, stared at Ms. Newton long enough that she began to feel uncomfortable, and stated: "You are so pretty. And that beautiful smile…I just can't get enough of it."  Ms. Newton recoiled at this statement and immediately turned away from Harasser Doran, who subsequently exited her office.

53.     After this initial encounter, Harasser Doran sexually harassed Ms. Newton for more than three years.  Each and every time he saw her, he acted in a sexually suggestive manner. They came into contact at least once every 3 to 4 weeks.

54.     Specifically, for example, Harasser Doran began to linger outside of Ms. Newton's office despite the fact that his office was on a different floor.  As he did each time he saw her, he would leer at Ms. Newton in a sexually suggestive manner that made -- and was intended to make -- Ms. Newton feel as though he was undressing her with his eyes and thinking about her in a sexual manner.

### *Harasser Doran Physically Sexually Assaults Ms. Newton*

55.    In or around September 2015, Harasser Doran entered Ms. Newton's office again to discuss office repairs and the hanging of artwork.  Ms. Newton was facing the doorway, seated at her desk in front of her computer screen.  In the midst of his discussion with Ms. Newton, under the guise of having to call a colleague, he suddenly and without warning lunged his body across and on top of Ms. Newton's, thrusting his pelvis and genitals into her face and pressing his body firmly against hers as he reached across her body for her phone.  Ms. Newton found herself pinned against her chair. The motion was completely unnatural and unnecessary and left Ms. Newton stunned and terrified. Leveraging the wheels of her office chair, she frantically pushed her body away from her desk and jumped up from her chair in horror, making clear that the contact was unwanted.  She chided Harasser Doran, but he did not even turn to face her as she did so.  Moments later, he slinked out of her office, without uttering a word to her.

### *Ms. Newton Reports the Physical Sexual Harassment and Assault to Employment Counsel Martinez*

56.    Feeling violated and unsafe, Ms. Newton reported the escalating sexual harassment to Employment Counsel Martinez in front of Real Estate Counsel Doe, with whom she had also become friends. She mentioned that Harasser Doran regularly appeared by her office and acted in a creepy and sexual manner. She specifically stated that he was very weird to her and that he had even come to her office and placed his body over hers in an extremely weird way.

57.    Employment Counsel Martinez ignored Ms. Newton as if she had said nothing and quickly changed the subject.

58.    Employment Counsel Martinez did not ask for any details or even acknowledge Ms. Newton's discomfort with Harasser Doran's actions.

59.     Employment Counsel Martinez still failed to act, even after Ms. Newton reported Physical sexual harassment.

### *Harasser Doran Sexually Harasses Ms. Newton at a Company Event*

60.     Following this incident, Harasser Doran continued to appear outside Ms. Newton's office, where he would lurk, often for minutes on end, leering intently at Ms. Newton. He likewise uncomfortably invaded her space at company events, before and after fire drills, in the elevator bank, and during chance encounters in the hallway, and on several occasions, in full view of other employees.

61.     At one company event, in or around 2015 or 2016, Harasser Doran, upon seeing Ms. Newton enter the room, walked across the room and directly approached the cocktail table at which Ms. Newton was standing, where she and a few female colleagues were conversing.  Upon arriving at the table, he made a point of kissing each woman twice—once on each cheek.

62.     After he had kissed each of the other women, he approached Ms. Newton last and attempted to kiss Ms. Newton on the cheeks as well. Ms. Newton leaned her face and body backwards so that he could not reach her.

63.     In response to Ms. Newton's movement, Harasser Doran, who, upon information and belief, is white American, loudly exclaimed to everyone at the table: "What? No 'bises'[3] for me?"  Ms. Newton sternly responded: "No" and kept her distance from Harasser Doran.

64.     Despite Ms. Newton's two rejections of Harasser Doran's attempts to kiss her, he again persisted with his attempts loudly stating to everyone at the table: "Oh, come on, it's a celebration…"  Ms. Newton gave him a look of disgust and quickly walked away.

---

[3]"Bises" are the pair of kisses that French people who are familiar with each other commonly use to greet each other or say goodbye.

### *Plaintiff's Co-worker Observes Harasser Doran's Harassment*

65.     In or about fall 2017, Ms. Newton was in her office having a discussion with Real Estate Counsel Doe, when Harasser Doran walked by Ms. Newton's office. After Real Estate Counsel Doe said "hello" Harasser Doran inexplicably entered Ms. Newton's office and stood there waiting to be included in the conversation and managing to get a few irrelevant sentences in. When Harasser Doran realized that both Real Estate Counsel Doe and Ms. Newton were not responding to his statements or engaging him in the conversation, he eventually left.

66.     Once Harasser Doran finally left, Real Estate Counsel Doe told Ms. Newton that Harasser Doran's behavior had been "weird" and "creepy," and later described Harasser Doran as "lurking" and "lingering" around Ms. Newton's office.

67.     During the holiday party, after Ms. Newton realized she was seated at the same table as Harasser Doran, she became anxious, agitated, and distraught and complained to Real Estate Counsel Doe, in a panic, about how uncomfortable she felt being seated so close to Harasser Doran.

68.     For years, Harasser Doran continued his harassment, and Ms. Newton did everything she could to avoid him. Ms. Newton spent less time in her office, kept her door closed more frequently, avoided taking the stairs, and devised other ways to reduce the likelihood of seeing or interacting with him. However, even with these precautions, Ms. Newton was unable to avoid highly uncomfortable encounters with Harasser Doran.

69.     Ms. Newton was constantly nervous because she knew that Harasser Doran had the ability to view where she was at all times through Defendant Louis Vuitton's security cameras and had authority over all of the security staff. Ms. Newton was particularly concerned in the evenings that she had to work late and there would be fewer employees in the building.

70.     For example, on or about January 3, 2018, Defendant Louis Vuitton's headquarters flooded.  Employees, including Ms. Newton, rushed to clean up and protect her colleagues and supervisor's important files, business documents, and electronic equipment on the floor from destruction.  Harasser Doran took this opportunity to stand nearby and leer at her.  He did not offer to help or provide any assistance.  He simply ogled Ms. Newton, staring suggestively at her body as she hastily tried to gather the documents.

71.     Ms. Newton continued to complain to Employment Counsel Martinez about Harasser Doran's sexual harassment, but every time she did, Employment Counsel Martinez ignored her complaints.

72.     As explained below, Ms. Newton repeatedly informed several colleagues of the behavior, and ultimately reported it to Human Resources, only to be retaliated against for her efforts to stop the harassment.

III.     **DEFENDANT LOUIS VUITTON IGNORES MS. NEWTON'S REPORTS OF SEXUAL HARASSMENT, RETALIATES AGAINST HER, AND INSTEAD TREATS HARASSER DORAN AS THE VICTIM**

### *Defendant Louis Vuitton Ignores Ms. Newton's Informal Reports of Harassment*

73.     Ms. Newton's complaints were in accordance with Defendant Louis Vuitton's Company policy, which allows a complaint of sexual harassment to be made to a "supervisor, any Company executive…" After an informal complaint, Defendant Louis Vuitton may "take action to address potential violations of this policy beyond an informal discussion."

74.     Ms. Newton had hoped that, by informally reporting the sexual harassment, Defendant Louis Vuitton would resolve the problem without the potential negative effects that could follow—and eventually did follow—from a formal report.  Ms. Newton was left with no other avenue to stop the sexual harassment, as Harasser Doran made it clear that he did not care

how visibly uncomfortable his behavior made her, and he showed no signs of ceasing his harassment.

75.     Between late 2015 and 2018, Ms. Newton informally reported Harasser Doran's conduct to Defendant Louis Vuitton personnel on several occasions, including to Defendant Louis Vuitton's in-house employment counsel Employment Counsel Martinez and Real Estate Counsel, both executives with Defendant Louis Vuitton.

76.     In every instance, Defendant Louis Vuitton failed Ms. Newton, in violation of Defendant Louis Vuitton's employment policies.

77.     In an especially egregious failing, on May 30, 2018, Employment Counsel Martinez coldly advised Ms. Newton that he could not report the conduct further within Defendant Louis Vuitton because he worked for the legal department, not HR, a statement which is flatly contradicted by Defendant Louis Vuitton's own Company policy—which upon information and belief Employment Counsel Martinez had assisted in creating.

78.     Upon information and belief, Employment Counsel Martinez intended to and did send the message to Ms. Newton that he did not take her claims seriously, did not care if Harasser Doran was harassing her, Defendant Louis Vuitton did not take her claims seriously, did not care if Harasser Doran was harassing her, and Defendant Louis Vuitton would do nothing to stop the harassment.

***Ms. Newton Emails Harasser Doran on the Instruction of Employment Counsel Martinez,***
***and is Then Reprimanded for Her Email Telling Harasser Doran to Stop Harassing Her***

79.     Following a May 30, 2018, incident involving Harasser Doran once more lingering outside her office and leering at her, Ms. Newton e-mailed Employment Counsel Martinez and Real Estate Counsel Doe to complain again about Harasser Doran's behavior.  Her

actions were in accordance with the complaint procedure outlined in Defendant Louis Vuitton's Company policy.

80.     When Employment Counsel Martinez failed to respond to Ms. Newton, she followed up and called him in his capacity as employment counsel of Defendant Louis Vuitton, pleading with him to do something to stop the harassment.  She told him "I can't be the first or only person he's done this to.  It wouldn't make sense for him to start with me.".  Employment Counsel Martinez did not respond to Ms. Newton's statements and stated that he could not report the conduct Ms. Newton was reporting because he worked for the legal department, not HR, again, directly contradicting Company policy.  Instead of addressing the matter with Harasser Doran himself or encouraging Ms. Newton to file a formal report, he then suggested that Ms. Newton confront Harasser Doran and tell him to stay away.

81.     Ms. Newton responded that, as she had previously explained to Employment Counsel Martinez, she had already made clear to Harasser Doran that his conduct was unwelcome, but it had not made a difference. She also explained that she feared interacting directly with him in person.   In response, Employment Counsel Martinez nevertheless encouraged her to confront Harasser Doran in "no uncertain terms," as if she had not properly conveyed the fact that his sexual harassment was unwelcome and that it was her own fault that it had gone on for years.

82.     Following Employment Counsel Martinez's instruction, and because Ms. Newton feared having any interaction whatsoever, including being alone with Harasser Doran, Ms. Newton sent Harasser Doran an email.  In this email, Ms. Newton referred to Harasser Doran's past incidents, including "loitering," "leering," and "peering," remarks about Ms. Newton's physical appearance and smile, invading Ms. Newton's personal space, and "hanging around."

Ms. Newton referred to this "ongoing pattern" of "inappropriate behavior" as "harassment" and told Harasser Doran to stop his inappropriate conduct and unequivocally stated it was "unwanted and unwelcome." She stated that "[i]t also ma[de] [her] concerned that [he] may have engaged in this type of behavior with others."

83.     In her email, Ms. Newton stated that if the behavior continued, she would report Harasser Doran to Human Resources.

84.     Ms. Newton forwarded this email to Employment Counsel Martinez and Defendant Louis Vuitton's in-house Real Estate Counsel.

### *Martinez, Firestone, and Smith Immediately and Aggressively Begin Their Campaign of Retaliation Against Ms. Newton*

85.     Minutes after Ms. Newton forwarded the email, Employment Counsel Martinez called Ms. Newton from his cell phone after he had left the office for the evening.  He had never previously called her from his cell phone after hours, and Ms. Newton assumed that he had called to make sure that she was OK, or to otherwise assist her as Defendant Louis Vuitton's Employment Counsel. Instead, to Ms. Newton's grave shock, disappointment and immediate fear, he called to reprimand, diminish, insult and attack her.

86.     Employment Counsel Martinez was enraged and stated repeatedly in an accusatory tone that he "now ha[d] to report this," even though he previously claimed he could not report Harasser Doran's behavior.

87.     On the phone, Employment Counsel Martinez initially denied having told Ms. Newton to confront Harasser Doran.  He subsequently admitted that he had told her to confront Harasser Doran but insisted that he had not instructed her to do so in writing.

88.     Employment Counsel Martinez was upset about being presented with a written record of the harassment, the obligation that carried, and the past neglected obligations that

revealed but he did not appear to have any care or concern at all for the harassment itself, or Ms. Newton.

89.     In addition to being angry about the writing, Employment Counsel Martinez repeatedly expressed concern for how Harasser Doran would feel when he read the email.

90.     Outrageously, after making it seem like she had committed a terrible infraction by following his instructions to ask Harasser Doran to stop harassing her, he ended the call by telling Ms. Newton that they could "no longer be friends," and from that time on, Employment Counsel Martinez "unfriended" Ms. Newton and continued to act in a hostile manner towards her in retaliation for reporting the sexual harassment.

### *Defendant Louis Vuitton Conducts a Sham Internal Investigation*

91.     The following day, Ms. Newton received a phone call from Emma Ancelle, the then Senior Director, Talent Development at Defendant Louis Vuitton ("Senior Director of Talent Ancelle"), who had been tasked by Martinez, Firestone, and Senior Vice President of Human Resources, Gena Smith ("SVP of HR Smith") with leading Defendant Louis Vuitton's internal investigation into Ms. Newton's email, under the supervision of Employment Counsel Martinez, SVP of HR Smith and Ms. Newton's supervisor, General Counsel Firestone, and upon information and belief, outside counsel Rex Sessions of Winston & Strawn. No explanation was given as to why independent outside counsel was not conducting the investigation.

92.     Upon information and belief, the outside counsel, SVP Smith, General Counsel Firestone, and Employment Counsel Martinez were guiding Senior Director of Talent Ancelle through the investigation because of Employment Counsel Martinez's failure to address Ms. Newton's prior complaints.

93.     Upon receiving this call, Ms. Newton became hopeful that Defendant Louis Vuitton was taking her complaint of Harasser Doran's sexual harassment seriously. Unfortunately, Ms. Newton quickly learned that Defendant Louis Vuitton had no interest in seriously investigating her complaints and in fact, was extremely angry at her for following their instructions to try to end the sexual harassment after Employment Counsel Martinez had refused to assist.

94.     Senior Director of Talent Ancelle informed Ms. Newton that she had read through the copy of Ms. Newton's email to Harasser Doran which she had requested of Ms. Newton, and summoned Ms. Newton to her office so they could talk "about the email." Previously, Senior Director of Talent Ancelle had always been extremely deferential and respectful to Ms. Newton and Ms. Newton was shocked by her obvious change in behavior towards her after she reported the sexual harassment.

95.     Later that day, Senior Director Talent Ancelle, to the embarrassment of Ms. Newton, had Ms. Newton wait outside her office on the Senior Executives' floor for an extended period of time but Senior Director of Talent Ancelle never appeared for the meeting.  The two subsequently had a brief meeting in Ms. Newton's office during which Senior Director of Talent Ancelle questioned Ms. Newton regarding the email. When Ms. Newton stated that Harasser Doran had been sexually harassing her for years and had assaulted her once, Senior Director of Talent Ancelle asked if he had ever threatened Ms. Newton and asked a series of accusatory questions relating to Ms. Newton's choice of words in her email.

96.     Senior Director of Talent Ancelle, rather than asking about the sexual harassment or assault, asked Ms. Newton who else knew about the email she had sent, and demanded that Ms. Newton forward her any emails she had sent concerning the email to Harasser Doran. Senior

Director of Talent Ancelle also completely disregarded when Ms. Newton told her that the Real Estate Counsel had witnessed some of the harassment.

97.    Senior Director of Talent Ancelle did not ask any follow-up questions regarding the sexual harassment that Ms. Newton had suffered and was uninterested in hearing about Ms. Newton's concerns. Senior Director of Talent Ancelle was far more concerned about how Ms. Newton's email could reflect on Defendant Louis Vuitton's "branding" and image than she was on the actual sexual harassment that Ms. Newton had experienced.

98.    The following day, Senior Director of Talent Ancelle requested another meeting with Ms. Newton.  At this meeting, Senior Director of Talent Ancelle informed Ms. Newton that she had met with General Counsel Firestone—Ms. Newton's supervisor, without first informing Ms. Newton as she had requested—and Employment Counsel Martinez, SVP of HR Smith, and Rex Sessions of Winston & Strawn [inferred] to discuss Ms. Newton's claims before meeting with Ms. Newton.  Senior Director of Talent Ancelle also informed Ms. Newton that she had spoken to Harasser Doran and Real Estate Counsel Doe and had concluded that this was all "just a misunderstanding" or "miscommunication," and that the matter was considered closed.

99.    Senior Director of Talent Ancelle described Harasser Doran's behavior as "mere flirting" and told Ms. Newton that the incident in which he had attempted to kiss Ms. Newton was "what executives do in a French company," suggesting that Ms. Newton was unfamiliar with French culture and should simply tolerate the behavior. Ms. Newton found this excuse to be demeaning, not only because she was indeed very familiar with French culture after living and working in France for several years, but also because he had never greeted her that way before.

100.    Senior Director of Talent Ancelle completely ignored other instances of harassment, including, most egregiously, the incident in which Harasser Doran had lunged at Ms. Newton and pressed his body against hers.

101.    Senior Director of Talent Ancelle then further retaliated against Ms. Newton by reprimanding her for the email she sent Harasser Doran and suggesting that Ms. Newton apologize to her harasser.  Senior Director Talent of Ancelle made the following statements to Ms. Newton:

   a)  The company is placed in a bad light by your emails referring to Harasser Doran as a stalker;

   b)  You need to understand how [Harasser Doran] feels;

   c)  Harasser Doran feels threatened;

   d)  Harasser Doran can't sleep or eat;

   e)  Harasser Doran is concerned that he might lose his job;

   f)  Harasser Doran is demanding an apology from you;

   g)  You should not have sent Harasser Doran an email; and

   h)  Your email was unjustifiably "attacking" Harasser Doran.

102.    Senior Director Talent Ancelle did not express any concern for Ms. Newton even though Ms. Newton had informed her that she had been sexually harassed by Harasser Doran for years.

103.    Ms. Newton lived in constant fear that he would again sexually harass, assault, and/or retaliate against her for reporting him and for refusing to apologize to him as he had demanded and as Defendant Louis Vuitton had encouraged her to do.

104.    Ms. Newton was shocked and demoralized to watch Defendant Louis Vuitton turn the tables on her and retaliate against her, portraying her as the perpetrator and the perpetrator as

the victim. Further, Ms. Newton could not believe she was actually being reprimanded simply for wanting to be free of sexual harassment and assault in her workplace and especially since Employment Counsel Martinez refused to intervene after she had repeatedly sought his help and after he had instructed her to resolve the matter herself.

105.    When Ms. Newton requested that the Company at least instruct Harasser Doran to stay away from her, Senior Director Talent Ancelle replied that Harasser Doran had to be able to do his job as he saw fit.

106.    Senior Director Talent Ancelle's internal "investigation" report, overseen by Employment Counsel Martinez and General Counsel Firestone and, upon information and belief, SVP of HR Smith and Rex Sessions of Winston & Strawn, is a clear reflection of Defendant Louis Vuitton's intent to protect its image at the expense of Ms. Newton and other employees' well-being and safety.

107.    Defendant Louis Vuitton was unconcerned that Harasser Doran had assaulted Ms. Newton and had engaged in inappropriate, sexually charged behavior which made Ms. Newton feel unsafe and emotionally distressed in her work environment.   Instead, Defendant Louis Vuitton was concerned only with and completely focused on how Ms. Newton's email which Employment Counsel had instructed her to send, pleading with Harasser Doran to stop, would reflect on Defendant Louis Vuitton.  Senior Director of Talent Ancelle's report was riddled with inaccuracies and altered Ms. Newton's statements to suit Defendant Louis Vuitton's narrative.

108.    Senior Director of Talent Ancelle went on to further retaliate against Ms. Newton for reporting the sexual harassment by shaming her, as she had during her second meeting with Ms. Newton. She described Ms. Newton's use of words such as "creep" and "stalker" in an email

24

as unprofessional, which was especially humiliating because it was Ms. Newton's job to instruct management on how emails should be written.

109.    On information and belief, prior to this meeting, Senior Director of Talent Ancelle was directed by General Counsel Firestone (who was Ms. Newton's supervisor), Employment Counsel Martinez, SVP of HR Smith, and Defendant Louis Vuitton's outside counsel Winston & Strawn—currently representing Defendant Louis Vuitton in this matter—to instruct Ms. Newton to apologize to Harasser Doran for sending the May 30, 2018, email.

***Ms. Newton Files a Formal Complaint with Human Resources,***
***Despite Being Retaliated Against and Discouraged from Doing so by General Counsel***
***Firestone***

110.    The night before the following business day, on or about June 3, 2018, Ms. Newton emailed General Counsel Firestone describing the prior week's events and expressing concern that she had been treated like the perpetrator and her harasser like the victim.

111.    In her email to General Counsel Firestone, Ms. Newton revealed that she would be submitting a formal report to Human Resources because Harasser Doran's behavior had not stopped, the Company had failed to instruct him to stop, and Ms. Newton was troubled by the company's handling of the situation.

112.    On the same date, June 3, 2018, Ms. Newton filed a formal complaint with SVP of HR Smith. In her complaint, Ms. Newton described the sexual harassment and response of Defendant Louis Vuitton's legal counsel and Senior Director of Talent Ancelle. Ms. Newton requested an investigation by an "outside, impartial, and unbiased expert who has no personal or professional connection to anyone at the company" and requested that the company "refrain from further dismissing, diminishing, or criticizing [Ms. Newton's] concerns, and from taking further steps to prevent [her] from, or reprimand [her] for, raising them." SVP of HR Smith refused to

provide Ms. Newton with Senior Director Talent Ancelle's report or any details regarding her "investigation."

113.     Ms. Newton only wanted Defendant Louis Vuitton to properly investigate her claims and stop Harasser Doran's sexual harassment, and requested the outside investigation because Defendant refused to grant her minimal requests and caused her concern that conflicts of interest were clouding their judgment.

114.     Ms. Newton believed that an outside investigation would show Defendant how little Ms. Newton was requesting and how easily Defendant could address her reports simply by having Harasser Doran stay away from her.

### *Defendant Louis Vuitton Continues to Retaliate Against Ms. Newton by Attempting to Pressure her to Drop her Complaint, Placing the Blame on Her, and Telling Her She Needs to Put Up with Harassment "As A Woman"*

115.     The following day, General Counsel Firestone called Ms. Newton to a meeting. When Ms. Newton entered the room, General Counsel Firestone was already visibly upset with Ms. Newton and questioned why Ms. Newton would file a report, insinuating that by doing so Ms. Newton had harmed General Counsel Firestone.

116.     General Counsel Firestone then asserted that, based on the Company's internal investigation, there was clearly no violation of company policy or the law. When Ms. Newton pointed out that the "investigation" was inadequate and that the talent personnel had hardly asked her any questions, General Counsel Firestone asked why Ms. Newton, as a lawyer, did not ensure Defendant Louis Vuitton's talent personnel had asked better questions of her.

117.     General Counsel Firestone chastised Ms. Newton for supposedly not sending strong enough "cues" to Harasser Doran that she was not interested in his advances and

shockingly went on to tell Ms. Newton that as professional women, there are "certain things we have to put up with" and "sacrifices we have to make."

118.    General Counsel Firestone declared that an outside investigator would be a waste of resources because they would reach the same conclusion reached in Senior Director of Talent Ancelle's report but asked if Ms. Newton would "let things go" if an outside investigator determined that no sexual harassment had occurred. General Counsel Firestone claimed that Ms. Newton only requested an outside investigator because she "wasn't happy with the result" of Senior Director of Talent Ancelle's investigation and accused Ms. Newton of wanting "special treatment."

119.    Ms. Newton could not understand Defendant Louis Vuitton's inconsistency in demonstrating absolute trust in her with advising them and advocating on multi-million-dollar lawsuits on their behalf but so flagrantly ignore her factual statements about the sexual harassment she experienced.

120.    Ms. Newton maintained her request for an independent investigator and finally, a few days later, General Counsel Firestone and SVP of HR Smith suddenly announced to Ms. Newton that they were engaging an external investigator.

***Defendant Louis Vuitton Conducts a Sham External Investigation and Continues to Retaliate Against Ms. Newton for her Reports of Sexual Harassment***

121.    Defendant Louis Vuitton hired an outside investigator (the "Investigator") to conduct the external investigation without requesting any input from Ms. Newton about who the investigator should be. The investigation was merely an attempt to persuade Ms. Newton to stop pursuing her claims.

122.    On or about June 8, 2018, Ms. Newton was interviewed by the Investigator.

27

123.    The Investigator's comments during the interview made clear that the Investigator had been tasked with intimidating Ms. Newton, further retaliating against her on behalf of Defendant Louis Vuitton, and convincing her to put an end to the matter in favor of Defendant Louis Vuitton, rather than using the interview as an opportunity to understand all the facts.

124.    The following are just a few of the comments the Investigator made during her "interview" of Ms. Newton:

a)   As Ms. Newton described the sexual harassment and assault, the Investigator stated it would be "hard to prove;"

b)   The Investigator stated: "I assume you like this job … you don't want to leave," suggesting Ms. Newton's claims could affect her employment;

c)   The Investigator told Ms. Newton that if she continued to press her claims "people will say that you're very thin-skinned.  After all, he didn't really touch you."  When Ms. Newton reminded the Investigator of the time Harasser Doran assaulted her, the Investigator replied dismissively "… except for that one incident…;"

d)   The Investigator asserted that, upon hearing about the sexual harassment, people would say: "alright, so he looked at her.  She's a good-looking girl.  So, what's so terrible?  She should be flattered …;"

e)   The Investigator told Ms. Newton that if she pursues her claims she "will be viewed as, I don't know if I'd say a troublemaker, but you know, you don't get off scot-free;"

f)   The Investigator stated to Ms. Newton: "you don't want him fired because … you know what happens once you get somebody fired … I want to say that to you, that it inures to your detriment, unfortunately … The one who gets somebody else fired, they look like a son of a bitch;"

g)   The Investigator stated that because Defendant Louis Vuitton is part of "a French Company," they "look at these things differently;" and

h)   The Investigator stated that she lived through the "McCarthy era" and that the #MeToo movement reminded her of McCarthyism.

125.    As a courtesy, Ms. Newton provided the Investigator with a few documents such as the email to Harasser Doran, a document summarizing the relevant individuals, and a

document summarizing her professional background to assist the investigator in performing the investigation.

126.    The investigator enthusiastically accepted the documents and expressed appreciation of Ms. Newton's gesture.  Later, in her report, after consulting with the Company, the investigator did an about-face and instead of repeating her appreciation of the documents Ms. Newton provided as a courtesy to facilitate the investigator's investigation, the Investigator criticized Ms. Newton for providing the Investigator with this additional information.

127.    After publicly announcing Harasser Doran's promotion at a Company event in late June, approximately one month later, on or about July 6, 2018, SVP of HR Smith requested a meeting with Ms. Newton and informed her that the Investigator had not found a violation of the company's policy or the law.

128.    SVP of HR Smith refused to provide Ms. Newton with the Investigator's report or any details regarding the investigation.

129.    SVP of HR Smith did inform Ms. Newton that Real Estate Counsel Doe had confirmed that Harasser Doran had "lingered" and "lurked" at Ms. Newton's office and that Ms. Newton expressed discomfort at being seated with him at the holiday party, but SVP of HR Smith continued to maintain that there was "nothing wrong" with this problematic behavior.

130.    Ms. Newton repeated her concerns that she continued to fear for her safety and asked if the Company would do anything to stop Harasser Doran's contact with her.  SVP of HR Smith quipped in a sharp, annoyed tone that because Harasser Doran had done "nothing wrong," the company would not issue any directive or instruction to him.

131.    Defendant Louis Vuitton's treatment of Ms. Newton was particularly troubling given the fact that this Defendant is a company whose customer base is mostly women and whose employees consist mostly of women.

132.    Likewise disappointing was Defendant Louis Vuitton's repeated attempts to deflect Ms. Newton's complaints of harassment by invoking false, negative stereotypes about "French" culture even though, on information and belief, none of the individual actors in this matter is, in fact, French. Specifically, in her "investigation" report and as noted above, Senior Director of Talent Ancelle wrote: "[a]s we are in a French Group, [Ms. Newton] should be aware that many executives may use the French greeting, as well as the US handshake, and she should be prepared to manage these interactions when they happen in a way that feels comfortable for her."

133.    The insinuation that Ms. Newton simply did not understand or fit in with the Company's "French" culture is laughable given that Ms. Newton had lived, worked, and studied in France for several years.[4]  Indeed, Defendant Louis Vuitton informed Ms. Newton that one of the main reasons they had hired her and considered her their "first choice candidate" was because of her vast experience with and knowledge of French culture.

134.    Ms. Newton had asked for nothing more than that Defendant Louis Vuitton instruct Harasser Doran to stop sexually harassing her, but Defendant Louis Vuitton inexplicably bent over backwards to avoid granting her request and instead punished and blamed her for complaining and subjected her to ongoing retaliation.

---

[4] In addition, while employed with multiple companies in France, Ms. Newton had never been subjected to any similar behavior.

IV. **DEFENDANT LOUIS VUITTON'S RETALIATION AGAINST MS. NEWTON ESCALATES, CREATING AN ONGOING RETALIATORY HOSTILE WORK ENVIRONMENT**

135.   On or about June 21, 2018, in the midst of Defendant Louis Vuitton's purported external investigation into Harasser Doran's conduct and before Defendant Louis Vuitton had even discussed the results of the sham investigation with Ms. Newton, Defendant Louis Vuitton publicly announced at the company's annual summer party that Harasser Doran was being promoted.

136.   Soon after Harasser Doran was being celebrated, Ms. Newton began to be subjected to an ongoing retaliatory hostile work environment.

137.   Ms. Newton's supervisor, General Counsel Firestone, began singling out Ms. Newton, suddenly treating her differently to other employees and differently than she had treated Ms. Newton before Ms. Newton had made a formal complaint.

138.   Notwithstanding her previous glowing reviews of Ms. Newton, General Counsel Firestone began to chip away at Ms. Newton's autonomy in the office and was actively trying to take control of Ms. Newton's cases.  General Counsel Firestone had also made comments that she is "watching" or "keeping an eye on" Ms. Newton despite her years of working independently with positive results.

139.   These acts of retaliation left Ms. Newton feeling isolated and targeted by Defendant Louis Vuitton and its employees, including Employment Counsel Martinez and General Counsel Firestone. Because of the actions taken by Defendant Louis Vuitton and its employees, Ms. Newton believed that she was being pushed out of the Company as a direct result of having reported Harasser Doran's improper conduct.

140.    As noted above, in each of the three years preceding Ms. Newton's formal complaint regarding the sexual harassment, Defendant Louis Vuitton gave Ms. Newton flawless performance reviews, devoid of any criticism whatsoever of her performance.

141.    For example, in prior years, General Counsel Firestone wrote the following comments:

- In Ms. Newton's 2015-2016 Performance and Career Review:

  o "[Ms. Newton] has not shied away from dealing with complex matters, on the legal/technical side, as well as the complex inter-relationships between the brands and Paris HQ.  She has ably handled all litigation matters that have come her way."

  o "[Ms. Newton] has brought much needed organization and strategic thinking to her role and is a valued member of the team."

- In Ms. Newton's 2016-2017 Performance and Career Review:

  o "[Ms. Newton] is a client's dream; she is attentive to their needs, handles all matters efficiently and with a calm demeanor, yet she is tough with outside counsel on her clients' behalf."

  o "Ms. Newton's understanding of the Group allows her to consistently handle [] uncertainty when it arises."

  o "Ms. Newton reflects the highest degree of honesty and ethics in all she does."

  o "Ms. Newton goes above and beyond to satisfy her cli[e]nts but also achieve consistent results across the Group. This is a very difficult task and requires a diplomatic touch as well as [] complete focus on the many moving parts litigations encompass."

- In Ms. Newton's 2017-2018 Performance and Career review:

  o That Ms. Newton had "excellent results."

  o "Pushing back against outside counsel is difficult and not without risk; brava."

  o "Ms. Newton continues to build confidence in our maisons as she handles what are stressful (and often costly) matters with aplomb. She is valued externally and internally for her intellect, ability and personal approach."

142.    Nevertheless, in an act of blatant retaliation for exercising her rights, General Counsel Firestone, on or about March 4, 2019, gave Ms. Newton—for the first time—a negative oral review, which was then memorialized in a written review Ms. Newton received on or about March 14, 2019 ("The Review").

143.    The Review contains false and inaccurate statements by General Counsel Firestone.   During her oral review, Ms. Newton requested, and General Counsel Firestone promised to provide, supporting documentation for the inaccurate and unfair characterizations of her performance.   However, to date, Ms. Newton has not been provided with any such documentation.   This is because no such documentation exists. The Review also includes criticism blatantly inconsistent with performance evaluations General Counsel Firestone gave Ms. Newton in all prior years.

144.    In her prior reviews, Ms. Newton consistently received the highest rating available in multiple areas. For example, in her 2016-2017 Performance and Career Review, Ms. Newton received the highest available rating in the categories "coordinate management of litigations and claims involving several "maisons" and "manage outside counsel."  In her 2017-2018 Performance and Career Review, Ms. Newton similarly received the highest available rating in the categories "strategically manage new legal claims and issues" and "strengthen and continue to develop key internal and external business relationships."

145.    Nothing had changed about Ms. Newton's performance in that year.  The only thing that had changed is that Ms. Newton exercised her right to formally assert claims of sexual harassment after Defendant Louis Vuitton repeatedly failed to address her previous claims and attempted to intimidate her out of pursuing them.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to Ongoing Retaliation, Making
her Job as Difficult as Possible***

146.    Defendant Louis Vuitton continued the pattern of retaliation and hostility that
included a variety of punishments meant to stifle Ms. Newton's career, including:  (i) spoiling
her relationships with her internal, international clients, co-workers, and partners; (ii) causing
Ms. Newton humiliation, shame, and "otherness" at the office; (iii) treating her adversely by
engaging in a variety of campaigns to stop Ms. Newton from playing quiet classical piano music
in her office even though she had always been allowed to and even though other employees,
including in-house employment counsel played much louder music in his office; (iv)  excluding
Ms. Newton from hiring decisions; (v) micromanaging and surveilling Ms. Newton; (vi)
interfering with Ms. Newton's ability to attend legal conferences; (vii) giving Ms. Newton lower
annual ratings inconsistently and disparately from the ratings of other employees for similar and
lesser performance; (viii) lowering Ms. Newton's annual salary increases and bonus; (ix) issuing
unsubstantiated  negative feedback in her evaluations;  and (x) intentionally failing and refusing
to introduce Ms. Newton to new employees within the legal department.

147.    On or about April 17, 2019, General Counsel Firestone continued to treat Ms.
Newton differently from her peers by refusing to allow Ms. Newton to be involved with hiring a
new intern, despite Ms. Newton's repeated requests to be involved in the process, in part because
she would be working directly with the new intern.

148.    General Counsel Firestone intentionally failed to even introduce the new intern to
Ms. Newton.

149.    General Counsel Firestone's actions became so unnecessarily hostile that General
Counsel Firestone sent a "Thank You" note to Winston & Strawn's pro bono coordinator who
assisted Ms. Newton on a pro bono event without notifying Ms. Newton or giving her a chance

to sign the card. This was blatant retaliation as General Counsel Firestone usually seeks the signatures of all of the Legal Department members associated with certain projects on gifts/cards sent from the Legal Department, let alone the person she had selected to direct the Pro Bono Program.

150.    On April 22, 2019, General Counsel Firestone began to escalate her retaliation by avoiding in person interactions with Ms. Newton in certain situations. For example, on one issue, General Counsel Firestone only communicated with Ms. Newton through the department's Legal Assistant. General Counsel Firestone would go out of her way, to the Legal Assistant's office, who was further than Ms. Newton's office, to give a document to the Legal Assistant with instructions to give it to Ms. Newton. There was no reason to involve the Legal Assistant outside of intentionally avoiding Ms. Newton.

### *Defendant Louis Vuitton Celebrates Harasser Doran While Continually Subjecting Ms. Newton to Ongoing Retaliation*

151.    Not only did Defendant Louis Vuitton continuously retaliate against Ms. Newton and subject her to ongoing hostility, it also made a show of favoring and celebrating Harasser Doran. First, the Company promoted him and exonerated him from any wrongdoing in 2018, and even went so far as to sit him next to CEO Anish Melwani at the 2019 holiday party.

152.    Following their public display of preference for Harasser Doran and their distaste for Ms. Newton, he became emboldened and frequently visited Ms. Newton's floor where he would talk loudly in the hallway outside of her office, visit General Counsel Firestone in her office only two doors down, and purposefully take the path that passed by Ms. Newton's office instead of the one that did not, and General Counsel Firestone encouraged his visits.

### *The Ongoing Retaliation Worsens after Ms. Newton Files a Complaint in Court and*
### *Defendant Louis Vuitton Publicly Retaliates Against Her*

153.    After Ms. Newton filed a Complaint in New York State Supreme Court on April 23, 2019, Defendant Louis Vuitton spoke to the press,[5] falsely asserting the sham investigations performed did not find "… any evidence to support Ms. Newton's claims … [there was] no violation of company policy or the law."[6] Defendant Louis Vuitton also publicly stated that "There is no merit whatsoever to the allegations."[7]

154.    The investigations Defendant Louis Vuitton publicly claimed found no violation were not sincere investigations at all, but rather an attempt by this Defendant to bully Ms. Newton out of pursuing her complaint and threaten her by telling her that she would be seen as a "thin-skinned" "son of a bitch" and a "troublemaker." Additionally, as stated above, Defendant Louis Vuitton refused to provide any report or documentation to support their claim that the investigation found no violation.

155.    Defendant Louis Vuitton intentionally misled the press to smear Ms. Newton in further retaliation for filing a Complaint in New York State Supreme Court.

### *Defendant Louis Vuitton Further Retaliates Against Ms. Newton by Internally Smearing her*

156.    In response to her lawsuit, Defendant Louis Vuitton repeatedly publicly denounced Ms. Newton both internally and publicly to the media by repeatedly inferring that her allegations were false and she was a liar, despite charging her with responsibilities as a legal executive that required her to display the "highest degree of honesty," "ethics," and integrity for which they had previously lauded her.

---

[5] *See generally* https://www.law.com/newyorklawjournal/2019/04/24/senior-lawyer-at-luxury-brand-house-claims-sexual-harassment-retaliation/?slreturn=20210501095029

[6] https://hypebeast.com/2019/4/lvmh-sued-in-house-new-york-attorney-harassment-retaliation-lawsuit

[7]    https://www.thefashionlaw.com/lvmh-told-attractive-vp-litigator-to-simply-tolerate-years-of-sexual-harassment-per-lawsuit/

157.    As if publicly vilifying Ms. Newton weren't enough, CEO Melwani even went so far as to take the unprecedented step of sending an email to all employees stating that Defendant Louis Vuitton had found no sexual harassment had occurred, creating the inference that Ms. Newton was a liar and directing them to "continue business as usual…" which for Ms. Newton meant enduring continued intense hostility against her.   This was despite Defendant Louis Vuitton's continuing to assign her executive-level responsibilities requiring "honesty," "ethics," and integrity.

158.    After this email was sent, more of Ms. Newton's coworkers, both in and outside her department, began to avoid her and refused to interact with her. When Ms. Newton would attempt to interact with coworkers with friendly greetings, they would ignore her or curtly respond with their head down and immediately walk away.

159.    Upon information and belief, specifically due to CEO Melwani's memo, coworkers were worried that Defendant Louis Vuitton would begin to retaliate against them if they were friendly or interacted with Ms. Newton.

160.    Outside the internal Legal Department, Defendant Louis Vuitton's outside counsel excluded Ms. Newton from a litigation matter after she attempted to give them pertinent information, instead responding directly to the internal client and excluding her. Ms. Newton did not know about this until the internal client approached her informing her that the outside counsel had met with them directly.

161.    Meanwhile, Ms. Newton continued to perform exceptional work at Defendant Louis Vuitton despite the continued overt discrimination and retaliation. Despite her multiple requests and Defendant Louis Vuitton telling Ms. Newton that Harasser Doran was angry and offended by her requests, Harasser Doran was allowed to come and go as he pleased, including,

repeatedly, in the hallway directly in front of Ms. Newton's office.  Smith and Firestone also encouraged Ms. Newton to meet with Harasser Doran and General Counsel Firestone invited him to meetings in her office, located two doors away from Ms. Newton's, on multiple occasions, knowing that would increase his opportunities to harass Ms. Newton.

### *Defendant Louis Vuitton Continues to Ostracize Ms. Newton in Retaliation for Her Complaints*

162.    Before a presentation on April 30, 2019, for Bloomberg Law legal research, upon information and belief, General Counsel Firestone told the presenter to not speak about the one area that would be applicable to Ms. Newton. The presenter even referenced how he had been told not to present on the topic by General Counsel Firestone during the presentation. There was no legitimate reason, outside of the continuing exclusion of Ms. Newton, not to present on the topic.

163.    On or about May 5, 2019, General Counsel Firestone completely took over full control of a litigation matter which Ms. Newton had been handling without notifying Ms. Newton. General Counsel Firestone did not tell Ms. Newton she was off this matter, instead simply taking it over.

164.    On information and belief, General Counsel Firestone was doing everything possible to show Ms. Newton that she was not needed or wanted by Defendant Louis Vuitton.

### *Defendant Louis Vuitton's Ongoing Retaliation Becomes so Severe, Pervasive, and Constant as to Create a Retaliatory Hostile Work Environment for Ms. Newton*

165.    Over the next several months, Ms. Newton's coworkers and General Counsel Firestone continued to retaliate against her and harass her, creating an intolerable, ongoing retaliatory hostile work environment. Some examples of the consistent hostility are:

- On May 13, 2019, General Counsel insisted on Ms. Newton interviewing a potential intern in a place where General Counsel could oversee.

- On or about May 23, 2019, an internal client snapped at Ms. Newton, blaming her for a mistake of another's, when, prior to her complaint and Defendant Louis Vuitton CEO's company-wide email inferring she lied, the client had treated Ms. Newton respectfully, pleasantly, and graciously in all of their interactions. Ms. Newton was forced to go on the defensive and prove that she acted appropriately, only to be met with the client's continued beratement of Ms. Newton.

- On May 27, 2019, General Counsel Firestone openly ignored and fought against Ms. Newton's advice, despite outside counsel agreeing with Ms. Newton.

- On May 28, 2019, a colleague aggressively accused Ms. Newton of supposedly usurping a brand executive's role in a litigation claim. Again, prior to Ms. Newton's complaints and the company-wide email, this colleague was consistently friendly with Ms. Newton.

- On June 10, 2019, General Counsel Firestone inexplicably started to micromanage and oversee a simple draft settlement agreement revision, instructing Ms. Newton to send her revisions to General Counsel Firestone before sending them to the internal client, never having instructed Ms. Newton to do that before. Notably, the settlement agreement pertained to a gender discrimination case. On information and belief, General Counsel specifically wanted to closely watch how Ms. Newton would respond to a gender discrimination settlement agreement.

- In or around June 2019, General Counsel Firestone and Employment Counsel excluded Ms. Newton from selecting a new paralegal on whom Ms. Newton would be

heavily relying, something which they repeatedly did during the entire, months-long hiring process.

- During a legal conference in Paris, France, the U.S. General Counsel of the Louis Vuitton brand ("LV Brand GC") owned by Defendant Louis Vuitton, who is very close to General Counsel Firestone, largely ignored Ms. Newton through the entire conference, and when she did acknowledge Ms. Newton, it was to cut her off mid-sentence, and walk away with another colleague while Ms. Newton was speaking so as to force her to stop talking out of embarrassment. She did it so blatantly that another employee looked shocked at how rude the LV Brand GC had been. Prior to the complaint, LV Brand GC was generally friendly with Ms. Newton, requesting lunches with Ms. Newton outside the office where they would exchange professional and personal stories, and would hug her when saying hello or goodbye, and encourage her to apply to General Counsel roles and offer to introduce her to General Counsel at other companies to expand her network and facilitate her career growth. The LV Brand GC subsequently avoided Ms. Newton generally and at Legal Group gatherings, rejected Ms. Newton's attempts to share potential work-related opportunities with her, and was overly aggressive with Ms. Newton in her interactions relating to the pro bono program.

- At the same legal conference, a coworker notified Ms. Newton that other colleagues had been making negative comments about Ms. Newton and her case.

- On July 18, 2019, Defendant Louis Vuitton excluded Ms. Newton from a company event.

- July 30, 2019, colleagues in the Legal Group were rude and hostile during a conference call while trying to convince Ms. Newton that she needed to perform duties which were not hers. When Ms. Newton told them to reach back out to the Employment Counsel Martinez who was responsible, the colleagues huffed, "Fine," and hung up on Ms. Newton.

- On August 18, 2019, while on a company-approved remote workday, Employment Counsel Martinez began to send multiple, unnecessary emails to make sure that Ms. Newton was actually performing work duties during the remote workday. There was no indication that Ms. Newton was not working.

- On August 20, 2019, Employment Counsel Martinez came into Ms. Newton's office upon her arrival for no reason other than to monitor what time she arrived.

- Later in the day, on August 20, 2019, General Counsel Firestone and Employment Counsel again refused to let Ms. Newton be involved in hiring an intern in the department.

- On September 9, 2019, General Counsel Firestone emailed Ms. Newton on a remote workday for an update on a matter which she had never done in that manner before. The only reason for General Counsel to email Ms. Newton was, again, to make sure that she was actually working on the remote workday.

- During an event on October 25, 2019, Ms. Newton approached a group of Defendant Louis Vuitton executives and said hello. When SVP of HR Smith turned around, she physically jumped back in surprise, which immediately turned to a scowl and she turned back around, ignoring Ms. Newton.

- Defendant Louis Vuitton excluded Ms. Newton from an event where a colleague was receiving an award.

- On December 12, 2019, General Counsel Firestone began to communicate directly with Defendant Louis Vuitton's auditors, a job that General Counsel Firestone previous told Ms. Newton to handle independently, particularly based on Ms. Newton's previous career as an auditor. Again, General Counsel Firestone was micromanaging Ms. Newton and making it difficult for her to perform her duties.

- On December 12, 2019, the CFO of one of Defendant Louis Vuitton's brands was rude and condescending in an email Ms. Newton sent with important information he needed, and then inferred that Ms. Newton's assistance was not needed nor wanted. When Ms. Newton brought these exchanges to General Counsel Firestone's attention, she dismissively downplayed them, describing the CFO as "prickly."

- On December 14, 2019, during Defendant Louis Vuitton's holiday party, the most high-profile event of the year and an important opportunity for employees to network, Defendant Louis Vuitton intentionally seated Ms. Newton in a far corner behind a large pillar, completely blocking her from viewing the presenters during the event and preventing others from interacting with her. Defendant Louis Vuitton also seated Ms. Newton next to the same SVP of HR Smith who had co-managed the sham investigations in 2018 and scowled at her at the October 2019 event and told Ms. Newton the results of the sham investigation and that the sexual harasser would not be reprimanded because "he didn't do anything wrong." Upon information and belief, Defendant Louis Vuitton intentionally sat Ms. Newton at this location to make her feel uncomfortable and monitor her during the holiday party.

- On January 7, 2020, Defendant Louis Vuitton tried to force Ms. Newton to work with her sexual harasser. Ms. Newton asked the outside counsel to primarily handle the matter because working with her harasser caused Ms. Newton extreme emotional distress. Despite this, General Counsel Firestone asked Ms. Newton if she would like to be more involved in the matter by being copied on emails from her harasser, knowing that Ms. Newton had repeatedly asked not to interact with her harasser and asked that her harasser physically stay away from her.

- The next day, on January 8, 2020, Ms. Newton's harasser copied her on an email even though he knew she did not want him to interact with her and that the outside counsel was handling the matter. Upon information and belief, both General Counsel Firestone's and Harasser Doran's behavior was meant to intimidate and harass Ms. Newton.

- On January 22, 2020, after Ms. Newton had requested some vacation days, General Counsel Firestone came into Ms. Newton's office yelling such that the paralegals, assistant, and other attorneys could hear, and flailing her arms around to reprimand Ms. Newton. General Counsel Firestone said that Ms. Newton was using a remote workday as a vacation day because the date was not included in the vacation request but the days before and after were. Ms. Newton calmly explained the day she had not requested to use a vacation day was a holiday, not a remote workday. General Counsel Firestone merely responded, "oh, I didn't check," and left Ms. Newton's office. It was obvious to Ms. Newton that General Counsel Firestone was actively looking for any reason to publicly reprimand Ms. Newton.

- The next day, on January 23, 2020, the General Counsel again stormed into Ms. Newton's office to reprimand her for the way Ms. Newton phrased an email response. There was no reason for General Counsel Firestone to be micromanaging Ms. Newton in this manner and General Counsel Firestone did not treat employees who did not complain of sexual harassment in this manner.

166.    On information and belief, Defendant Louis Vuitton constantly targeted Ms. Newton and continually retaliated against her for her complaints of sexual harassment and harassed her to create such an ongoing retaliatory hostile environment to attempt to get her to resign from her position and in retaliation for her complaints.

### *Defendant Louis Vuitton Appeals NY Supreme Court's Decision Denying Their Motion to Compel Arbitration of Her State Supreme Court Case Alleging Sex Discrimination*

167.    On or about April 23, 2019, Ms. Newton filed a Complaint in New York state court alleging sexual harassment, assault, and retaliation in violation of the New York State and City Human Rights Laws.

168.    Eight days after Ms. Newton filed her sexual harassment, assault, and retaliation lawsuit against Defendant Louis Vuitton in State Supreme Court, County of New York, Defendant Louis Vuitton filed a motion to compel arbitration on May 1, 2019.  Defendant Louis Vuitton published Ms. Newton's salary and home address in their motion to compel arbitration, jeopardizing her safety and her career. Upon information and belief, they did so on purpose.

169.    After the State Supreme Court denied Defendant's motion to compel arbitration on July 10, 2020, Defendant Louis Vuitton appealed.   On March 18, 2021, the Appellate Division, First Department reversed the order of State Supreme Court and ordered that Ms. Newton's claims be adjudicated in arbitration. This ruling was issued prior to the Ending Forced

Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").  Ms. Newton's disputes with Defendant Louis Vuitton have remained in arbitration since that time.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Setting Her Up to Fail with a Client and Transferring Additional Work to Her***

170.    On February 12, 2020, during Ms. Newton's annual evaluation meeting, General Counsel Firestone acknowledged how much work Ms. Newton had done in 2019, handling approximately 245 matters – a number which surprised General Counsel Firestone, which Ms. Newton had completed despite the ongoing retaliatory hostile work environment that Defendant had created.

171.    However, after acknowledging how much work Ms. Newton was doing, General Counsel Firestone told Ms. Newton that she would be taking over a set of matters from a colleague. Even though Ms. Newton's colleague had done considerable work on the project, General Counsel Firestone insisted on the file being transferred to Ms. Newton.

172.    To add to Ms. Newton's workload and stress levels, her colleague did not send Ms. Newton any of the relevant file documents, so Ms. Newton did not know what type of advice her colleague had previously rendered on the matters.

173.    Ms. Newton repeatedly asked for the file, to no avail.

174.    Despite knowing that Ms. Newton did not have any information about the file or have access to any relevant information, Ms. Newton's colleague sent Ms. Newton, copying General Counsel Firestone, an inquiry from the client regarding the matter, expecting Ms. Newton to address the client's concern while simultaneously not providing Ms. Newton with any of the relevant information.

175.    Ms. Newton had no way of responding to the client because she had no information on what had previously been advised.

### *Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Giving Her an Unwarranted Negative Performance Review*

176.    On March 12, 2020, Defendant Louis Vuitton told all employees that they may work remotely due to the COVID-19 pandemic.

177.    On March 13, 2020, Ms. Newton emailed Defendant Louis Vuitton requesting that she be able to work remotely due to underlying medical conditions which made her high risk with regards to COVID-19.

178.    Defendant Louis Vuitton approved Ms. Newton's request to work remotely.

179.    That same day, on March 13, 2020, General Counsel Firestone submitted her comments to Ms. Newton's self-evaluation, which Ms. Newton had previously completed.

180.    General Counsel Firestone's comments were negative and completely without merit or downplayed her accomplishments, intended to further antagonize Ms. Newton.

### *Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment*

181.    Throughout the rest of 2020, Ms. Newton's colleagues and General Counsel Firestone continued to subject her to an ongoing retaliatory hostile work environment by continuing to micromanage, harass, and refuse to cooperate with Ms. Newton, making it incredibly difficult for her to perform the functions of her job. Examples of this include:

- On April 27, 2020, Ms. Newton's colleagues intentionally left her out of discussions regarding a litigation matter under Ms. Newton's purview, and then incorrectly accused Ms. Newton during conferences of not doing her job correctly, forcing her to have to repeatedly defend herself against the untrue accusations.

- In July 2020, Defendant Louis Vuitton continued to tell the media that "the allegations in this matter were thoroughly investigated and are entirely without merit," even though the investigations referred to were shams meant only to intimidate Ms. Newton.

- In July 2020, citing budget cuts, General Counsel Firestone denied Ms. Newton's request to attend a virtual legal conference, which was a benefit offered to employees by Defendant Louis Vuitton, while, upon information and belief, approving Ms. Newton's colleague to attend a different, costly in-person legal conference.

- On or about September 9, 2020, Defendant Louis Vuitton excluded Ms. Newton from a high-profile litigation matter even though it fell squarely within her role and responsibilities. On information and belief, Defendant Louis Vuitton did not want the employee who complained of and reported sexual harassment, assault, and retaliation being seen to be involved in a high-profile case.

- On or about September 24, 2020, Ms. Newton complained about being excluded from the high-profile litigation to General Counsel Firestone. General Counsel Firestone dismissed Ms. Newton's complaint and attempted to make up excuses as to why she was excluded on a case that clearly fell within her role. After Ms. Newton pressed back against General Counsel Firestone's excuses, General Counsel Firestone unprofessionally snapped at Ms. Newton, "Andowah – Stop!" When Ms. Newton asked why General Counsel Firestone had reprimanded her in that manner, and continued to explain she thought it was wrong to be excluded, General Counsel Firestone coldly stated that Ms. Newton had "made it clear" that she felt that way.

182.     Despite this constant barrage of retaliation, Ms. Newton continued to perform her duties diligently and effectively.

### _Ms. Newton Requests a Reasonable Accommodation_

183.    On September 30, 2020, Defendant Louis Vuitton notified the employees that they would return to the office two days per week unless they had medical issues. At a regularly-scheduled conference call around the same time, Defendant Louis Vuitton told employees that anyone with childcare or medical issues would be able to get an accommodation, including being able to work remotely.

184.    On October 1, 2020, Ms. Newton emailed HR Benefits Manager, Andrea Kuglstatter ("HR Manager Kuglstatter") that she had medical issues and would like to continue working remotely two days per week but come into the office from time-to-time for important meetings or to collect important documents.

185.    Ms. Newton had been hospitalized on two separate occasions for several days at a time earlier in the year due to a medical condition, which she expressed to HR Manager Kuglstatter was one of the reasons she believed she was at a higher risk for COVID-19. She elaborated that she could come to the office for short periods of time as needed.

186.    HR Manager Kuglstatter responded that Defendant Louis Vuitton would need a note from Ms. Newton's health care provider regarding the nature of the medical condition and the nature and duration of any restrictions/reasonable accommodations. HR Manager Kuglstatter requested that Ms. Newton provide the note within the next week, knowing that Ms. Newton would be on an approved vacation during that time and would not be able to see her healthcare provider within the requested timeframe.

187.    Ms. Newton responded that she would not be able to get a note to Defendant Louis Vuitton during that time period because of her pre-scheduled vacation and offered to provide the note as soon as she could.

188.   On October 14, 2020, while HR Manager Kuglstatter knew Ms. Newton was on vacation, she emailed Ms. Newton asking if Ms. Newton had obtained a note from her provider, even though Ms. Newton had told HR Manager Kuglstatter that she would not be able to until she returned from her vacation.

189.   On information and belief, Defendant Louis Vuitton did not insist that other employees who needed the accommodation of working remotely provide a note from their health care providers, or if they did, not as quickly as Defendant Louis Vuitton was insisting Ms. Newton provide one.

190.   On information and belief, employees who did not complain about discrimination and sexual harassment were able to easily request and be approved to work remotely, including from other areas of the country.

191.   When Ms. Newton returned to work on October 19, 2020, she immediately notified HR Manager Kuglstatter that her provider would be able to get her a note the next day.

192.   On October 19, 2020, Ms. Newton provided Defendant Louis Vuitton with the note from her provider requesting the reasonable accommodation of working remotely.

193.   Several hours later on the morning of October 20, 2020, Defendant Louis Vuitton granted Ms. Newton's reasonable accommodation request through January 21, 2021, at which point HR Manager Kuglstatter told Ms. Newton she would need an updated note from her provider.

194.   HR Manager Kuglstatter told Ms. Newton that she would need to notify General Counsel Firestone that her request had been approved.

***Defendant Louis Vuitton Continues to Create A Sexually Hostile Work Environment***

195.    On October 28, 2020, during Defendant Louis Vuitton's annual Fall Assembly, the SVP of Architecture, Harasser Doran's supervisor, introduced a new, female employee approximately 50 years old. On information and belief, this employee would be replacing Ms. Newton's harasser, as he was retiring from Defendant Louis Vuitton. When the SVP of Architecture introduced the woman, he made a comment regarding the woman being hired being "far better-looking" than Ms. Newton's harasser. Ms. Newton's harasser replied that he "didn't know" about that.

196.    This entire exchange, which took place with the permission of CEO Melwani who was standing near both Harasser Doran and his supervisor at the front of the room, made Ms. Newton incredibly uncomfortable because the SVP of Architecture was openly joking about the looks of the man who sexually harassed Ms. Newton and the woman recently hired to replace that man.

197.    Ms. Newton felt the senior executives at Defendant Louis Vuitton were acting as though Harasser Doran's sexual assault and harassment never happened, or worse, that they were mocking or making light of it.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile
Work Environment by Failing to Match Donations to the Charity She Founded in Memory of
Her Baby Brother***

198.    Defendant Louis Vuitton provides a benefit to employees by matching donations made by the employee to various charitable organizations.

199.    Ms. Newton regularly donates to a nonprofit that she founded in honor of her youngest brother who had passed away at the age of 25, The Ryan Andrews Newton Fund.

200.    In 2019 and 2020, Ms. Newton donated to The Ryan Andrews Newton Fund and provided the documents necessary for Defendant Louis Vuitton to match her donation.

201.    On November 11, 2020, the Treasurer of The Ryan Andrews Newton Fund reached out directly to HR Manager Kuglstatter because the Fund never received the 2019 matching donation.

202.    Despite HR Manager Kuglstatter informing the Treasurer that she would look into the donation, she did not do so for approximately one month.

203.    Finally, after multiple attempts to follow-up on the donation match by the Fund and Ms. Newton providing HR Manager Kuglstatter with the application forms, HR Manager Kuglstatter reached out to Ms. Newton on December 15, 2020, and requested additional paperwork to complete the donation match.

204.    Defendant Louis Vuitton had never requested these additional documents for donation matches including other donation matches made by Ms. Newton, and on information and belief did not request them of any other employees who were seeking to have their donations matched by Defendant Louis Vuitton to the charities of their choice.

205.    On January 25, 2021, The Ryan Andrews Newton Fund Treasurer again reached out to HR Manager Kuglstatter, after supplying the extra documentation, in an attempt to obtain the matching donation but HR Manager Kuglstatter did not respond.

206.    Defendant Louis Vuitton failed to submit matching donations and then required unnecessary documents when it finally looked into the matter.  After numerous requests by Ms. Newton and a Board member of The Ryan Andrews Newton Fund, Defendant Louis Vuitton finally made the matching donations to The Ryan Andrews Newton Fund, over a year and

several months, respectively, after they were initially requested and long after Defendant Louis Vuitton made the matching donation to another organization to which Ms. Newton had donated.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Fighting All Requests Made by her and Giving her a Negative Performance Review***

207.    On January 3, 2021, Defendant Louis Vuitton closed its offices due to the resurgence of COVID levels, and HR Manager Kuglstatter told Ms. Newton she no longer needed to provide a medical note, because all of the employees were working remotely.

208.    On January 6, 2021, in an effort to continually subject Ms. Newton to an ongoing retaliatory hostile work environment, General Counsel Firestone delayed the processing of Ms. Newton's expense report for remote working expenses during the pandemic, despite Defendant Louis Vuitton repeatedly encouraging all employees to seek reimbursement for remote working expenses during the pandemic.

209.    General Counsel Firestone insisted that Ms. Newton "walk her through" Ms. Newton's expense report, something that General Counsel Firestone had never asked Ms. Newton to do and, on information and belief, did not require other employees to do.

210.    Only after Ms. Newton provided a detailed list of each expense and documents supporting the expenses, repeating information already on the originally submitted expense report, did General Counsel Firestone approve the reimbursement.

211.    On February 1, 2021, Defendant Louis Vuitton informed all employees that it would be reinstating the two-day in-office work requirement on February 16, 2021. At this time, HR Manager Kuglstatter requested that Ms. Newton provide a second note from her medical provider by February 12, 2021. Ms. Newton immediately responded that she would provide the note.

212.    On January 7, 2021, while Defendant Louis Vuitton's mandatory remote working order was still in place, Ms. Newton reserved a trip beginning on February 6, 2021, to work remotely and take pre-approved vacation days.

213.    On February 12, 2021, Ms. Newton sent HR Manager Kuglstatter the updated note requesting the reasonable accommodation for working remotely, the same request she made in October 2020.

214.    On February 16, 2021, four days after Ms. Newton submitted her second reasonable accommodation request, General Counsel Firestone gave Ms. Newton a negative performance review.

215.    During a video conference regarding Ms. Newton's performance evaluation, General Counsel Firestone minimized Ms. Newton's accomplishments and continually stated that her work was not as good as her colleagues' work.

216.    The evaluation was in stark contrast from performance reviews Ms. Newton had received prior to her complaint of sexual harassment, assault, and retaliation, as described above.

217.    General Counsel Firestone also suggested that Ms. Newton revise the following-year goals portion of the annual evaluation to include, among other things, that she put together an in-house panel for diverse law students. Ms. Newton had previously told General Counsel Firestone that, as the sole Black attorney in the legal department, she did not feel comfortable creating this panel because she would then become, in addition to the Pro Bono Program Director, the office's de-facto point person for all diversity matters, a role she thought was inappropriate for her to be tasked with given the documented research concerning employers' "taxing" Black and other underrepresented employees with additional responsibilities and

obligations related to diversity initiatives, some of which research Ms. Newton provided to General Counsel Firestone.

218.    During this conference, Ms. Newton also informed General Counsel Firestone that the location to which she'd traveled instituted a COVID-related "pause," so Ms. Newton would postpone her scheduled vacation days to a date after the pause was lifted, and instead she would continue to work remotely, as she had been successfully doing.

219.    General Counsel Firestone did not object to Ms. Newton's plan, only saying that she "do[es] not feel sorry for [Ms. Newton]."

### *Defendant Louis Vuitton Pre-textually Reprimands Ms. Newton for Working Remotely*

220.    After Ms. Newton submitted the exact same request for reasonable accommodation on February 12, 2021, as she had in October 2020, HR Manager Kuglstatter unexpectedly told Ms. Newton that an additional note was required.

221.    On February 23, 2021, HR Manager Kuglstatter told Ms. Newton that Defendant Louis Vuitton needed the additional physician's note because it just found out that Ms. Newton had been working from the remote location, despite General Counsel Firestone and Ms. Newton discussing this weeks before and Ms. Newton successfully competing all of her tasks.

222.    HR Manager Kuglstatter then condescendingly and aggressively stated that Ms. Newton working remotely from the remote location was inconsistent with Ms. Newton's reasonable accommodation request and the note Ms. Newton provided.

223.    Ms. Newton explained that was inaccurate, but HR Manager Kuglstatter disregarded Ms. Newton and continued to robotically repeat the need for a third medical note.

224.    HR Manager Kuglstatter told Ms. Newton she needed to provide the note by March 8, 2021, which was also during her scheduled vacation.

225.    During the call, Ms. Newton again notified HR Manager Kuglstatter that The Ryan Andrews Newton Fund had still not received the matching donations, and again, HR Manager Kuglstatter dismissed Ms. Newton's request.

### *Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Lowering Her Annual Compensation Increase*

226.    On February 24, 2021, based on the pretextual negative performance evaluation, General Counsel Firestone told Ms. Newton that her salary would again increase by one-third less than her annual salary increases prior to her complaint of sexual harassment and that her bonus compensation would also decrease by one third, ultimately decreasing Ms. Newton's anticipated compensation by approximately $20,000 annually.

227.    This reduction resulted in Ms. Newton receiving even less compensation than her male peers.

### *Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Continuously Pre-Textually Reprimanding her*

228.    On March 1, 2021, while Defendant Louis Vuitton knew that Ms. Newton was on an approved vacation, HR Manager Kuglstatter sent Ms. Newton an email incorrectly stating that Ms. Newton working in the remote location was inconsistent with her reasonable accommodation request.

229.    The email baselessly asserted that Ms. Newton's travel was in direct conflict with her reasonable accommodation request because it involved "a significant degree of exposure to the general public."

230.    This was factually inaccurate as the location had required negative PCR testing and in-room quarantines by all entrants and had been on a COVID-related "pause" for most of Ms. Newton's time there, which Defendant Louis Vuitton knew, and Ms. Newton had been

working from where she was staying, avoiding interactions with the public. She had to quarantine in her hotel room initially, then when she was later permitted to leave her room, she stayed on the hotel property and adjoined land, which was nearly empty.

231.    On information and belief, Defendant Louis Vuitton was using the fact that Ms. Newton was working remotely from another location as another excuse to reprimand her in its continued efforts to subject her to a retaliatory hostile work environment for her complaints of sexual harassment.

232.    Despite the blatant misrepresentations by Defendant Louis Vuitton about Ms. Newton's travel making it necessary to provide a third physician's note, Ms. Newton actively tried to provide the requested note.

233.    While Ms. Newton was on a pre-approved vacation, Defendant Louis Vuitton agreed that she could provide the third note when she finished her vacation, after the March 8, 2021 deadline.

234.    Even though Defendant Louis Vuitton agreed that Ms. Newton could supply her note after March 8, 2021, on March 9, 2021, after not receiving the note, Defendant Louis Vuitton emailed Ms. Newton reprimanding her for not supplying the note by March 8, 2021.

235.    At this point, Defendant Louis Vuitton was so preoccupied with finding pre-textual ways to reprimand Ms. Newton to further subject her to an ongoing retaliatory hostile work environment, it was reprimanding her for things it had actively approved.

***Defendant Louis Vuitton Denies Ms. Newton's Request for a Reasonable Accommodation in an effort to Further Subject her to an Ongoing Retaliatory Hostile Work Environment for her Complaints of Sexual Harassment, Violates Her Privacy, and Humiliates and Triggers Her Trauma by Making Unreasonable Requests for Details about Her Medical Condition and Denying that the Sexual Harassment and Assault Occurred, Forcing Her to Take Disability Leave***

236.    Upon Ms. Newton's return to New York, she immediately emailed Defendant Louis Vuitton to say she had reached out to her physician for a third accommodation request and reiterated that her remote work during her trip and her vacation were not in conflict with her previous accommodation request.

237.    At this time, Ms. Newton also complained that Defendant Louis Vuitton's continued insistence on a third physician's note was continued retaliation for her complaints of sexual harassment.

238.    On March 19, 2021, Ms. Newton provided two notes from her therapists requesting the reasonable accommodation of working remotely due to her "significant anxiety as a result of a pattern of harassment towards her since she filed a formal internal complaint in 2018," and "depression related to her workplace environment."

239.    Even though Defendant Louis Vuitton had received two therapist notes from Ms. Newton, in addition to the two it had already received from her medical doctor, requesting she work remotely, on March 22, 2021, Defendant Louis Vuitton escalated her request to SVP of HR Smith, on information and belief to intimidate Ms. Newton. SVP of HR Smith reprimanded Ms. Newton for not having submitted a physician's note and required her to provide an onslaught of unnecessarily detailed and humiliating information in her request—which necessarily referred to conduct by SVP of HR Smith, General Counsel Firestone, and Employment Counsel Martinez— in an attempt to make it as difficult and demeaning as possible for Ms. Newton to obtain her reasonable accommodation.

240.    Upon information and belief, this communication as well as all of the other communications beginning in February 2021 and relating to Ms. Newton's accommodation request were drafted by Employment Counsel Martinez, whose conduct, along with SVP of HR Smith and Firestone's, was among the bases Ms. Newton's therapists had identified for her medical condition -- of which Defendant Louis Vuitton was made aware by the first set of therapist notes.

241.    In 2021, Defendant Louis Vuitton requested that Ms. Newton inform the Company about all of the alleged retaliation since 2018, the names of the employees who were retaliating, the dates on which the retaliation occurred, and an explanation of the harassment which was referenced in the notes submitted from Ms. Newton's therapists. It had not done the same with the previous notes she submitted for a physical condition.

242.    SVP of HR Smith's email even went so far as to instruct Ms. Newton to "keep in mind" when providing her therapists' notes that the sham investigations Defendant Louis Vuitton had done in 2018—organized by SVP of HR Smith herself—"found no basis for your alleged claims of  harassment," even though those investigations completely disregarded Ms. Newton and her colleague's statements about the harassment, Ms. Newton's statements about the assault and never investigated the ongoing retaliation she was being subjected to as a result of her complaints of sexual harassment, and about which Ms. Newton was now complaining.

243.    These details had nothing to do with and were not needed to approve Ms. Newton's reasonable accommodation request as she was requesting a reasonable accommodation due to being high risk for COVID-19 and because she was suffering from anxiety and depression–Defendant Louis Vuitton's opinion as to what was and was not retaliation or

misconduct by their employee was irrelevant to any interactive process regarding Ms. Newton's therapists' confirmed disabilities.

244. This email required Ms. Newton to submit the note and responses—containing information regarding retaliation inflicted by the very people requesting the additional information—to Defendant Louis Vuitton's questions within five days and that if Ms. Newton did not meet the deadline, Defendant Louis Vuitton would deny Ms. Newton's reasonable accommodation request.

245. On information and belief, Defendant Louis Vuitton was not requiring such excessively detailed and intrusive documentation from Ms. Newton's peers who requested to work remotely. In fact, based on emails sent at the beginning of the pandemic, Defendant Louis Vuitton was readily allowing other employees to work remotely from locations the same distance away as the location Ms. Newton had selected.

246. Ms. Newton responded to Defendant Louis Vuitton by reiterating her complaints of continued retaliation. She pointed out the multiple factual inaccuracies of Defendant Louis Vuitton's previous emails and questioned what exactly was needed in the third medical note request because SVP of HR Smith's previous emails focused on her complaints of retaliation, not her medical condition or request for accommodation, and Defendant Louis Vuitton had now received two notes from a physician and two notes from two therapists.

247. On March 30, 2021, instead of engaging in any form of interactive process with Ms. Newton or clarifying its request, Defendant Louis Vuitton stated that it was granting but effectively denied Ms. Newton's request for a reasonable accommodation based on her physical medical condition and mandated that Ms. Newton needed to "resume working in the office two days per week," beginning on April 1, 2021 but tolled that start date while it requested even

further information on her mental health medical condition.  Defendant Louis Vuitton's March 30 email also required Ms. Newton to submit the additional notes and responses—again knowing they would contain information regarding retaliation inflicted by the very people requesting the additional information.  Ms. Newton responded to Defendant Louis Vuitton by reiterating her complaints of continued retaliation.

248.    Ms. Newton complied with Defendant Louis Vuitton's unreasonable requests and provided two more additional notes from two different medical providers.  She pointed out the multiple factual inaccuracies Defendant Louis Vuitton repeated regarding her accommodation request based on her physical medical condition as well as the conflicts of interest, violations of privacy, HIPAA issues, and attorneys' ethics violations raised by Defendant Louis Vuitton's renewed additional requests regarding her mental health medical condition.  Defendant Louis Vuitton totally ignored Ms. Newton's suggestion that her accommodation request be reviewed by a third party due to those concerns and issues.  It also ignored her request Defendant Louis Vuitton take steps to protect her privacy and confidentiality regarding her medical conditions.

249.    On April 20, 2021, Defendant Louis Vuitton denied Ms. Newton's request for a reasonable accommodation based on her mental health medical condition and mandated she needed to "resume working in the office two days per week," beginning the following week.  In total, Defendant Louis Vuitton had received six separate detailed medical notes from three different medical providers validating and emphasizing the need for Ms. Newton to work remotely.

250.    Defendant Louis Vuitton refused to engage in any form of interactive process regarding Ms. Newton's request to work remotely due to her anxiety and depression, and used the interactive process regarding her request to work remotely as a vehicle to further subject her

to an ongoing retaliatory hostile work environment, aggressively arguing their defenses to her claims of retaliation, humiliate her, and retrigger her trauma.

251.    On information and belief, Defendant Louis Vuitton was still allowing Ms. Newton's peers to work remotely, including from areas far outside of the New York region but requiring significantly less information.

252.    Due to the ongoing retaliatory hostile work environment and Defendant Louis Vuitton's continued retaliatory actions violating her privacy, humiliating her, and retriggering her trauma in connection with her reasonable accommodation request, Ms. Newton was forced to go on disability leave on April 21, 2021, through mid-July 2021.

253.    While on disability leave, Defendant Louis Vuitton continued to send Ms. Newton work to be performed.

### *Ms. Newton Returns to the Ongoing Retaliatory Hostile Work Environment at Defendant Louis Vuitton*

254.    On or about July 13, 2021, Ms. Newton returned from leave, only to continue to be subjected to an ongoing retaliatory hostile work environment.

### *Ms. Newton Requests Reasonable Disability Accommodations*

255.    In or about September 2021, Defendant Louis Vuitton increased its in-office working requirement from 2 days to 3 days per week.

256.    On or about October 20, 2021, outside counsel Rex Sessions of Winston & Strawn excluded Ms. Newton from an email invitation to attend a Zoom program by his firm, which he sent to all of Ms. Newton's attorney VP colleagues in Defendant Louis Vuitton's legal department, including Employment Counsel Martinez, as well the Compliance Department.

257.    Ms. Newton began to experience such extreme and severe anxiety while present in the office that her health care providers diagnosed her with PTSD and again determined that she should be working remotely.

258.    On or about November 5, 2021, Ms. Newton submitted a reasonable accommodation request based on her PTSD diagnosis, requesting to work remotely for 6 months.

259.    In addition, Ms. Newton submitted a detailed medical note from her psychiatrist—which included her PTSD diagnosis and the detrimental effect her current office work environment had on her mental health—recommending that Ms. Newton be allowed to work remotely for at least 6 months while she underwent treatment.

260.    On or about November 9, 2021, Defendant Louis Vuitton responded to Ms. Newton's request for disability accommodations and psychiatry note, insisting they were insufficient and requesting further information.

### *Ms. Newton Testifies Before Congress About the Sexual Harassment and the Ongoing Retaliation She Continues to Endure at Defendant Louis Vuitton*

261.    On or about November 16, 2021, Ms. Newton, together with three other survivors of sexual harassment, assault, and retaliation in the workplace, complied with Congress's subpoena and engaged in the protected activity of speaking out against and objecting to the ongoing retaliatory hostile work environment she was being subjected to as a result of her complaints of sexual harassment and assault by testifying before Congress about the sexual harassment and assault she endured at Defendant Louis Vuitton, Defendant Louis Vuitton's refusal to protect her from sexual harassment and assault, and the ongoing retaliatory hostile work environment she continued to face as a then employee of Defendant Louis Vuitton.

262.    Following her Congressional testimony, the ongoing retaliatory hostile work environment that Ms. Newton had long suffered worsened and grew even more hostile and she

began to feel extreme exclusion and venomous dislike from Defendant Louis Vuitton senior management and the vast majority of her co-workers.

### *Defendant Louis Vuitton Subjects Ms. Newton to a Worsened Ongoing Retaliatory Hostile Work Environment After she Testifies Before Congress About the Ongoing Retaliation She Continues to Endure at Defendant Louis Vuitton*

263.    After Ms. Newton's testimony before Congress, Defendant Louis Vuitton's challenges to her request for a reasonable accommodation intensified.

264.    For the next several months, Defendant Louis Vuitton engaged in a long series of delay tactics, extended periods of non-response, dismissiveness, and outrageous actions including:

- gaslighting Ms. Newton by suggesting that the harassment and assault never occurred;

- unlawfully disclosing her PHI to coworkers despite her explicit instructions to the contrary;

- requiring her psychiatrist to produce a series of no less than five separate, detailed medical notes when the first one was sufficient on its face, causing her to incur thousands of dollars in unnecessary additional expenditures; and

- stating nonsensical, dismissive, and demeaning things like "the Company [Defendant Louis Vuitton] continues to have doubts about the existence of a disability requiring accommodation" even after receiving five detailed notes from her psychiatrist.

### *The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act Becomes Law and Defendant Louis Vuitton Subjects Ms. Newton to a Worsened Ongoing Retaliatory Hostile Work Environment*

265.    Ms. Newton's testimony, together with that of three other survivors, was critical to changing the law regarding the arbitrability of claims related to sexual harassment and led to the enactment of the EFAA on March 3, 2022.

266.    Ms. Newton was invited to and attended the White House's Bill Signing Ceremony, where the President of the United States asked Ms. Newton and the three other survivor-witnesses to stand up and be publicly recognized as one of the four "courageous survivors who led this historic reform."[8] The President and Vice President also met with Ms. Newton and the three other survivor-witnesses before the Bill Signing Ceremony.

267.    Following the enactment of the EFAA, Defendant Louis Vuitton subjected Ms. Newton to a worsened ongoing retaliatory hostile work environment, while she continued to perform her job in an exemplary manner.

268.    On or about March 25, 2022, Defendant Louis Vuitton inexplicably denied Ms. Newton reasonable accommodation to work remotely in violation of Ms. Newton's rights under the law. Upon information and belief, her reasonable accommodation was denied in retaliation for asserting her rights to be free from gender discrimination by her employer and reporting, speaking out at Congress and elsewhere, against, and objecting to the ongoing retaliatory hostile work environment and continuing to object to sexual harassment, assault, and retaliation.

269.    On or about March 25, 2022, Defendant Louis Vuitton refused to consider Ms. Newton for a promotion for which she was qualified by making up unnecessary criteria after she attempted to apply.

***Defendant Louis Vuitton Attempts to Exclude Ms. Newton From an April 2022 Defendant Louis Vuitton Legal Retreat***

270.    In 2022, General Counsel Firestone asked the law firm of Winston & Strawn to host and lead Defendant Louis Vuitton's annual Legal Group retreat in Dallas, Texas in April

---

[8]    https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/03/03/remarks-by-president-biden-at-signing-of-h-r-4445-ending-forced-arbitration-of-sexual-assault-and-sexual-harassment-act-of-2021/.

2022 even though they have actively represented Defendant Louis Vuitton and Firestone against Ms. Newton since 2018.

271.    Upon information and belief, General Counsel Firestone did this to further retaliate against Ms. Newton.

272.    Immediately prior to the Winston & Strawn-hosted Legal Group retreat, upon information and belief, General Counsel Firestone and/or Employment Counsel Martinez, acting through the HR manager, attempted to prevent Ms. Newton from attending the Legal Group retreat, stating that because she had been ill in March, she could not travel until after the Legal Group retreat ended.

273.    Only after Ms. Newton provided a doctor's note stating that she could safely travel before and during the dates of the Legal Group retreat was she allowed to attend.

274.    During the conference, Defendants' employees continued to display outwardly hostile attitudes towards Ms. Newton, such as avoiding greeting her, giving her disdainful looks, and loudly remarking to her colleagues, "Why is *she* here?" and "What is she *doing* here?" in reference to Ms. Newton.

275.    Ms. Newton suffered extensive anxiety and stress as a result of the humiliating and hateful way she was treated at the retreat.

### ***Defendant Louis Vuitton's Retaliation Continues throughout Fall 2022***

276.    This campaign to "ice out" Ms. Newton continued to be part of the course and sadly routine.

277.    Throughout Spring, Summer, and Fall 2022 Ms. Newton was frequently specifically targeted for exclusion, ignored, at best, and often publicly scorned and humiliated by her colleagues.

278.     In or about April 2022, Ms. Newton learned that she had not even been introduced to the department intern.

279.     Throughout May 2022, General Counsel Firestone repeatedly berated and falsely and inaccurately accused Ms. Newton of dropping the ball on one of her assigned matters.

280.     In June 2022, she specifically gave Ms. Newton a time-consuming assignment while Ms. Newton was on vacation.

281.     In July 2022, Defendant Louis Vuitton and Winston & Strawn planned a farewell dinner in NYC for General Counsel Firestone, inviting Ms. Newton's colleagues from all across the country but excluding Ms. Newton.  Ms. Newton was the only attorney on her team who was not invited.

### *Defendant Pratt Begins Working at Defendant Louis Vuitton and Immediately Begins Retaliating Against Ms. Newton in Summer 2022*

282.     On July 25, 2022, Defendant Rodney Pratt began his tenure at Defendant Louis Vuitton as SVP, Chief Legal Officer, and became Ms. Newton's direct supervisor, replacing General Counsel Firestone.

283.     Defendant Pratt informed the team that he did not want to be copied on most emails because he did not want to become too involved, nor undermine his direct reports authority with internal clients and colleagues. Initially, Defendant Pratt did not engage in much interaction with Ms. Newton, but he was reasonably pleasant.

### *Ms. Newton Rejects Her Boss Defendant Pratt's Demand to Have "One on One Settlement Discussions" about her Sexual Harassment, Assault, and Retaliation Claims*

284.     In August 2022, Defendant Pratt requested a "one on one" meeting with Ms. Newton without attorneys present to "discuss or negotiate a settlement" of her claims against Defendant Louis Vuitton.

285.    Scared and appalled that her new boss was pressuring her to meet one on one without her attorneys present to settle her sexual harassment and retaliation claims against Defendant Louis Vuitton, Ms. Newton refused Defendant Pratt's request. She continued to assert her rights to be free from gender discrimination by her employer and continued to engage in the protected activity of pursuing her sexual harassment, assault, and retaliation claims against Defendant Louis Vuitton, thereby infuriating Defendant Pratt.

***Defendant Pratt Worsens the Ongoing Retaliatory Hostile Work Environment After Ms. Newton Rejects his Demand to Meet "One on One" to Settle her Sexual Harassment, Assault, & Retaliation Claims Without Attorneys Present***

286.    After she did not respond to his request, Defendant Pratt suddenly and drastically changed the rules for Ms. Newton, thereby contributing to and joining in on the ongoing retaliatory hostile work environment.

287.    On August 25, 2022, Defendant Pratt informed Ms. Newton that he would require manager preapproval before she agreed to speak on any panel or at any conference, something that had never previously been required.

288.    In or around September or October 2022, Defendants objected to Ms. Newton speaking on a keynote panel at the Women Influence & Power in the Law conference in which she would be asserting her rights to be free from gender discrimination by her employer.

289.    The Crime Victims Treatment Center presented Ms. Newton with its Advocacy and Awareness Award in October 2022 for reporting about her sexual harassment, assault and retaliation experiences at Defendant Louis Vuitton.  In her acceptance speech, she asserted her— and all women's—rights to be free from gender discrimination by their employers.

290.    In October 2022, Ms. Newton spoke on a keynote panel at the Women, Influence, and Power in the Law conference entitled *Leading by Example: How Women Successfully*

*Passed the Most Bipartisan, Transformational Law Ending the Silencing of Sexual Misconduct Claims*.   Her remarks asserted her—and all women's---rights to be free from gender discrimination by their employers.

291.   On the 1-year anniversary of her testimony, from October 2022 through November 16, 2022, Ms. Newton protested her employment conditions and asserted her right to be free from gender discrimination by sharing 2 posts on LinkedIn, approximately 20 posts on Instagram, and 2 posts on Twitter about testifying before Congress about her sexual assault and the unlawful retaliation she endured at Defendant Louis Vuitton after she reported it and continued to oppose it.

292.   In or around October 2022, Ms. Newton realized that Defendant Pratt was inserting himself in communications on her matters while simultaneously excluding her from other very important communications on her matters. Ms. Newton learned of these communications only when Ms. Newton's internal clients forwarded Defendant Pratt's communications to her, often expressing confusion as to why she had not been included.

293.   In or around late October and early November 2022, during weekly one-on-one meetings, Defendant Pratt generally ignored her while she spoke, except to sometimes agitatedly criticize her.

294.   On October 26, 2022, Defendant Pratt informed the Legal Department during a team meeting that Employment Counsel Martinez would be leaving the company, and that his last day would be November 18, 2022.

295.   Following Employment Counsel Martinez's departure, a farewell dinner was hosted by Winston & Strawn and Defendant Louis Vuitton on November 30, 2022. Defendant Louis Vuitton excluded Ms. Newton from the dinner.  Upon information and belief, Defendant

Pratt approved and ensured that every other attorney in the Legal Department was invited to attend, except for Ms. Newton. All of the attorneys on her team attended the dinner.

296.    On November 30, 2022, Defendant Louis Vuitton held a sale open to employees, which Ms. Newton was entitled to attend as a major part of her employee benefits.  Defendant Louis Vuitton, however, went out of its way to exclude and not invite Ms. Newton, leaving her humiliated when forced to respond to colleagues in ignorance when asked why she had not been present.

### *Defendants Fire Ms. Newton in December 2022, Effective January 2023, After 8 Years of Employment*

297.    On or about November 28, 2022, for the first time ever, Defendant Pratt scheduled a mandatory in-person team meeting for the entire Legal Department on Thursday, December 1, 2022.  Everyone in the Legal Department except for Defendant Pratt had selected Thursdays as one of their remote working days per company policy.  As a result, each team member had to rearrange their schedules, including modifying travel plans, to be able to attend the December 1, 2022 meeting in person.

298.    On or about November 30, 2022, Defendant Pratt rescheduled his regular one-on-one meeting with Ms. Newton to December 1, 2022. At the last minute, Defendant Pratt moved the meeting to a conference room on a different floor.  When Ms. Newton arrived at the meeting, she noted that Defendant Louis Vuitton's Human Resources Director Jolie Shehadeh was also present.

299.    At the December 1, 2022 meeting, Defendant Pratt informed Ms. Newton that her employment would be terminated effective January 1, 2023. Ms. Newton was instructed to exit the office "within the hour," by 5 PM, and to leave her work devices and badge in the office.

300.   At the discharge meeting, Defendant Pratt explicitly stated that Ms. Newton's firing was completely unrelated to her performance.

301.   Upon information and belief, Defendant Louis Vuitton's protocol was to terminate previous executives on Fridays at 8 AM, specifically so that no one else would see or hear, and to avoid their humiliation in front of their colleagues. Defendant Louis Vuitton decided to use a different practice when firing Ms. Newton as Defendant Louis Vuitton intended to—and did—humiliate her by making her firing as public as possible.

302.   In fact, to make sure that Ms. Newton was as publicly demeaned and dehumanized as possible, and so that other employees could be reminded of what happens to employees who report sexual harassment and retaliation, Defendant Pratt scheduled the unprecedented, highly unusual, mandatory, in-person team meeting for 4 PM that very Thursday, immediately after the meeting in which he fired Ms. Newton, with the express intent of making sure that all of her colleagues were present to watch her public humiliation.

303.   Defendant Louis Vuitton's intended effect took place—when the team meeting finished, her colleagues returned from the meeting just in time to see her frantically packing up her personal items, sweating profusely, while the HR and building staff assigned to monitor her packing barked their countdown at her: "7 minutes!…2 minutes!…30 seconds!"

304.   Upon information and belief, Defendant Louis Vuitton provided previous executives with a vehicle service home with their personal effects. Although they told Ms. Newton that a car had been called for her, the car never arrived.  Instead, Defendant Louis Vuitton intentionally made a spectacle of Ms. Newton.  They forced her stand outside of the building in shame, made to wait an entire hour in 30-degree weather with a large trolley piled with boxes of her belongings in front of her, at rush hour—5:00 pm on a Thursday, as her then

colleagues from the holding company and the affiliates gawked at her as they walked in and out of work.



305.   Defendant Louis Vuitton created a scene and made it obvious to all of their employees and affiliate employees leaving and entering the building that she had just been fired.

306.   This is how Defendant Louis Vuitton punishes women who report sexual harassment and retaliation.

***Defendant Louis Vuitton Cannot Resist the Urge to Continue Retaliating Against Ms. Newton Even After Firing Her***

307.   After firing Ms. Newton, for eighteen days, Defendant Louis Vuitton illegally took and retained possession of her personal effects, including framed diplomas and valuable personal items, despite repeated requests for their return by Ms. Newton and her attorneys, and even though Defendant Louis Vuitton had promised to ship her items to her the day after they fired her.   Only after her attorneys were forced to repeatedly threaten legal action against

Defendant Louis Vuitton did they finally return Ms. Newton's personal items but even then, they returned some items in damaged condition.

308.    Defendant Louis Vuitton intentionally deprived Ms. Newton of all of the annual bonus she had earned for 2022, which was projected to be 25% of her annual salary on documents with which Defendant Louis Vuitton had provided her.

309.    In December 2022, Defendant Louis Vuitton also intentionally refused to provide a charitable match for the nonprofit organization she founded in memory of her baby brother, rescinded the sale of items she had purchased through a Company sale in November as one of her benefits, refused to reimburse expenses such as attorney registration fees, as well as expenses previously authorized by Defendant Pratt for change and cancellation fees incurred because of his last-minute demand for an in-person team meeting so that he could fire Ms. Newton essentially in front of her colleagues, and withheld her COBRA information for 47 days. Defendant Louis Vuitton returned holiday gifts sent to her from colleagues outside the Company. Upon information and belief, Defendant Louis Vuitton threw away dozens of holiday cards and gifts Ms. Newton typically received from internal and external colleagues each December.

310.    In December 2022 and January 2023, Defendant Louis Vuitton intentionally deprived Ms. Newton of life insurance and Accidental Death and Dismemberment continuation information by providing the information in such disarray such that Ms. Newton did not see it until January 21, 2023, 51 days after the December 1, 2022 firing meeting. Defendant Louis Vuitton's delay caused Ms. Newton to miss the enrollment period.

311.    Due to Defendants' unlawful firing of Ms. Newton for reporting sexual harassment and assault, conference organizers have revoked their invitations to Ms. Newton to be a guest speaker at or attend their conferences as recently as November 2023, and an invitation

to join the Board of a major nonprofit has been revoked, thereby depriving her of career-enhancing opportunities that could have led to her securing a new job and earning an income.

## IV.    DEFENDANT LOUIS VUITTON HAS A PATTERN AND PRACTICE OF DISCRIMINATION AND SEXUAL HARASSMENT

312.    Although Defendant Louis Vuitton and its corporate affiliates have been accused of workplace misconduct in other public filings, these filings likely represent only a small fraction of the actual workplace harassment, discrimination and retaliation Defendant Louis Vuitton employees face. On Glassdoor.com, a website where a company's employees can anonymously post reviews about their employer, Defendant Louis Vuitton employees across the globe have identified strikingly similar conduct by Defendant Louis Vuitton to the conduct Ms. Newton has experienced.  The reviews describe a company with a negative, outdated, and discriminatory culture.  These reviews include numerous claims that Defendant Louis Vuitton engages in "discrimination," "favoritism," "xenophobia," "nepotism," "bias," and "bullying." The reviews explain that "[e]mployees are exploited, humiliated, abused, [and] women are sexually harassed."  The reviews further state that there is "toxic behavior within the executive leadership," including "abusive" managers.  These problems can be attributed to Defendant Louis Vuitton's perceived oppressive and negatively-viewed "culture" coupled with Defendant Louis Vuitton's pervasive failure to promote women into executive positions.

313.    The claims asserted on Glassdoor about Defendant Louis Vuitton's Human Resources departments are even more relevant to Ms. Newton's claims.  Many reviewers describe Defendant Louis Vuitton's HR departments as "corrupted" and "useless." The reviews state that Defendant Louis Vuitton's HR representatives "really do not care about their employees," "don't know what they are doing," and HR "is only there to protect the company and not the employees" and "does not have the employees['] best interest[s]" in mind.

73

Unsurprisingly, reviewers state that Defendant Louis Vuitton "HR teams are less interested in personal development than the development of the brand or business as a whole" and "[c]urrent and potential employees are constantly discriminated [against]" but "HR team members take pride in being ignorant."  The employee reviewers aptly note that "HR Managers are out of touch with [the] reality of what goes on in each location" and need to actually "[l]isten and act on employee concerns" and "[e]ducate...employees on how to interact in an international and multicultural workplace."

## V.  MS. NEWTON HAS SUFFERED EMOTIONAL DISTRESS AS A RESULT OF THE HARASSMENT AND DEFENDANT LOUIS VUITTON'S RETALIATION

314.    For years, Ms. Newton has experienced severe distress and anxiety as a result of the sexual harassment and retaliation she suffered at Defendant Louis Vuitton. Ms. Newton has shaken uncontrollably, felt tightness in her chest, and has panicked about her safety.  Due to Defendant Louis Vuitton's continued retaliatory acts, Ms. Newton continues to suffer from PTSD and recently has had panic attacks and suffered sleep issues due to their continued retaliation.

315.    Ms. Newton often cannot sleep and has had her eating patterns disrupted because of the trauma she has experienced as a result of the harassment, assault, and retaliation, reminders of the harassment, and Defendant Louis Vuitton's reaction to her claims, including attempts to isolate her, lie about her, and destroy the career and life she has worked so hard to build.  Ms. Newton's constant anxiety at work only increased as a result of the Company's retaliation against her and refusal to instruct Harasser Doran to stay away from Ms. Newton.

316.    For the first time in her life, Ms. Newton has been forced to seek a significant amount of one-on-one therapy since 2018 to deal with the emotional trauma she has and

continues to suffer as a result of the harassment, assault, and retaliation inflicted on her by Defendant Louis Vuitton.

317.    Ms. Newton also suffered from a medical condition that had been treated successfully until 2018. Several months later, after Ms. Newton began suffering retaliation at the hands of Defendant Louis Vuitton, the condition returned through the end of 2022. Upon information and belief, this resulted from the stress caused by Defendant Louis Vuitton's conduct. Since then, Ms. Newton has been hospitalized twice for several days at a time for a second physical medical condition that is triggered by stress. In 2021 and 2022, Ms. Newton began suffering from two additional physical medical conditions/injuries, likely caused or exacerbated by Defendant Louis Vuitton's retaliation and hostile work environment, conditions and injuries for which she continues to be treated to this day.

### AS AND FOR A FIRST CAUSE OF ACTION
*Retaliation in Violation of Title VII*
*(Against Defendant Louis Vuitton)*

318.    Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

319.    Ms. Newton repeatedly reported and actively opposed the sexual harassment, assault, and retaliation that occurred and filed a lawsuit against Defendant Louis Vuitton for claims of sexual harassment, assault, and retaliation.

320.    Ms. Newton has actively engaged in the protected activity of objecting to the sexual harassment and retaliation since 2018 by internally reporting, complaining about, actively pursuing her legal rights, testifying about the sexual harassment and retaliation, publicly objecting to the sexual harassment and retaliation, and refusing to engage in settlement discussions with Defendants.

321.    In retaliation for her active reports of and opposition to the sexual harassment and assault she had endured, Defendant Louis Vuitton subjected Ms. Newton to a continuing series of adverse employment actions including but not limited to subjecting her to changes in workplace treatment, harassment, a retaliatory hostile work environment, and disparate treatment in comparison to employees who were not engaged in protected activity.

322.    Defendant unlawfully and without cause retaliated against Ms. Newton for engaging in protected activity under Title VII.

323.    Later, Ms. Newton again engaged in protected activity under Title VII when she publicly reported about the sexual harassment, assault, and ongoing retaliatory hostile work environment she was subjected to when she testified before Congress and spoke out on social media after her testimony before Congress which led to the passage of the EFAA.

324.    In retaliation, Defendant Louis Vuitton's ongoing retaliation against Ms. Newton worsened, as Defendant Louis Vuitton further subjected Ms. Newton to a series of adverse employment actions including but not limited to refusing to grant her reasonable accommodation request, subjecting her to changes in workplace treatment, harassment, a worsened hostile work environment, disparate treatment in comparison to employees who were not engaged in protected activity, and termination of her employment of eight years at Defendant Louis Vuitton.

325.    Defendant Louis Vuitton unlawfully and without cause retaliated against Ms. Newton for engaging in protected activity under Title VII.

326.    The retaliation Ms. Newton suffered while employed with Defendant was severe and pervasive, unwelcome by Ms. Newton, and would be offensive to a reasonable person.

327.    The retaliation Ms. Newton suffered while employed at Defendant severely affected the terms and conditions of her employment.

328.     Defendant Louis Vuitton's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Newton.

329.     As a result of Defendant Louis Vuitton's conduct alleged in this Complaint, Ms. Newton has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

330.     By reason of Defendant Louis Vuitton's retaliation, Ms. Newton is entitled to all remedies available for violations of Title VII.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
*Retaliation in Violation of the New York State Human Rights Law and
the New York City Human Rights Law
(Against Defendant Pratt)*

331.     Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

332.     Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107, *et seq.,* prohibits retaliation against an employee who seeks to assert rights under the Human Rights Laws. Defendants are Ms. Newton's employer within the meaning of those laws.

333.     Ms. Newton complained to Defendants about the sexual harassment inflicted upon her by an employee of Defendant Louis Vuitton and has repeatedly publicly complained about the sexual harassment and the retaliation she suffered. In response to her protected activity, Defendant Pratt retaliated against Ms. Newton in the terms and conditions of her employment by giving her changes in workplace treatment, treating her disparately from other employees, and ultimately terminating her employment.

334.     Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

335.    As a direct and proximate result of Defendants' discriminatory conduct, Ms. Newton has suffered adverse employment consequences.  Ms. Newton has also been forced to endure severe emotional pain and trauma and the physical effects thereof, all to her detriment.

336.    Accordingly, Defendant Rodney Pratt discriminated against Ms. Newton by subjecting her to a retaliatory hostile work environment and terminating her employment in violation of her statutory rights as guaranteed by the New York State Human Rights Law and the New York City Human Rights Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq., Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 et seq. and Title 8 of the New York City Administrative Code, § 8-107, et seq.

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices and conduct.

Dated: New York, New York
      December 11, 2023

Respectfully submitted,

GODDARD LAW PLLC

By: */s/ Megan S. Goddard*

    Megan S. Goddard, Esq.
    Siobhan Klassen, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: (646) 964-1178
Fax: (202) 208-2914
Megan@goddardlawnyc.com
Siobhan@goddardlawnyc.com

BERGSTEIN & ULLRICH

By: */s/ Stephen Bergstein*

    Stephen Bergstein, Esq.
5 Paradies Lane
New Paltz, New York 12561
Office: (845) 419-2250
Steve@tbulaw.com

CHARNY & WHEELER P.C.

By: */s/ Nathaniel K. Charny*

    Nathaniel K. Charny
42 West Market Street
Rhinebeck, New York 12572
Office: (845) 876-7500
ncharny@charnywheeler.com

*Attorneys for Ms. Newton*