UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDOWAH NEWTON,

              Plaintiff,

-against-                          Case No. 1:23-cv-10753 (LAP)

LVMH MOET HENNESSY LOUIS
VUITTON INC. and RODNEY C. PRATT,

              Defendants.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION AND/OR DISMISS AND IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR LEAVE TO AMEND
THE COMPLAINT AND TO ENJOIN THE ARBITRATION PROCEEDING

Dated: Rhinebeck, New York
       March 19, 2024

Nathaniel K. Charny
Charny & Wheeler P.C.
42 West Market Street
Rhinebeck, New York  12572
(845) 876-7500
ncharny@charnywheeler.com

Megan S. Goddard
Goddard Law PLLC
39 Broadway, Suite 1540
New York, New York  10006
(646) 504-8363
Megan@goddardlawnyc.com

Stephen Bergstein
Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York  12561
(845) 419-2250
steve@tbulaw.com

Attorneys for Plaintiff Andowah Newton

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................................iii

INTRODUCTION ................................................................................................................1

PROCEDURAL BACKGROUND.........................................................................................3

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION AND/OR DISMISS ....................................................7

POINT I
THE EFAA VOIDS MS. NEWTON'S ARBITRATION AGREEMENT
WITH RESPECT TO HER SEXUAL HARASSMENT AND
ASSAULT CLAIMS AND SHE HAS PLED RETALIATION CLAIMS
PROPERLY EXEMPTED FROM MANDATORY ARBITRATION ...........................................7

A.      The EFAA Voids Ms. Newton's Arbitration Agreement and Prohibits
        the Complaint's Claims From Being Subject to Mandatory Arbitration.............................7

B.      Ms. Newton Alleges Sufficient Facts in Her Complaint....................................................10

C.      Ms. Newton Elected to Litigate, Not Arbitrate .................................................................16

        1.      Defendants Misrepresent the Procedural Posture of this Matter ...........................17

        2.      Defendants' Argument Fails as a Matter of Law....................................................19

D.      Plaintiff Has Successfully Pled Violations of
        Federal, State and City Sexual Harassment Laws ............................................................21

        1.      The Complaint Meets the Standard of
                Review on Rule 12(b)(6) Motions to Dismiss.......................................................21

        2.      Ms. Newton's Claims are Timely and the Court should not
                restrict the universe of allegations relevant to Ms. Newton's claims....................22

        3.      Ms. Newton adequately alleges that she engaged
                in protected activity under federal, state, and city law .........................................23

        4.      The Complaint asserts that Ms. Newton's protected activity was
                the direct cause of Defendants' multiple adverse actions against her ...................25

        5.      Ms. Newton asserts Louis Vuitton and its GC's
                retaliatory intent as a result of her protected activity.............................................30

      6.      The Court should not dismiss the Complaint because
it sufficiently pleads violations of federal, state and city law ...............................33

PLAINTIFF'S CROSS-MOTION FOR LEAVE TO AMEND
AND TO ENJOIN THE ARBITRATION PROCEEDINGS .........................................................33

POINT I
PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND HER COMPLAINT
TO ADD ALL OF THE CLAIMS PRESENTLY BEFORE ARBITRATOR BELEN .................33

A.      Introduction.....................................................................................................................33

B.      Only A Court Can Determine if the EFAA
Governs or Applies to All of Ms. Newton's Claims...........................................................34

C.      The Court Should Grant Leave to File the Proposed First
Amended Complaint So That All Claims Are Litigated in this Tribunal...........................34

POINT II
THE ARBITRATION PROCEEDINGS
SHOULD BE PERMANENTLY ENJOINED.............................................................................37

POINT III
THIS COURT SHOULD UNSEAL THE ARBITRATION MATERIALS ...................................38

CONCLUSION..........................................................................................................................40

APPENDIX...............................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

CASES

*Ahmad v. White Plains City Sch. Dist.*,
18-CV-3146 (KMK), 2020 WL 5720753 (S.D.N.Y. Sept. 24, 2020) ........................................ 24

*Albunio v. City of New York*, 16 N.Y.3d 472 (2011) .................................................. 23

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .................................... 21

*Barnes v Festival Fun Parks, LLC*,
No. 3:22-cv-165, 2023 WL 4209745 (W.D. Pa. June 27, 2023) ........................................ 35, 36

*Barton Group, Inc. v. NCR Corp.*, 796 F. Supp. 2d 473 (S.D.N.Y. 2011) .................................. 19

*Bilitch v. New York City Health & Hosps. Corp.*, 194 A.D.3d 999 (2d Dept. 2021) .................. 25

*Bosse v. Dept. of Econ. & Cmty. Dev.*,
20-CV-00760 (JCH), 2021 WL 6337750 (D. Conn. Aug. 3, 2021) ........................................ 31

*Buon v. Spindler*, 65 F.4th 64 (2d Cir. 2023) ........................................................ 27, 30

*Chauca v. Abraham*, 30 N.Y.3d 325 (2017) .............................................................. 27

*Collins v. Indart-Etienne*, 59 Misc. 3d 1026 (Sup. Ct. Kings Co. 2018) .................................. 27

*Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018) ............................................... 30

*Europe v. Equinox Holdings, Inc.*,
20-CV-7787 (JGK), 2022 WL 4124763 (S.D.N.Y. Sept. 9, 2022) ........................................ 28

*Foman v. Davis*, 371 U.S. 178 (1962) ................................................................. 33

*Gabin v. Greenwich House, Inc.*, 210 A.D.3d 497 (1st Dept. 2022) ...................................... 22

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*,
764 F.3d 210 (2d Cir. 2014) .......................................................................... 38

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir. 1980) ........................................... 32

*Harrington v. Halpern*,
No. CV 19-0476 (ABJ), 2022 WL 4245483 (D.D.C. Sept. 15, 2022) ...................................... 25

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ...................................................... 25, 29

*Hix v. Dave & Buster's Mgt. Corp., Inc.,*
No. 3:23-cv-623-AR, 2023 U.S. Dist. LEXIS 234274 (D. Or. Nov. 14, 2023),
*adopted*, 2014 WL 326592 (D. Or. Jan. 29, 2024) ........................................................................ 8

*In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113 (2d Cir. 2011) .................................. 38

*Johnson v. Everyrealm, Inc.,*
No. 22-CV-6669 (PAE), 2023 U.S. Dist
LEXIS 31242 (S.D.N.Y. Feb. 24, 2023)................................................................ 7, 9, 34, 35, 36

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005)................................................ 23

*K.T. v A Place for Rover*,
No. 23-02858, 2023 U.S. Dist. LEXIS 194723 (E.D. Pa. Oct. 31, 2023) ..................................... 9

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015).......................................... 21, 23, 30

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).................................... 38, 39

*Mitura v Finco Servs., Inc.,*
No. 23-CV-2879 (VEC), 2024 WL 232323 (S.D.N.Y. Jan. 22, 2024)..................................... 9, 36

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 37

*Newton v. LVMH Moet Hennessy Louis Vuitton Inc.,*
No. 154178/2019, 2020 WL 3961988 (Sup. Ct. N.Y. Co. July 10, 2020) (Nock, J.) ....................4

*Newton v. LVMH Moet Hennessy Louis Vuitton, Inc.,*
192 A.D.3d 540 (1st Dept. 2021)......................................................................................... 4, 12

*Olivieri v. Stifel*,
No. 21-CV-0046 (JMA/ARL), 2023 U.S.
Dist. LEXIS 57001 (E.D.N.Y. Mar. 31, 2023) ...................................................................... 34, 35

*Petrosino v. Bell Atl.*, 385 F.3d 210 (2d Cir. 2004) .................................................................... 23

*Pistello v. Bd. of Educ.*, 808 Fed. Appx. 19 (2d Cir. 2020) ........................................................ 26

*Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379 (2d Cir. 2020).......................................................... 32

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11 (2d Cir. 2014) ........................... 22

*Separ v. Cnty. of Nassau,*
21-CV-10 (DRH) (JMW), 2022 WL 1085496 (E.D.N.Y. Jan. 28, 2022),
*report and recommendation adopted in part,*
2022 WL 842667 (E.D.N.Y. Mar. 22, 2022)................................................................................ 30

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013) ................................................................ 32

*Sumner v. U.S. Postal Serv.*, 899 F.2d 203 (2d Cir. 1990) ......................................................... 23

*Thompson v. Morris Heights Health Ctr.*,
No. 09 CIV. 7239 (PAE), 2012 WL 1145964 (S.D.N.Y. Apr. 6, 2012) ...................................... 27

*United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) ................................................................ 23

*Vega v. Hempstead Union Free Sch. Dist.*,
801 F.3d 72 (2d Cir. 2015) ......................................................... 21, 22, 25, 26, 27, 29

*Vogel v. CA, Inc.*, 662 Fed. Appx. 72 (2d Cir. 2016) ................................................................ 26

*Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217 (2d Cir. 2006) .................................................. 25, 29

## STATUTES

9 U.S.C. § 401(4) ........................................................................................................................... 7

9 U.S.C. § 402(a) ......................................................................................................... 7, 34, 36, 37

9 U.S.C. § 402(b) .................................................................................................................. 34, 37

CPLR 7515 ........................................................................................................................................ 3

Fed. R. Civ. P. 15(a) ................................................................................................................... 33

N.Y.C. Admin Code § 8–130(a) ................................................................................................. 28

## OTHER AUTHORITIES

168 Cong. Rec. S626 (daily ed. Feb. 10, 2022) .......................................................................... 8

<u>INTRODUCTION</u>

Plaintiff Andowah Newton submits this memorandum (i) in opposition to Defendants' Motion to Compel Arbitration and/or Dismiss and (ii) in support of her cross motion for leave to amend the complaint and enjoin the arbitration proceedings.

At a minimum, Ms. Newton's new retaliation claims set out in the Complaint are subject to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA") and this case is therefore exempt from mandatory arbitration. In addition to the retaliation claims set out in the Complaint, the claims currently pending in the preliminary stages of arbitration before JAMS are also subject to the EFAA and the Court should allow them to be added to this case.

Therefore, Ms. Newton seeks an order denying Defendants' motion to dismiss the Complaint, granting leave to file the proposed Amended Complaint, and enjoining the arbitration proceeding currently in its initial stages before JAMS. Ms. Newton also asks this Court to reconsider its order granting Defendants' motion to seal certain arbitration materials.

Defendants are attempting to circumvent the EFAA, enacted in 2022, and other controlling law through their motions. Pursuant to the EFAA, the instant matter should include all the claims presently before Arbitrator Ariel Belen and this matter should proceed to discovery before this Court. Federal law prohibits compelled or forced arbitration of the claims made in the Complaint and they are sufficiently pleaded to survive Defendants' motion to dismiss.

Defendants make two glaring omissions and conceal two important facts: (1) No decisionmaker has ever heard, considered, or decided Ms. Newton's substantive claims. The parties have not even produced or exchanged discovery documents on substantive issues. (2) The only issue that has been decided by an arbitrator is a procedural threshold issue of arbitrability of claims asserted in 2021 *before* the EFAA's enactment. The Appellate Division *left open* that

threshold issue, based on Defendant Louis Vuitton's Revised Anti-Harassment policy, for an arbitrator to decide. That issue was not decided until March 2023. That made Ms. Newton's first opportunity to "elect" to litigate under the EFAA March 2023 and she did so when she filed her EEOC Charge in May 2023, as she elected to litigate by virtue of her 2019 complaint in State Supreme Court and 2021 Arbitration Demand seeking to have her claims heard in court.

Defendants also mischaracterize and omit the facts alleged by Ms. Newton to the point that they are unrecognizable from what she alleged in the Complaint. As one appalling example, Defendants characterize their employee-perpetrator's attempt to sexually assault Ms. Newton a *second* time as a gift to Ms. Newton, claiming that he "offered" to give her unwanted kisses. Worse, Defendants infer that the perpetrator's attempted assault was tolerable because Ms. Newton was "not forced to accept" those unwanted kisses. The remainder of Defendants' factual presentation is replete with similar truth-bending misstatements and falsehoods that are belied by the Complaint's allegations. The distortions Defendants make in downplaying, minimizing, and concealing the sexual assault, harassment, and extreme retaliation they inflicted upon Ms. Newton exemplifies Defendant Louis Vuitton's long-standing cavalier approach to sexual assault/harassment, is the precise reason Congress subpoenaed Ms. Newton to testify in support of the EFAA and the very reason Ms. Newton has consistently elected to litigate, never arbitrate, this matter.

Although Defendants pretend the EFAA never passed, the reality is that the law and public policy on mandating arbitration of sexual harassment/assault disputes has changed. As the President stated at the EFAA's Bill Signing Ceremony, Defendants like Louis Vuitton should want to be "put . . . on the right side of history." Yet Louis Vuitton has continued to retaliate against Ms. Newton because of her sexual harassment/assault disputes *after* the law changed.

This Court should deny Defendants' attempt to make an end-run around the EFAA and deny their motion to compel arbitration and their motion to dismiss.

<u>PROCEDURAL BACKGROUND</u>

In February 2015, Ms. Newton began employment with Defendant Louis Vuitton. At the time, and as a prerequisite to her employment, Ms. Newton was compelled to sign an arbitration agreement mandating that all employment disputes be heard in arbitration (herein the Arbitration Agreement).

Within months, Ms. Newton began to experience gender-based hostility, harassment and assault in the workplace. Ms. Newton made both verbal and then written complaints, to no avail.

Effective July 11, 2018, New York amended Article 75 of the Civil Practice Law and Rules (the CPLR) to prohibit mandatory arbitration of sexual harassment and assault claims. *See* CPLR 7515.

In November 2018, Defendant Louis Vuitton amended its Anti-Harassment Policy to incorporate New York's prohibition on mandatory arbitration, stating that "[E]mployees and applicants may file formal complaints of discrimination, harassment, or retaliation with federal or state agencies . . . . You may also file a complaint in state court."

In reliance on CPLR 7515 and Defendant Louis Vuitton's amendment of the Anti-Harassment Policy, Ms. Newton commenced litigation in State Supreme Court for sexual harassment, hostile work environment and retaliation under New York State and New York City Human Rights Laws.

In response to Defendant Louis Vuitton's motion to compel arbitration, State Supreme Court denied same and found that the Arbitration Agreement was "null and void, insofar as it seeks to remit the parties to binding arbitration in connection with the claims asserted in this

lawsuit." *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, No. 154178/2019, 2020 WL 3961988 (Sup. Ct. N.Y. Co. July 10, 2020) (Nock, J.).

On appeal, the First Department reversed "without costs" and ordered that the question of whether the Anti-Harassment Policy abrogated the mandatory arbitration agreement was a question for an arbitrator. *Newton v. LVMH Moet Hennessy Louis Vuitton*, 192 A.D.3d 540, 541-42 (1st Dept. 2021).

On June 1, 2021, Ms. Newton commenced an arbitration proceeding pursuant to the First Department's Decision to challenge, among other things, sexual harassment and retaliation within her workplace. In August 2021, Ms. Newton filed a second arbitration demand pursuant to the First Department's Decision seeking a threshold ruling— before the arbitration proceeding on her underlying claims would commence—that she could pursue her claims in court because Defendant Louis Vuitton's Revised Anti-Harassment Policy revisions abrogated the mandatory arbitration provisions of the Arbitration Agreement.

While Defendants attempt to mischaracterize the nature of the proceedings before the arbitrators and improperly infer there has been a denial of Ms. Newton's substantive claims, in fact there have been no rulings on the substance of Ms. Newton's claims. Only a threshold procedural issue regarding arbitrability due to Defendant Louis Vuitton's Revised Anti-Harassment Policy was being considered by Arbitrator Belen between August 2021 and March 2023. Between March 2023 and October 2023, Arbitrator Belen was deciding additional procedural issues regarding Ms. Newton's request to stay the arbitration pending the EEOC Charge and Complaint in this action.

On February 28, 2023, Arbitrator Belen ruled that Defendant Louis Vuitton's revisions to its Anti-Harassment Policy stating that sexual harassment survivors "could sue in court" did not

abrogate the Arbitration Agreement.[1] Meanwhile, Ms. Newton made application to Arbitrator Belen to stay the arbitration pending this then-putative lawsuit. By decision dated October 6, 2023, Arbitrator Belen denied the stay request but acknowledged that a court may issue an injunction based on the EFAA. The parties have only now exchanged discovery requests and preliminary responses on Ms. Newton's substantive claims. No documents have been produced on the substantive claims, and production is not due until April 19, 2024.

In response to Ms. Newton's pursuit of her claims through her June 1, 2021 Arbitration Demand, on June 30, 2021, Defendant Louis Vuitton commenced an arbitration proceeding seeking to recover hundreds of thousands of dollars in attorneys' fees for its 2019 motion to compel arbitration and its 2021 appeal of the denial of that motion.[2] JAMS denied Ms. Newton's application that both her June 1, 2021 Demand and Defendant Louis Vuitton's June 30, 2021 Demand for Attorneys' Fees be heard by the same Arbitrator, and the two arbitrations were then heard by different arbitrators. On March 7, 2024, the Fees Arbitrator, Kathleen Roberts, issued a Final Award granting Defendant Louis Vuitton attorneys' fees for its 2019 motion to compel arbitration and related 2021 appeal.

While both arbitrations were pending on procedural issues only, Ms. Newton continued to suffer workplace discrimination and retaliation, including, on December 1, 2022, effective January 1, 2023, Defendant Louis Vuitton's unnecessarily and excessively punitive and public termination of Ms. Newton's employment in retaliation for her reports of, and opposition to, the ongoing gender-based hostility in the workplace.

---

[1] The Decision is dated February 28, 2023 but was not delivered to Ms. Newton's counsel until March 2, 2023.
[2] *See* http://docs.house.gov/meetings/JU/JU00/20211116/114227/HHRG-117-JU00-Wstate-NewtonA-20211116.pdf at 3, 7; https://www.govinfo.gov/content/pkg/CHRG-117hhrg46552/pdf/CHRG-117hhrg46552.pdf at 37, 41, 133-34. Defendants have never sought attorneys' fees against another employee.

Along the way, a significant event happened at the national level. Recognizing the overwhelming evidence and studies demonstrating that sexual assault and harassment are perpetuated when companies and institutions silence survivors through mechanisms such as forced arbitration, and based in part on Ms. Newton's public testimony in November 2022 before Congress on the sexual harassment, assault, and retaliation she suffered while employed at LVMH, Congress passed, with overwhelming, bipartisan support in February 2022, the President signed into law on March 3, 2022, the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA") with the express purpose of ending the forced arbitration of claims arising out of sexual harassment and assault in the workplace – the exact claims presented here – in order to reduce and prevent sexual assault and harassment.  The EFAA "invalidates arbitration agreements that preclude a party from filing a lawsuit in court involving sexual assault or sexual harassment."[3]

On May 19, 2023, two months after Arbitrator Belen had denied Ms. Newton the opportunity to pursue her claims in court pursuant to Defendant Louis Vuitton's Anti-Harassment policy, Ms. Newton elected to pursue her claims in court pursuant to the EFAA by commencing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants Louis Vuitton, Louise Firestone, Frank Martinez, Anish Melwani and Rodney C. Pratt – the administrative prerequisite to Ms. Newton's putative Title VII Federal Court litigation on all the sexual harassment and continuing retaliation that Defendant Louis Vuitton and its employees have inflicted upon Ms. Newton.

On November 24, 2023, the EEOC issued its Notice of Right to Sue and Ms. Newton filed this action on December 11, 2023.

---

[3] https://www.congress.gov/bill/117th-congress/house-bill/4445

POINT I

THE EFAA VOIDS MS. NEWTON'S ARBITRATION AGREEMENT WITH RESPECT TO
HER SEXUAL HARASSMENT AND ASSAULT CLAIMS AND SHE HAS  PLED
RETALIATION CLAIMS PROPERLY EXEMPTED FROM MANDATORY ARBITRATION

By way of the Complaint, Ms. Newton has both sufficiently pleaded retaliation claims

under federal, state and city law which all post-date the effective date of the EFAA and Ms.

Newton has elected to litigate and not arbitrate these claims.  As such, the claims in the

Complaint are properly before this Court.

A.      The EFAA Voids Ms. Newton's Arbitration Agreement and Prohibits the Complaint's
        Claims From Being Subject to Mandatory Arbitration

The EFAA's plain language exempts Ms. Newton's claims from mandatory arbitration.

The EFAA is unequivocal that cases that relate to sexual harassment and assault  may not be

compelled to arbitration. Under the statute:

> Notwithstanding any other provision of this title, at the election of the person
> alleging conduct constituting a sexual harassment dispute or sexual assault dispute
> . . . no predispute arbitration agreement . . .  shall be valid or enforceable with
> respect to a case which is filed under Federal, Tribal, or State law and relates to
> the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).

"Sexual harassment disputes" are defined by the EFAA as "a dispute relating to conduct

that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  9

U.S.C. § 401(4).

Retaliation for complaining about sexual harassment/sexual assault — as Ms. Newton

does here — is a "sexual harassment dispute or sexual assault dispute" under the EFAA.  *See*

*Johnson v. Everyrealm, Inc.,* 22-cv-6669, 2023 WL 2216173, at *18 (S.D.N.Y. Feb. 24, 2023)

(noting that "even if the EFAA applies only to claims related to the sexual harassment dispute, that scope includes retaliation claims"); *Hix v. Dave & Buster's Mgt. Corp., Inc.,* No. 3:23-cv-623-AR, 2023 U.S. Dist. LEXIS 234274, at *23-24 (D. Or. Nov. 14, 2023) (stating that "relating to" includes retaliation claims arising from sexual harassment and sexual assault claims), *adopted*, 2014 WL 326592 (D. Or. Jan. 29, 2024). Therefore, the EFAA applies equally to retaliation claims related to sexual assault or sexual harassment.

The Act's focus on allegations shows that "sexual harassment dispute" was intended to encompass allegations of sexual harassment, without regard to whether those allegations are ultimately proved or there is, in the end, a successful claim. As Senator Durbin, Chair of the Judiciary Committee, the Senate committee with jurisdiction over the Act, explained on the Senate floor, "the bill text does not require … that victims have to prove a sexual assault or harassment claim before the rest of their related case can proceed in court." 168 Cong. Rec. S626 (daily ed. Feb. 10, 2022).

Under these principles, to determine whether the EFAA applies, the court should first examine what conduct is alleged, not whether that conduct plausibly states a claim under the *Iqbal* pleading standards. Once the court makes that threshold determination that the EFAA applies, it should then proceed to address the motion to dismiss on the merits under *Iqbal.*

Here, Ms. Newton alleges that she was retaliated against both in the terms of employment and by Defendants terminating her employment because she engaged in the protected activity of reporting and complaining about the sexual harassment and sexual assault Defendant Louis Vuitton and its employees inflicted upon her.

The instant matter falls squarely within that definition as Ms. Newton alleges that her reports of and complaints about sexual harassment/sexual assault are the cause of the retaliation. *Id.; see also Everyrealm*, 2023 WL 2216173, at *18.

The Court should reject Defendants' efforts to circumvent and misapply the law.

Defendants' citation to *K.T. v A Place for Rover*, No. 23-02858, 2023 U.S. Dist. LEXIS 194723 (E.D. Pa. Oct. 31, 2023), is misplaced. In that case, the Court refused to apply the EFAA to claims wholly unrelated to federal, state and city sexual harassment statutes, noting that "This plain language makes the EFAA inapplicable where there has not been an allegation that such conduct violated a law prohibiting sexual harassment." *Id.* at *14. Here, by contrast, all of the claims in the Complaint in-and-of-themselves are claims based on "a law prohibiting sexual harassment." Defendants' reliance on *Mitura v Finco Servs., Inc.,* No. 23-CV-2879 (VEC), 2024 WL 232323 (S.D.N.Y. Jan. 22, 2024), is also misplaced.[4] In *Mitura*, the Court merely reiterated the oft-cited proposition that in order for the EFAA to apply, the claims must be adequately pled. In *Mitura*, those claims happened to be limited to sexual harassment and did not include retaliation. The court found the claims to be adequately pled and then applied the EFAA *to the entire complaint including claims completely unrelated to sexual harassment disputes*, such as the FMLA claim. *Id*. at *5.

As discussed below, Ms. Newton has adequately pled violations of federal, state and city sexual harassment statutes in regard to the prohibition on retaliation for complaining about sexual harassment in the workplace. As such, the EFAA applies and Ms. Newton's election to proceed in this Court should be honored, particularly in light of the strong policy considerations

---

[4] As discussed below, *Mitura* is directly applicable to Plaintiff's cross motion for leave to amend insofar as it joined the vast majority of courts in concluding that once a plaintiff has successfully pleaded a covered claim under the EFAA, all claims are protected by the EFAA, not just those related to sexual harassment and sexual assault.

leading to the EFAA's overwhelmingly bipartisan passage and enactment. *See, e.g.*,

https://www.whitehouse.gov/wp-content/uploads/2022/02/HR-4445-SAP.pdf ("This legislation

advances efforts to prevent and address sexual harassment and sexual assault, strengthen rights,

protect victims, and promote access to justice. The Administration is committed to eliminating

sexual harassment and assault.")

B.      Ms. Newton Alleges Sufficient Facts in Her Complaint

As demonstrated below, Ms. Newton engaged in a series of protected acts under Title VII

and the state and city human rights laws. Louis Vuitton and its General Counsel ("GC") reacted

and responded to these protected acts by retaliating against Ms. Newton in numerous ways.

Beginning in or about 2015, shortly after Lloyd Doran sexually assaulted Ms. Newton by

lunging his body across and on top of her; thrusting his pelvis and genitals into her face and

pressing his body firmly against hers, and pinning her against a chair (¶ 55), Ms. Newton

repeatedly reported Doran's behavior to Louis Vuitton's Employment Counsel Frank Martinez

and Real Estate Counsel, who repeatedly ignored her complaints. (¶¶ 56-58). Doran continued to

harass Ms. Newton, leering and lurking outside her office and attempting to kiss her at a

company event. (¶¶ 60-64). Between late 2015 and 2020, Doran persisted in harassing Ms.

Newton (¶ 68), prompting Ms. Newton to informally report Doran's conduct "on several

occasions" to company executives, who ignored Doran's misconduct. (¶¶ 75-78).

On May 30, 2018, Ms. Newton emailed Martinez to report that Doran was again leering

and lurking outside her office. (¶¶ 79-84). After initially ignoring her, when Ms. Newton

followed up, Martinez responded in anger that Ms. Newton had drafted a written record of the

harassment (¶¶ 85-90). Louis Vuitton conducted a sham investigation into her complaints—

disregarded witness statements, downplayed Doran's misconduct, investigated and reprimanded

*Ms. Newton* for reporting it, rather than Doran, and even sympathized and made excuses for Doran's misconduct. (¶¶ 91-109). After Ms. Newton filed a formal complaint with Human Resources (¶ 112), Louis Vuitton's GC pressured her to drop the complaint and said she had to tolerate Doran's conduct because there are "certain things we have to put up with as women," said that an outside investigator would be a waste of time, and asked if Ms. Newton would drop her complaint if an outside investigator found that there was no harassment. (¶¶ 115-18). Ms. Newton insisted on the outside investigation (¶ 120), which also proved to be a whitewash as the outside investigator threatened Ms. Newton, disregarded witness testimony, disregarded the assault, downplayed the harassment, did not seriously undertake to determine if Doran had violated Louis Vuitton's anti-harassment policy, said Ms. Newton would be considered a "son of a bitch" if she pursued her claims, threatened her job, and inferred that Ms. Newton should feel flattered by the harassment. (¶¶ 121-34).

Plaintiff's complaints about Doran deterred no one at Louis Vuitton. As demonstrated below, the Complaint asserts that (1) Doran came around Ms. Newton's office more than ever after the 2018 reports and investigation, (2) Ms. Newton avoided encounters with him while in the office, and (3) the GC tried to get her to work and interact with him long after the 2018 reports.

Before even concluding the investigations, Louis Vuitton publicly promoted and announced Doran's promotion (¶ 135) and Louis Vuitton's GC began to micromanage Ms. Newton's employment, take control over her cases, and issued a negative performance review in bad faith. (¶¶ 137-45). More broadly, through Spring 2019, Louis Vuitton began taking steps to stifle Ms. Newton's career by:

> (i) spoiling her relationships with her internal, international clients, co-workers, and partners; (ii) causing Ms. Newton humiliation, shame, and "otherness" at

the office; (iii) treating her adversely by engaging in a variety of campaigns to stop Ms. Newton from playing quiet classical piano music in her office even though she had always been allowed to and even though other employees, including in-house employment counsel played much louder music in his office; (iv) excluding Ms. Newton from hiring decisions; (v) micromanaging and surveilling Ms. Newton; (vi) interfering with Ms. Newton's ability to attend legal conferences; (vii) giving Ms. Newton lower annual ratings inconsistently and disparately from the ratings of other employees for similar and lesser performance; (viii) lowering Ms. Newton's annual salary increases and bonus; (ix) issuing unsubstantiated negative feedback in her evaluations; and (x) intentionally failing and refusing to introduce Ms. Newton to new employees within the legal department.

(¶ 146); *see also* ¶¶ 147-152 (Louis Vuitton's GC continued a series of retaliatory acts).

Because it appeared that the investigations were concocted solely to bury Doran's misconduct rather than seek out the truth and Louis Vuitton's SVP HR continued to refuse to ask Doran to stop his misconduct, insisting he had "done nothing wrong," Ms. Newton had no other choice but to file a sexual harassment suit in State Supreme Court, County of New York, in April 2019 pursuant to CPLR 7515 and Louis Vuitton's Revised Anti-Harassment Policy stating that sexual harassment survivors could "sue in court." (¶ 153). The trial court denied Louis Vuitton's motion to compel arbitration but the Appellate Division, First Department reversed "without costs" on March 18, 2021, leaving one threshold issue regarding arbitrability open for an arbitrator's determination. *Newton v. LVMH Moet Hennessy Louis Vuitton, Inc*., 192 A.D.3d 540 (1st Dept. 2021).

Throughout 2019 and into September 2020, Louis Vuitton continued retaliating against Ms. Newton, publicly inferring she was a liar, disparaging her, and inciting coworkers to act hostilely towards and refuse to interact with her. (¶¶ 156-60). The Complaint further asserts a series of more than two dozen retaliatory acts from coworkers, the GC, and other company officials who *inter alia* further micromanaged Ms. Newton's employment, ignored her advice, falsely blamed her for a supposed mistake, excluded her from hiring decisions, ignored her

during conferences, excluded her from company events, forced her to work with Doran, and embarrassed her in the presence of colleagues. (¶¶ 165, 181).

After December 11, 2020, within the three-year limitations period covered under the State and City Human Rights Laws, Louis Vuitton continued retaliating by (1) failing to submit timely and inordinately delaying matching donations for the charity that Ms. Newton founded in memory of her brother (¶¶ 198-206), (2) delaying the processing of her COVID-19 remote work policy expense reports (¶¶ 207-210); (3) issuing a false and negative performance review only days after Ms. Newton had requested a reasonable accommodation (¶¶ 213-17), (4) reprimanding her in bad faith for working remotely despite Company policy permitting it (¶¶ 220-25), (5) lowering her annual compensation increase (¶¶ 226-27), (6) reprimanding her for false and pretextual reasons (¶¶ 228-235); and (7) denying her request for reasonable accommodation to work remotely for various medical conditions without engaging in a valid interactive process. (¶¶ 236-253, 257-260).

The egregiousness of Louis Vuitton's misconduct and retaliation caused Congress to take notice and subpoena Ms. Newton to testify before it – a protected activity – in November 2021 in support of legislation to void the Federal Arbitration Act as to sexual harassment cases. (¶ 261). Ms. Newton's testimony[5] included the sexual harassment and assault to which Louis Vuitton had subjected her (*id.*) and informed Congress's decision to enact the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA").

Post-testimony, Louis Vuitton continued retaliating: (1) "gaslighting Ms. Newton by suggesting that the harassment and assault never occurred"; (2) "unlawfully disclosing her PHI to coworkers despite her explicit instructions to the contrary"; (3) "requiring her psychiatrist

[5] https://youtu.be/qyzJzuZBg4s?si=zLFnSCzSW-LhPN6v

to produce a series of no less than five separate, detailed medical notes when the first one was sufficient on its face, causing her to incur thousands of dollars in unnecessary additional expenditures"; and (4) "stating nonsensical, dismissive, and demeaning things like 'the Company [Defendant Louis Vuitton] continues to have doubts about the existence of a disability requiring accommodation' even after receiving five detailed notes from her psychiatrist." (¶ 264). After the President of the United States invited Ms. Newton to participate in the Bill Signing of the EFAA and invited her, her co-witnesses, and Gretchen Carlson to a private meeting with him and the Vice President on March 3, 2022, Louis Vuitton continued its retaliation: it (1) inexplicably denied Ms. Newton's reasonable accommodation request to work remotely for six months (¶ 268), (2) denied her a promotion for which she was qualified by making up unnecessary criteria for the position, some of which Ms. Newton met (¶ 269), and (3) tried to prevent Ms. Newton from attending a Legal department retreat (¶ 272-73).[6] The proposed Amended Complaint asserts that, upon information and belief, Louis Vuitton decided to replace its GC soon after Ms. Newton's testimony before Congress.

Following July 23, 2022, Louis Vuitton continued its relentless retaliation against Ms. Newton, frequently targeting her for exclusion and inciting public scorn by her colleagues. (¶ 277). In August 2022, within weeks after Defendant Rodney Pratt ("Louis Vuitton's GC") replaced Firestone as GC, he asked Ms. Newton — his direct report — for a one-to-one meeting *without her attorneys present* "to discuss" settlement of her claims. (¶¶ 284-85). Ms. Newton refused to engage in such an unethical meeting, during which her direct supervisor would

---

[6] Contrary to Defendants' assertion, the Complaint makes it clear that Defendant Louis Vuitton's GC continued to retaliate against Ms. Newton through the month of the GC's retirement in July 2022. In addition, Defendants are wrong that Defendant Pratt—the replacement GC's--adverse actions began only after his employment as, upon information and belief, he engaged in activity in concert with Defendant Louis Vuitton prior to his hiring to assist it with taking adverse actions against Ms. Newton (¶¶ 284-87, 292-95, 297-302) as demonstrated by his — the company's main lawyer — unethical attempt to hold settlement discussions with Ms. Newton without her lawyers present, immediately after officially commencing his role. (¶¶ 284-85).

pressure her to settle. "She continued to assert her rights to be free from gender discrimination by her employer and continued to engage in the protected activity of pursuing her sexual harassment, assault, and retaliation claims" against Louis Vuitton in arbitration, "thereby infuriating [its GC]." (¶ 285). After Ms. Newton rebuffed Louis Vuitton's GC's unethical request to discuss settlement without her attorneys present, from August 2022 through December 2022, like his predecessor, Louis Vuitton's GC retaliated against Ms. Newton by (1) requiring his pre-approval before she agreed to speaking at any conference, an unprecedented demand (¶ 287); (2) objecting to Ms. Newton's speaking on a high-profile keynote panel with Gretchen Carlson and other high-profile advocates against gender discrimination, in which Ms. Newton would be asserting her rights to be free from gender discrimination by her employer (¶ 288), and publicly depriving her of benefits including access to a Company sale from which her colleagues talked about her absence and canceling her order from a different company sale. In October-November 2022, at the conference where she spoke on a keynote panel, at a gala where the Crime Victims Treatment Center awarded her an Advocacy and Awareness Award, and on social media, Ms. Newton continued to speak publicly on the sex discrimination and retaliation to which Louis Vuitton was subjecting her. (¶¶ 289-91). In October, Ms. Newton learned that Louis Vuitton's GC was excluding her from important communications on her cases and undermining her role. (¶ 292). Louis Vuitton's GC also ignored Ms. Newton when she spoke during weekly one-on-one meetings and unjustifiably criticized her work. (¶ 294). Then, when Louis Vuitton organized an important farewell dinner for its Employment Counsel Martinez, its executive for almost a decade, Louis Vuitton and its GC invited every attorney in the Legal Department except for Ms. Newton. (¶ 295).

Louis Vuitton fired Ms. Newton on December 1, 2022, effective January 1, 2023, and ordered her to leave the office "within the hour." (¶ 297). Contrary to company protocol to avoid humiliation in the presence of colleagues, Louis Vuitton and its GC made Ms. Newton's termination "as public as possible," requiring a mandatory in-person team meeting for the first time ever and timing it such that when it ended, coworkers saw Ms. Newton being rushed to pack up her personal items, sweating and being barked at by HR: : "7 minutes . . . 2 minutes!  . . . 30 seconds!" (¶¶ 301-03). Contrary to past practice and its promise to Ms. Newton, Louis Vuitton denied her the vehicle it had promised her to take her home with her large boxes of personal effects, and forced her to stand outside waiting for more than an hour for a car that never came with her boxes on a large trolley in 30-degree weather during late afternoon rush-hour when her colleagues from Louis Vuitton's brands would be entering and exiting the building. (¶¶ 304-05).

After Louis Vuitton fired Ms. Newton, Louis Vuitton and its GC deprived Ms. Newton of her annual bonus for 2022 and failed to make a charitable match in 2022 for the youth empowerment nonprofit that Ms. Newton founded in memory of her youngest brother. (¶¶ 308-09). Post-firing, Louis Vuitton also intentionally mishandled Ms. Newton's life insurance and Accidental Death and Dismemberment continuation information such that she did not see it until January 21, 2023, failed to forward her holiday gifts and cards from business contacts, and illegally retained Ms. Newton's personal possessions and valuables for several weeks despite repeated requests by her attorneys. (¶ 310).

C.      Ms. Newton Elected to Litigate, Not Arbitrate

Ms. Newton elected to proceed in court, not arbitration, and Defendants' arguments to the contrary are without merit.  *See* Def. Mem. at 9-10.

1.    <u>Defendants Misrepresent the Procedural Posture of this Matter</u>

First, nowhere in the EFAA does it state that the election is a "one-time choice" as Defendants falsely assert.  Second, Ms. Newton cannot be deemed to have relinquished a right in 2021 that did not exist under law before March 3, 2022, and she could not have benefitted from until March 2, 2023, when Arbitrator Belen sent her attorneys his decision deeming himself as the proper adjudicator of her claims despite the Company's Revised Anti-Harassment Policy stating that she "could sue in court."  While the arbitrability issue was pending before Arbitrator Belen from August 2021 through March 2023, Ms. Newton could not "elect" court as a forum under the EFAA.  Moreover, Defendants' most glaring retaliation incident did not occur until January 2023.  It is nonsensical for Defendants to terminate Ms. Newton *ten months after* the EFAA's enactment and then assert that she should have elected to proceed under the EFAA either *before* the EFAA's enactment in 2021 or *before* Defendant Louis Vuitton terminated her effective January 2023.

Second, contrary to Defendants' assertions, Ms. Newton never "elected to arbitrate" any of her claims.  Quite the opposite: she filed a Complaint in court in 2019 pursuant to CPLR 7515 and the Company's Revised Policy.  Through that Complaint, Ms. Newton only "elected" to *litigate*, not arbitrate, her 2015-19 claims.  Pursuant to the Appellate Division's order, Ms. Newton continued to challenge arbitration as a forum before an arbitrator because the Appellate Division forced her to challenge it before an arbitrator, not because she "elected" to challenge it there.

In that threshold arbitration proceeding, Ms. Newton then vigorously pursued her right to be heard in court, not arbitration from June 2021[7] through March 2023.  Here, too, therefore, far

---

[7] Ms. Newton submitted letter pleadings to JAMS on July 8, 2021 requesting that the threshold issue of arbitrability be decided before the proceedings on the main arbitration commenced and for a different arbitrator to be assigned to

from "electing to arbitrate" her claims, Ms. Newton specifically elected to *litigate* her 2015-2021 claims, specifically and expressly asserting her desire for litigation rather than arbitration throughout the threshold arbitrability deliberations June 2021-March 2023.

And yet again, when Arbitrator Belen rejected Ms. Newton's efforts to get her case back into court pursuant to the Appellate Division's order, Ms. Newton communicated her intent and election to *litigate*, not arbitrate, her claims before a court pursuant to the EFAA and later sought a stay of the commencement of the substantive arbitration proceedings accordingly immediately thereafter in March 2023. In addition, from 2021 through Present, Ms. Newton has continuously and frequently spoken out in myriad ways about the sexual harassment/assault and retaliation Defendant Louis Vuitton inflicted on her and the negative consequences of forced arbitration of sexual assault and harassment claims on survivors and forced arbitration's devastating and dangerous role in silencing survivors and perpetuating sexual harassment as a result.[8]

Therefore, at no point in time has Ms. Newton ever "elected to arbitrate" her claims. The facts evince an unwavering intent and election to *litigate* her claims since she first filed a public Complaint in 2019. Defendants' misguided attempt to suggest otherwise is disingenuous and misleading.

Third, there is also no support for Defendants' argument because the claims currently before Arbitrator Belen are different from those here; the former include sexual harassment,

---

the threshold issue of arbitrability. JAMS denied her request regarding a separate arbitrator for the threshold issue of arbitrability.

[8] *See, e.g.,* https://www.linkedin.com/in/andowah-newton-6aba7513/recent-activity/all/
https://www.instagram.com/andowahnewton
https://twitter.com/andowah?lang=en
These social media accounts include more than 100 posts advocating to "end forced arbitration" of sexual assault and harassment claims). Ms. Newton's vocal and consistent advocacy against ending forced arbitration of sexual assault and harassment won her an Advocacy & Awareness Award from the Crime Victims Treatment Center, the Phoenix of the Year Award from Womankind f/k/a NY Asian Women's Center, and an Exemplary Alumni Public Service Pro Bono Award from Cornell Law School which she will receive in two days, as well as being named a Global Top 100 Most Influential Person of African Descent—Law & Justice.

assault, and pay inequity, whereas the claims here do not; and the retaliation claims here are materially different  because the pending retaliation claims in arbitration are comprised primarily of retaliatory hostile work environment while the retaliation claims in the instant proceeding arise primarily out of Defendants' retaliatory discharge of Ms. Newton from her employment, denial of reasonable accommodation, and denial of promotion.

Nonetheless, as alleged in the amended complaint, these are all continuing violations which mandate their exclusion from mandatory arbitration under the EFAA.

2.  Defendants' Argument Fails as a Matter of Law

Defendants' argument also fails because it lacks legal support. Not a single case cited by Defendants supports their position.  All of Defendants' cases are pre-EFAA and none of them is relevant or comparable to the facts present here.  Defendants continue to refer to and rely upon the Federal Arbitration Act as if it were not expressly voided by the EFAA for the very type of sexual harassment/assault dispute that is at issue here.  Even *Barton Group, Inc. v. NCR Corp.*, 796 F. Supp. 2d 473 (S.D.N.Y. 2011), merely stands for the rote, inapplicable proposition that a party facing a breach of contract cannot "at the same time treat the contract as broken and as subsisting.  One course of action excludes the other." *Id.* at 501.

The instant matter is completely different.  First, *Barton* involved a commercial litigation matter between two corporate entities.  This involves an employment dispute between a $500 billion, "world lead[ing]" company and its employee, and a dispute in which a "historical" and "transformational" law was recently enacted to restore survivors' Seventh Amendment rights in order to reduce sexual assault and harassment.  In addition, prior to Defendants' retaliatory discharge of Ms. Newton from her employment, she  was compelled, against her election and will, to have the question of whether her claims should be heard by any arbitrator, and after

vigorously pursuing her right to have her claims against Defendants for sexual harassment/assault and a resulting retaliatory hostile work environment heard in court, was putatively deprived of that right by an arbitrator — exactly the adjudicator the EFAA dictates does *not* have a right to decide arbitrability of Ms. Newton's claims.

After the effective date of the EFAA, Defendants terminated Ms. Newton's employment in violation of federal, state and city law. This standalone claim is "materially different" from the claims in arbitration and is necessarily covered by the EFAA. The same applies to Defendants' post-EFAA retaliatory acts of: denying Ms. Newton a promotion, denying her bonus, denying her benefits from two company sales, denying her reasonable accommodation request, retaliating against her for responding to Congress's subpoena to testify about her experience at Louis Vuitton in support of survivors' rights and against sexual assault and harassment, actively participating in the EFAA Bill Signing to which the President invited her, and speaking out against sexual assault and harassment at an acceptance speech for an award for the same, and a high-profile keynote panel on the same.

In other words, Ms. Newton has never sought both to arbitrate and litigate at the same time. Nor has she ever elected to pursue any of her claims in arbitration.[9] Instead, Ms. Newton has consistently and unwaveringly elected to pursue her pre- and post-EFAA claims of retaliation in court and not before an arbitrator. Therefore, *Barton* is inapplicable.

---

[9] By way of her cross-motion to amend herein, Ms. Newton is also continuing to seek to have her claims that are putatively currently before an arbitrator heard in court instead.

D.    Plaintiff Has Successfully Pled Violations of
      Federal, State and City Sexual Harassment Laws

      1.    The Complaint Meets the Standard of
            Review on Rule 12(b)(6) Motions to Dismiss

A district court should not resolve competing factual inferences on a motion to dismiss.

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *Vega v. Hempstead*

*Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (vacating 12(c) dismissal of Title VII

claim because the district court held the plaintiff to stringent pleading standards). "We have …

cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination

at the 12(b)(6) stage." (*Id.*)

In *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015), the Second Circuit

clarified: "[W]hile the plaintiff ultimately will need evidence sufficient to prove discriminatory

motivation on the part of the employer-defendant, at the initial stage of the litigation – prior to

the employer's coming forward with the claimed reason for its action – the plaintiff does not

need substantial evidence of discriminatory intent." *Id.* at 311. Instead, if the plaintiff "makes a

showing (1) that she is a member of a protected class, (2) that she was qualified for the position

she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal*

burden of showing facts suggesting an inference of discriminatory motivation, then she has

satisfied the *prima facie* requirements and a presumption of discriminatory intent arises in her

favor." (*Id.*) (emphasis on original) "The facts required by *Iqbal* to be alleged in the complaint

need not give plausible support to the ultimate question of whether the adverse employment

action was attributable to discrimination. They need only give plausible support to a minimal

inference of discriminatory motivation." (*Id.*)

The Second Circuit returned to these pleading requirements in *Vega*, stating that "our decision in *Littlejohn* makes clear that plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss." 801 F.3d at 84. "In making the plausibility determination, the court must be mindful of the 'elusive' nature of intentional discrimination" and should be "alert to any unconscious bias that could affect decisionmaking." *Id*. at 86.

2.   Ms. Newton's Claims are Timely and the Court should not
     restrict the universe of allegations relevant to Ms. Newton's claims[10]

Defendants' arguments for dismissal under a statute of limitations are unavailing. A court should only dismiss a claim at this stage if it is absolutely clear from the complaint that the claim cannot be timely, and Defendants have failed to make that showing. Rather, Ms. Newton's claims are timely. While Louis Vuitton and its GC note that the statute of limitations for actionable conduct under Title VII is 300-days prior to the filing of the EEOC charge (Def. Mem. at 15), they overlook the three-year statute of limitations under the State and City Human Rights Laws. *Gabin v. Greenwich House, Inc.*, 210 A.D.3d 497, 497 (1st Dept. 2022).

Particularly on a motion to dismiss, the continuing violations doctrine supports the timeliness of Ms. Newton's claims. In retaliation cases, "'[c]ontext matters,' as some actions may take on more or less significance depending on the context,' and '[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). Under any circumstance, any such retaliatory acts remain "relevant background evidence" to prove Louis Vuitton and its GC's

---

[10] In addition, and as set out in Ms. Newton's cross-motion, assuming the cross-motion for leave to amend is granted, all of the allegations would necessarily be deemed timely.

subsequent retaliatory intent for the actionable events. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) (citing *inter alia United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir. 2005) ("relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act"). Therefore, Louis Vuitton and its GC's argument that the continuing violations doctrine does not allow Ms. Newton to recover damages for any retaliatory acts that predate the statute of limitations, (Def. Mem. at 15-16), fails.

      3.      Ms. Newton adequately alleges that she engaged
                   in protected activity under federal, state, and city law

"Section 704(a)'s opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Littlejohn*, 795 F.3d at 317 (same). The City HRL defines protected activity even more broadly. *See Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011).

After Doran sexually assaulted Ms. Newton in 2015, she reported his behavior through 2018 to Louis Vuitton's Employment Counsel and Real Estate Counsel. (¶¶ 56-58). On May 30, 2018, Ms. Newton emailed Martinez to report that Doran was again lingering outside her office. (¶¶ 79-84). Following Louis Vuitton's unsatisfactory responses to her internal complaints, she filed her sexual harassment suit in State Supreme Court in April 2019. (¶ 153). Then, due to the egregious nature of Louis Vuitton's misconduct and retaliation, Congress subpoenaed Ms. Newton to testify before it in November 2021, in support of legislation to void the Federal

Arbitration Act as to sexual harassment cases. (¶ 261). Her testimony addressed the sexual harassment, assault, and retaliation to which Louis Vuitton had inflicted upon Ms. Newton. (*Id.*) In October-November 2022, at a keynote panel, during an advocacy award speech, and on social media, Ms. Newton continued to speak out publicly about the sex discrimination at Louis Vuitton. (¶¶ 289-91). Under *Sumner* and its progeny, each of these acts constitutes protected activity under Title VII and the State and City HRLs. Louis Vuitton and its GC concede that Ms. Newton's actions constitute protected activity, with limited exceptions. They first concede that Ms. Newton's testimony before Congress "against contractual arbitration provisions would constitute opposition to a practice made unlawful" under federal, state, and city law. (Def. Mem. at 20 n. 9). Her testimony also exposed the sexual harassment, assault, and retaliation Louis Vuitton and its employees had inflicted upon her. (¶ 261). For that additional reason, Ms. Newton's testimony was protected activity.

Louis Vuitton and its GC also wrongly assert that his request for a one-on-one meeting with Ms. Newton to discuss settlement of her claims against the company, outside the presence of her attorneys, cannot predicate any protected activity. (Def. Mem. at 19); *see also* ¶¶ 284-85. But Ms. Newton alleges that she refused to engage in this meeting and "continued to assert her rights to be free from gender discrimination by her employer and continued to engage in the protected activity of pursuing her sexual harassment, assault, and retaliation claims" against Louis Vuitton in arbitration, "thereby infuriating Defendant Pratt." (¶ 285). As the context of Louis Vuitton's GC's unethical request for a settlement discussion without Ms. Newton's lawyers present was her ongoing litigation, the Complaint sufficiently asserts the lawsuit was protected activity. *Compare Ahmad v. White Plains City Sch. Dist.*, 18-CV-3146 (KMK), 2020 WL 5720753, at *8 (S.D.N.Y. Sept. 24, 2020) (holding that even "actions taken by an employer in

response to a lawsuit against a third-party may well constitute retaliation") (citations omitted); *Harrington v. Halpern*, No. CV 19-0476 (ABJ), 2022 WL 4245483, at *7 n.14 (D.D.C. Sept. 15, 2022) ("Ongoing litigation of the EEO complaint, which plaintiff asserts resulted in 'extensive litigation,' . . . could give rise to an inference of a causal connection between plaintiff's protected activity and the proposed suspension.").

4.    The Complaint asserts that Ms. Newton's protected activity was the direct cause of Defendants' multiple adverse actions against her

Defendants' retaliation is causally connected to Ms. Newton's protected activity and her claims are sufficiently pled under Rule 12(b)(6) standards.  In retaliation cases, "an adverse action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90; *see also Bilitch v. New York City Health & Hosps. Corp.*, 194 A.D.3d 999, 1004 (2d Dept. 2021) ("to make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that . . . her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity").

Courts emphasize that "context matters" and that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Id.*); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) ("[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination.").

"In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Zelnik,* 464 F.3d at 227) ("[T]his ridicule was considered a

part of a larger campaign of harassment which though trivial in detail may have been substantial in gross, and therefore was actionable")); *see also Vega*, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish [plaintiff] for complaining of discrimination"); *Pistello v. Bd. of Educ.*, 808 Fed. Appx. 19, 23 (2d Cir. 2020) (summary order) ("In light of, among other things, the considerable number of [retaliatory acts] . . . a reasonable juror could construe these actions as materially adverse, as well as unfounded and retaliatory in nature"); *Vogel v. CA, Inc.*, 662 Fed. Appx. 72, 76 (2d Cir. 2016) (summary order) (jury could find retaliation where, post-complaint, plaintiff's supervisor was persistently hostile toward him on conference calls, ridiculed him in front of his colleagues, removed him from meetings, yelled at him during a performance evaluation, called him names, said his actual performance was irrelevant, and repeatedly said he did not want plaintiff on his team).

Louis Vuitton and its GC argue that Ms. Newton fails to assert any adverse actions other than the termination of her employment and that the remaining grievances merely "consist of alleged exclusion or attempted exclusion from non-essential social or office functions." (Def. Mem. at 18). Apart from not reviewing the Complaint in the light most favorable to Ms. Newton, Louis Vuitton and its GC omit Ms. Newton's numerous relevant allegations. For example, from 2015 (when Ms. Newton first objected to Doran's sexual harassment and sexual assault) through August 2022 (when she rebuffed the GC's unethical attempt to pressure Ms. Newton to settle her case without her counsel present), and beyond, and particularly after May 30, 2018, when Ms. Newton repeated her internal complaints about Doran, Louis Vuitton subjected her to dozens of retaliatory acts, ranging from excluding her from important Legal Department milestone events to shunning her at the company's social events to excluding her from making hiring decisions to

micromanaging her employment to ridiculing her to yelling at her to giving her negative performance reviews in bad faith to lowering her annual compensation increases to denying her reasonable accommodations over her health issues to terminating her employment and then humiliating her on numerous occasions, including during and after her discharge. These adverse actions were steady and continuous, and several constitute adverse actions on their own, such as negative performance evaluations, *Vega*, 801 F.3d at 92, and denying Ms. Newton income. *Compare Buon v. Spindler*, 65 F.4th 64, 82 (2d Cir. 2023) ("loss of salary income" is an adverse action that survives a motion to dismiss); *Vega*, 801 F.3d at 91 (finding adverse action in retaliation claim where the plaintiff's "salary was temporarily reduced").

Despite the sufficiency of Ms. Newton's allegations, Louis Vuitton and its GC further argue that Ms. Newton's allegations of post-employment retaliation cannot support her claims because "they do not assert Louis Vuitton and its GC's actions sought to impair her ability to obtain future employment." (Def. Mem. at 15 n.6). But the cases they cite in support of this argument either address Title VII, *see Thompson v. Morris Heights Health Ctr.*, No. 09 CIV. 7239 (PAE), 2012 WL 1145964, at *5-9 (S.D.N.Y. Apr. 6, 2012), or merely present a trial court ruling from State Supreme Court, which interpreted the State and City HRL's by referring to Title VII rulings. *Collins v. Indart-Etienne*, 59 Misc. 3d 1026, 1051 (Sup. Ct. Kings Co. 2018). Ms. Newton's allegations are sufficient and these rulings do not warrant dismissal of Ms. Newton's claims arising from the post-termination retaliation and humiliation or any other claim. (¶¶ 301-11). The State and City laws were intended to reach further than their federal counterparts. *See Chauca v. Abraham*, 30 N.Y.3d 325, 332 (2017) ("in 2005, . . . the City Council passed the Restoration Act, amending the Administrative Code of the City of New York to ensure that "[t]he provisions of [the NYCHRL] shall be construed liberally . . . regardless of

whether federal or New York state civil and human rights laws . . . have been so construed")
(citing N.Y.C. Admin Code § 8–130(a)); *Europe v. Equinox Holdings, Inc.*, 20-CV-7787 (JGK),
2022 WL 4124763, at *7 n.10 (S.D.N.Y. Sept. 9, 2022) ("In August 2019, the NYSHRL was
amended to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the
accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws
including those laws with provisions worded comparably to the provisions of [the NYSHRL]
have been so construed'").

Under the State and City laws, Title VII standards do not apply. Contrary to Louis
Vuitton and its GC's assertion, Ms. Newton does in fact assert that their adverse actions sought to
impair her ability to obtain future employment. The luxury industry has a small amount of
employers and employees often weave in and out of the handful of companies in the industry.
Louis Vuitton dominates the industry, publicly describes itself as the "world's leading luxury
goods group" with no true competitor to its 75 brands.[11] By excluding Ms. Newton from
important company milestones, hiring decisions, by depriving her of benefits, and placing a
target on her back, inferring she is a liar, publicly questioning her judgment, signaling to the
press and her colleagues — all of whom would have been likely future colleagues, references, or
employers — that she was incompetent and unqualified, Louis Vuitton and its GC thereby
seriously and severely impacted her ability to obtain future employment.[12] This Court should

---

[11] https://www.lvmh.com/news-documents/press-releases/2023-new-record-year-for-lvmh/

[12] Furthermore, as Ms. Newton asserts in the proposed Amended Complaint, Louis Vuitton and its GC engaged in
additional vindictive actions after firing Ms. Newton to impair her ability to obtain future employment. For
example, they forced her to change her title on LinkedIn in 2023 – something it still has not asked her legal
department colleague, who was also terminated, to do – which negatively impacted Ms. Newton's ability to find new
employment. Since Defendants ordered Ms. Newton but not her colleague to changed her LinkedIn designation,
Ms. Newton was singled out, making that directive an act of retaliation. It is well-established public knowledge that
it is much easier to find a job when one already has a job. Defendants' requested change made it clear that Ms.
Newton no longer had a job. They also, upon information and belief, on December 15, 2023, forced Instagram to
take down Ms. Newton's post in which she briefly mentioned her termination and proceeded in the remaining 94%
of the post, to describe her qualifications, experience, and the type of work she was searching for, an effort to find

find that Defendant Louis Vuitton's repeatedly publicly humiliating one of its most respected and highest-performing attorneys, including during and after her termination, and then denying and delaying certain benefits pre- and post-termination, would deter reasonable employees, including those who are aware of Defendant Louis Vuitton and its employees' mistreatment of Ms. Newton in this regard, constitutes an adverse action under the State and City HRL's.

In sum, the Complaint asserts that, in the aggregate, the numerous acts of retaliation were "sufficiently 'substantial in gross' as to be actionable," *Hicks*, 593 F.3d at 165, and that even the less egregious acts of hostility were "part of a larger campaign of harassment" which though less egregious in detail "may have been substantial in gross, and therefore w[ere] actionable," *Zelnik,* 464 F.3d at 227, creating "a mosaic of retaliation and an intent to punish [plaintiff] for complaining of discrimination." *Vega*, 801 F.3d at 92. Put another way, the multitude of retaliatory acts would deter any reasonable employee from again asserting her rights under Title VII and the State and City HRL's. *Id*. at 90. No rational employee wishes to endure these hostile responses to protected activity. Ms. Newton certainly did not. As a result, she had to seek therapy and was diagnosed with PTSD. For these reasons, Louis Vuitton and its GC cannot show as a matter of law that Ms. Newton did not suffer any adverse action sufficient to maintain this lawsuit.

---

new employment. Ms. Newton had to request that Instagram reinstate the post but by the time it did several hours later, the post appeared on a late Friday afternoon just before the holidays when most viewers did not view it, thereby thwarting Ms. Newton's efforts to obtain new employment. In addition, the combination of terminating Ms. Newton's employment while pursuing her for attorneys' fees also severely limits her ability to find new employment by increasing the difficulty of paying for networking conferences, industry conferences, bar memberships, and similar activities which improve and enhance her job prospects.

5. Ms. Newton asserts Louis Vuitton and its GC's
   retaliatory intent as a result of her protected activity

As part of Ms. Newton's minimal pleading burden, she must "show[] facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 111. The series of adverse actions alleged by Ms. Newton, even if they did not independently show retaliatory intent (which many of them do), fully satisfies Ms. Newton's pleading burden in the aggregate. This Court should view those adverse actions in the aggregate. In *Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018), the Second Circuit held that "an inference of causation is more easily drawn when one considers the facts as a whole," such as when "protected activity is followed by discriminatory treatment" or a "pattern of antagonism" over the intervening period "demonstrate[s] the requisite causal connection." *Id*. at 626. In *Duplan*, "[f]ollowing [the plaintiff's] 2011 complaints, his supervisors collectively and persistently discouraged him from remaining at the Department by ostracizing him, giving him insufficient work, and making it clear to him that his career would not advance further by denying him every promotion and raise." (*Id*.) "Those allegations establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn." (*Id*.); *see also Buon*, 65 F.4th at 84 (where plaintiff alleged a series of minor personnel actions, his complaint survived a Rule 12 motion because "[a]lthough these alleged other instances of disparate treatment may not separately rise to the level of adverse actions, Buon is permitted to 'create a mosaic with the bits and pieces of available evidence' that, taken together, support a plausible inference of intentional discrimination to deny her [promotions] and terminate her position"); *Separ v. Cnty. of Nassau*, 21-CV-10 (DRH) (JMW), 2022 WL 1085496, at *8 (E.D.N.Y. Jan. 28, 2022), *report and recommendation adopted in part,* 2022 WL 842667 (E.D.N.Y. Mar. 22, 2022) (plaintiff alleged retaliatory animus where she "'was moved to a more hazardous location, against her will, for no reason' in June 2020, after she filed

the EEOC charge tethered to this case in May 2020," and she "alleged discrete retaliatory acts…

each year since Plaintiff's 2015 trial"); *Bosse v. Dept. of Econ. & Cmty. Dev.*, 20-CV-00760

(JCH), 2021 WL 6337750, at *11 (D. Conn. Aug. 3, 2021) (plaintiff alleged a "pattern of

antagonism" where she was reprimanded and placed on a performance improvement plan shortly

after filing an EEOC charge and, following her second EEOC charge, a supervisor engaged in a

series of adverse actions culminating in her termination).

  As demonstrated above, Louis Vuitton and its GC subjected Ms. Newton to a plethora of

adverse actions after she asserted her written objections to sexual harassment and assault in the

workplace. After Ms. Newton emailed Martinez that Doran was again sexually harassing her on

May 30, 2018 (¶¶ 79-84), when she filed her Spring 2019 State Supreme Court Complaint, Louis

Vuitton subjected her to a series of adverse actions, including a negative performance review in

bad faith, lowering her salary increases and bonus, and micromanagement, denying her

promotion, depriving her of benefits, publicly humiliating her, among other adverse actions. (¶¶

85-109, 112, 115-18, 121-34, 137-45). As demonstrated above, the same pattern followed each

of Ms. Newton's subsequent protected activities, including her November 2021 testimony before

Congress, her March 2022 active participation in the EFAA Bill Signing Ceremony, and

indicating to Louis Vuitton's GC in August 2022 that she intended to proceed with her litigation

against Louis Vuitton. Following its GC's unethical efforts to "settle" Ms. Newton's claims (¶¶

284-85), Louis Vuitton inflicted additional retaliation on her (¶¶ 287-88, 292, 294-95), through

and past her October 18, 2022 high-profile keynote panel, October 26, 2022 advocacy award

acceptance speech, and November 16, 2022  social media posts, including excluding her from a

momentous team event on November 30, publicly denying her benefits and  publicly firing her on December 1, 2022, effective January 1, 2023.[13] (¶ 292).

That narrow two-week period between her last protected activity while employed and Louis Vuitton's firing of her, by itself, requires an inference of causation and retaliatory intent. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("seven-month gap between [plaintiff's] filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding a causal connection between a retaliatory act and an EEOC complaint filed eight months earlier). In addition, Louis Vuitton fired Ms. Newton effective January 1, 2023, and on March 2, 2023, Arbitrator Belen issued his decision on the threshold issue which would have sent the case back to court. The EEOC Charge was filed on May 18, 2023.  This temporal proximity supports Ms. Newton's claim in light of Louis Vuitton's size, foreign base in France, and the lengthy process that decisionmakers would likely undertake in effectuating the termination of one of its highest-performing attorneys. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020) ("Questions regarding the time gap and causal connection of an alleged retaliatory termination may entail special consideration of the size and complexity of a defendant employer, where termination of employment may involve multiple layers of decisionmakers, as well as the nature of the plaintiff's claims. In some such circumstances, a five-month time frame for a decision to fire an employee may not be exceptional").

---

[13] As Ms. Newton asserts in the proposed Amended Complaint, upon information and belief, Louis Vuitton made the decision internally to fire Ms. Newton soon after her testimony before Congress in late 2021 and concocted a pretextual plan to call it a "restructuring" by switching out GCs, involving the prior GC's intended retirement, announced by her to Ms. Newton in March 2022 the day after the EFAA Bill Signing Ceremony, and the new GC's pressuring Ms. Newton to settle without her attorneys present a few weeks after he began his employment in August 2022.

6.   The Court should not dismiss the Complaint because
     it sufficiently pleads violations of federal, state and city law

As demonstrated above, (i) Ms. Newton has provided all necessary factual allegations to state claims for retaliation for reporting, and which relate to, sexual harassment and assault against the Defendants on claims that arose post-EFAA; (ii) the EFAA applies to these claims; and (iii) Ms. Newton has elected to proceed in court, not arbitration. As such, Defendants' motion to compel arbitration or dismiss should be denied.

## PLAINTIFF'S CROSS-MOTION FOR LEAVE TO AMEND AND TO ENJOIN THE ARBITRATION PROCEEDINGS[14]

### POINT I

### PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND HER COMPLAINT TO ADD ALL OF THE CLAIMS PRESENTLY BEFORE ARBITRATOR BELEN

A.   Introduction

Ms. Newton cross-moves for leave to amend her complaint to add all of the allegations currently pending before Arbitrator Belen.

The Federal Rules of Civil Procedure permit a party to amend his or her complaint with "the court's leave," which "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Generally, "[i]n the absence of any apparent or declared reason" for denying such leave, "the leave sought should, as the rules require, be 'freely given'" such that an "outright refusal to grant the leave without any justifying reason" amounts to "abuse of . . . discretion." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).

---

[14] Ms. Newton is attaching the proposed Amended Complaint as an appendix to this memorandum of law. This proposed Amended Complaint is different from the version that Plaintiff's counsel sent to this Court prior to the mediation conference in January 2024.

B.     Only A Court Can Determine if the EFAA
       Governs or Applies to All of Ms. Newton's Claims

As discussed below, the EFAA and its jurisprudence applying the Act mandate that the entirety of Ms. Newton's "case," as that term is defined under 9 U.S.C. § 402(a), be heard in this Court.  In addition, the EFAA states just as unequivocally that the scope of its coverage is to be determined by a Court, not an arbitrator.

The EFAA states:

> The applicability of this chapter [9 USCS §§ *401 et seq.*] to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter [9 USCS §§ 401 et seq.] applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

9 U.S.C. § 402(b); *see also Johnson*, 2023 U.S. Dist. LEXIS 31242, at *25 & n.11 ("consistent with the statutory text, that the EFAA empowers the Court to decide the arbitrability in the first instance").

Therefore, whatever objections Defendant Louis Vuitton may have to a Court's jurisdiction over the entirety of Ms. Newton's case against Defendant Louis Vuitton, such dispute is for the Court to decide, as mandated by the EFAA, and not an arbitrator, which is the purpose of the instant motion.  Therefore, pursuant to the EFAA and jurisprudence interpreting it, Ms. Newton seeks to bring all of her claims in court through the proposed Amended Complaint.

C.     The Court Should Grant Leave to File the Proposed First
       Amended Complaint So That All Claims Are Litigated in this Tribunal

It is now well established that when the claims involve continuing violations – as here – the EFAA encompasses all claims whether they arose before or after the effective date of the EFAA.  *Olivieri v. Stifel*, No. 21-CV-0046 (JMA/ARL), 2023 U.S. Dist. LEXIS 57001, at *10

(E.D.N.Y. Mar. 31, 2023); *Johnson v. Everyrealm, Inc.,* No. 22-CV-6669 (PAE), 2023 U.S. Dist LEXIS 31242, at *47 (S.D.N.Y. Feb. 24, 2023); *cf. Barnes v. Festival Fun Parks, LLC,* No. 22-CV-165 (SLH), 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023) (acknowledging that "if the claim accrues after the effective date of the Act, the Act applies even though the violations occurred prior to March 3, 2022," but rejecting application of the EFAA because the plaintiff, unlike here, was terminated from employment prior to enactment).

Judge Azrack has explained that in the context of the EFAA where, like here "the 'continuing violation' doctrine purportedly applies to a plaintiff's claims, it is well-settled that those claims accrue on the day of the last act in furtherance of the violation." *Olivieri*, 2023 U.S. Dist. LEXIS 57001, at *12-14.

To minimize the perpetuation of sexual assault and harassment that occurs when survivors are silenced, the EFAA was intended to have broad application. At the Bill Signing Ceremony, the Vice President stated: "The legislation the President will sign today will end forced arbitration in all cases of sexual abuse. And — and almost equally as important, it will apply retroactively invalidating every one of these agreements, no matter when they were entered into."[15] It is now similarly established that because of the broad wording of the EFAA, not only are such Arbitration Agreements struck down, but such abrogation also applies to *all the claims made in the case*, even those unrelated to the sexual harassment and retaliation claims. *See Johnson*, 2023 U.S. Dist LEXIS 31242, at *43-47; *Olivieri*, 2023 U.S. Dist. LEXIS 57001, at *10.

Therefore, the *Johnson* Court stated that "invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete

---

[15] https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/03/03/remarks-by-vice-president-harris-at-signing-of-h-r-4445-ending-the-forced-arbitration-of-sexual-assault-and-sexual-harassment-act-of-2021/

claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute." 2023 U.S. Dist. LEXIS 31242, at *43-47 (citations omitted).

*Johnson*'s conclusions have been repeatedly accepted and applied by additional courts. In *Mitura, supra*, Judge Caproni considered application of the EFAA to a variety of claims including claims under the FMLA and Section 1981, and once the Court determined that there were viable sexual harassment statutory claims -- as are present here -- the Court excluded the entire proceeding from mandatory arbitration. *Mitura*, 2024 U.S. Dist. LEXIS 11000, at *13-14 ("Because Plaintiff has stated a claim for sexual harassment in violation of the NYSHRL and the NYCHRL, the arbitration agreement is unenforceable pursuant to the EFAA. 9 U.S.C. § 402(a). Defendants' motion to compel arbitration is denied with respect to *all* claims in the Amended Complaint") (citing *Johnson*, 657 F. Supp. 3d at 562).

*Barnes v Festival Fun Parks, LLC*, No. 3:22-cv-165, 2023 WL 4209745 (W.D. Pa. June 27, 2023), is instructive. In *Barnes*, the Court concluded – in what is now the consensus – that the accrual date for EFAA purposes is not the date the action is commenced but is instead the date that the last violative adverse action occurred. While the plaintiff in *Barnes* was terminated from employment prior to the effective date of the EFAA, the Court nonetheless noted the consensus that if the opposite was true – if the plaintiff were terminated after the effective date of the EFAA, as Ms. Newton was – then, all of their claims are subject to the EFAA's prohibitions of mandatory arbitration. *Id*. at *10 ("if the claim accrues after the effective date of the Act, the Act applies prospectively even though the violations occurred prior to March 3, 2022").

While this case is different from *Barnes* because the ultimate adverse action occurred after the effective date of the EFAA, the well-reasoned finding of *Barnes* should apply, and

"[because] the claim accrues after the effective date of the Act, the Act applies prospectively even though the violations occurred prior to March 3, 2022." *Id.*

As such, this matter is similar to *Olivieri, Johnson* and *Mitura* and subject to the reasoning of *Barnes*, Ms. Newton should be granted leave to file the proposed First Amended Complaint and this Court should determine that the EFAA applies to the entirety of Ms. Newton's claims including those currently putatively before Arbitrator Belen.

POINT II

THE ARBITRATION PROCEEDINGS SHOULD BE PERMANENTLY ENJOINED

"A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm' (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

In connection with its grant of leave to amend, the Court should enjoin the JAMS arbitration proceedings consistent with the Court's authority under the EFAA. 9 U.S.C. § 402(a)-(b). Plaintiff has demonstrated a likelihood of success on her claim that the EFAA applies to her case, and the public has a strong interest in enforcing its provisions, the product of a bipartisan effort to exempt sexual harassment cases from mandatory arbitration. Ms. Newton will also suffer irreparable harm without an injunction, as her claims will proceed to arbitration and subjected to all of the downsides of arbitration as it pertains to sexual harassment and assault claims discussed and sought to be addressed in the legislative history leading up to the EFAA, which found that sexual harassment/assault survivors fare decidedly worse—both in outcome

and recovery—in arbitration than in court and that sexual harassment/assault is perpetuated and enabled as a direct result of these claims being heard in arbitration rather than in court. Moreover, such an injunction is consistent with longstanding jurisprudence regarding unenforceable arbitration agreements. "Federal courts generally have remedial power to stay arbitration." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 764 F.3d 210, 213 (2d Cir. 2014). "Where the court determines . . . that the parties have not entered into a valid and binding arbitration agreement, the court has the authority to enjoin the arbitration proceedings." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 140 (2d Cir. 2011). If and when, as is requested here, the Court determines that the arbitration agreement is a nullity because of application of the EFAA, it is submitted that this Court should permanently enjoin the arbitration proceedings currently pending between Ms. Newton and the Defendants.

In the event this Court declines to enjoin the arbitration proceeding entirely, it may issue a partial injunction, mandating that the parties conduct discovery in the arbitration proceeding but that any discovery disputes or motions -- as well as the arbitration hearing on the merits of Ms. Newton's claims -- be stayed and tolled to be heard in court rather than in arbitration.

POINT III

THIS COURT SHOULD UNSEAL THE ARBITRATION MATERIALS

On February 21, 2024, this Court granted Defendants' motion to seal certain materials in this litigation before Ms. Newton had an opportunity to contest that motion. Those materials were Exhibits C and D to the motion to compel arbitration and to dismiss the Complaint.

Ms. Newton respectfully argues that the "weight of the presumption of access and competing considerations" (ECF 29, at 1) (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-120 (2d Cir. 2006)), do not favor Defendants' position. Given the strong policy

considerations to eliminate sexual assault and harassment invoked by the EFAA, as described above, and which Congress passed with bipartisan support, "higher values" are not preserved but rather eviscerated by sealing documents in this case. Moreover, any such argument that it is confidential based on the Arbitration Agreement is undermined by the EFAA. Furthermore, what Defendants seek—complete sealing of two entire documents—is not "narrowly tailored to preserve that interest" as the documents could be redacted for any portions that don't meet the standards above strongly favoring disclosure. *Lugosch*, 435 F.3d at 120. In addition, all of the allegations in the June 1, 2021 arbitration demand have previously been publicly disclosed, primarily through Ms. Newton's Congressional testimony in support of the EFAA's enactment, and also through her Complaint in this matter.

Furthermore, pursuant to longstanding policy and principles favoring disclosure (*id.*), those exhibits should not be sealed. Defendants should not be able to do an end-run around the EFAA which was enacted to shed light on the secretive practices of companies and institutions which lead to the proliferation of sexual assault and sexual harassment.

<u>CONCLUSION</u>

This Court should deny Defendants' motion to compel arbitration and motion to dismiss, unseal Exhibits C-D of their motion, and grant Plaintiff's motion for leave to file the proposed First Amended Complaint and to enjoin the arbitration proceedings currently putatively before Arbitrator Belen.

Dated: Rhinebeck, New York
March 19, 2024

Nathaniel K. Charny
Charny & Wheeler P.C.
42 West Market Street
Rhinebeck, New York 12572
(845) 876-7500
ncharny@charnywheeler.com

Megan S. Goddard
Goddard Law PLLC
39 Broadway, Suite 1540
New York, New York 10006
(646) 504-8363
Megan@goddardlawnyc.com

Stephen Bergstein
Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 419-2250
steve@tbulaw.com

Attorneys for Plaintiff Andowah Newton

# APPENDIX

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**------------------------------------------------------------------------X**

**ANDOWAH NEWTON,**                                              Case No. 23-cv-10753

                          **Plaintiff,**                           ~~PROPOSED AMENDED~~
                                                                   ~~COMPLAINT~~

                          **-against-**                            *Jury Trial Demanded*

**LVMH MOËT HENNESSY LOUIS**
**VUITTON**
**INC.~~, and~~ RODNEY C. PRATT,**
**LLOYD DORAN, LOUISE FIRESTONE,**
**FRANK MARTINEZ, ANISH MELWANI, and**
**GENA SMITH,**

                          **Defendants.**
**------------------------------------------------------------------------X**

Formatted: Underline

Formatted: Indent: Left: 4", First line: 0.5"

       Plaintiff Andowah Newton ("Ms. Newton"), by her attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, Charny & Wheeler P.C., whose offices are located at 42 West Market Street, Rhinebeck, New York 12572, and Bergstein & Ullrich, whose offices are located at 5 Paradise Lane, New Paltz, New York 12561, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

<u>**INTRODUCTION**</u>

       1.      For years, Ms. Newton, Vice President of Legal Affairs at ~~Defendant LVMH~~Defendant Louis Vuitton Moët Hennessy Louis Vuitton Inc. ("Defendant Louis Vuitton," the "Company" or "Defendant"), suffered sexual harassment and an incident of assault at the hands of Defendant Louis Vuitton Director of Property and Facility Operations, Defendant Lloyd Doran ("~~Harasser Doran~~Defendant Harasser Doran"). When repeated informal reports and requests for help to Defendant Louis Vuitton's in-house employment counsel fell on deaf ears, Ms. Newton,

1

pursuant to the instructions of Defendant Louis Vuitton's Employment Counsel, ~~Defendant~~ Frank Martinez ("~~Employment Counsel Martinez~~Defendant_Employment_Counsel_Martinez") sent ~~Harasser Doran~~Defendant Harasser Doran an email asking him to stop harassing her.

2.　Instead of apologizing and, more importantly ceasing the harassment, ~~Harasser Doran~~Defendant Harasser Doran stunningly reported Ms. Newton to Defendant Louis Vuitton, immediately forwarding the email to his supervisor. And then came the retaliation.  Defendant Louis Vuitton did everything it could to intimidate Ms. Newton into not pursuing her claims and convince Ms. Newton that the harassment was just a byproduct of being an "attractive woman" who works at a company with a French culture, and thus should simply be tolerated.  Defendant Louis Vuitton even chastised Ms. Newton for sending the email, suggested that she apologize to ~~Harasser Doran~~Defendant Harasser Doran, and promoted ~~Harasser Doran~~Defendant Harasser Doran to an even higher position.

3.　Shocked that Defendant Louis Vuitton had turned the tables on her and was engaging in victim blaming, Ms. Newton filed a formal complaint with Human Resources and requested that they hire an external third party to conduct an investigation. Defendant Louis Vuitton eventually and reluctantly agreed, but the truncated investigation was merely an extension of Defendant Louis Vuitton's campaign to intimidate Ms. Newton into silence amidst allegations that might tarnish its public image.

4.　Prior to reporting sexual harassment, Ms. Newton had received nothing but outstanding, stellar reviews for her performance year in and year out. She had been recently promoted for achieving "excellent results" and being someone who "continues to build confidence in our maisons as she handles what are stressful (and often costly) matters with aplomb." Ms. Newton's supervisor further stated that Ms. Newton "reflects the highest degree of honesty and

2

ethics in all she does." She was valued externally and internally for her "intellect, ability and personal approach." But that changed once Ms. Newton filed her sexual harassment complaint. Ms. Newton was criticized for some of the very same things that had won her praise in the past.

5.     Ms. Newton's "fall from grace" lasted throughout the rest of her employment at Defendant Louis Vuitton. She was increasingly outcast and othered from her team thereafter and it was clear that Defendant Louis Vuitton, aware that it would be unlawful to fire her, instead hoped to pressure her into quitting.

6.     Sickened—literally and figuratively—by the way in which Defendant Louis Vuitton weaponized its forced arbitration agreement by subjecting her to such hostility, discrimination, and retaliation for reporting sexual assault and harassment, Ms. Newton attempted to seek accountability and redress for what she had endured, and to prevent other employees—particularly the interns—from having to endure the same,  and felt that she had no other choice but to engage in the protected activity of filing a lawsuit about the sexual harassment, assault, and retaliation. In response to Ms. Newton's lawsuit, Defendant Louis Vuitton ramped up the retaliatory hostile work environment against her: Defendant Louis Vuitton's CEO made the unprecedented and outrageous step of sending an email to all employees essentially calling Ms. Newton a liar and directing them to "continue business as usual…" which for Ms. Newton meant enduring continued intense hostility and retaliation against her.

7.     While she continued to be employed at Defendant Louis Vuitton and was continually subjected to the ongoing retaliatory hostile work environment in response to her reports of sexual harassment and assault, Congress subpoenaed Ms. Newton to testify in support of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").

8.     Despite continually being subjected to a retaliatory hostile work environment, and fearing more retaliation, Ms. Newton did her civic duty and publicly testified about the sexual harassment and assault, and the way that she was retaliated against for reporting sexual harassment, assault, and retaliation at Defendant Louis Vuitton. She also testified about how Defendant Louis Vuitton gaslit her and inferred that the sexual assault and harassment she endured were figments of her imagination.[1]

9.     In retaliation for engaging in the protected activity of objecting to the sexual harassment and the ongoing retaliatory hostile work environment she was subjected to at Defendant Louis Vuitton, this Defendant further retaliated against her by denying her reasonable accommodation request to work remotely and refusing to engage in an interactive process to accommodate her PTSD.

10.    As a result of Ms. Newton and other brave women's efforts, Congress banned forced arbitration for survivors of sexual assault and harassment in February 2022. The President signed the EFAA into law on March 3, 2022. Thereafter, Ms. Newton continued to work as an in-house attorney for Defendant Louis Vuitton.

11.    Following the enactment of the EFAA, Defendant Louis Vuitton continued to retaliate against Ms. Newton and subject her to a worsened ongoing retaliatory hostile work environment, while she continued to perform her job in an exemplary manner.

12.    In retaliation, on or about March 25, 2022, despite requesting and receiving a series of five detailed notes from a medical doctor, Defendant Louis Vuitton inexplicably denied Ms.

---

[1] The Opening Statement to Ms. Newton's testimony is available at https://youtu.be/qyzJzuZBg4s?si=-5qAfOLAz3DEv5Me. Her full testimony, including Q&A by Congressmembers, is available at https://www.c-span.org/video/?516114-1/sexual-harassment-abuse-victims-testify-forced-arbitrations.

Newton reasonable accommodation to work remotely in violation of Ms. Newton's rights under the law.

13.     In 2022, even after they knew that the EFAA had gone into effect, Defendant Louis Vuitton continued to subject Ms. Newton to an ongoing retaliatory hostile work environment and made it clear that she was not welcome or wanted.

14.     In summer 2022, Defendant Louis Vuitton hired Defendant Rodney Pratt as its new General Counsel and Ms. Newton's direct supervisor. Ms. Newton was hopeful that the change in leadership would end the retaliation against her so that she could successfully continue her career at Defendant Louis Vuitton. To her great disappointment, a few months after coming on board, Defendant Pratt suddenly pressured Ms. Newton—his direct report, through her attorneys, to have a "one on one negotiation" with him about settling her sexual harassment, assault, and retaliation claims against Defendant Louis Vuitton.

15.     To make matters worse, Defendant Pratt insisted that such "settlement talks" be between him and Ms. Newton only, without attorneys present, even though both Defendant Louis Vuitton and Ms. Newton had long been represented by counsel. Ms. Newton was stuck with a terrible ultimatum: subject herself to a "settlement talk" with her new boss, without representation, or refuse his "request." Fearful about angering her new boss, Ms. Newton declined Defendant Pratt's "invitation" to enter into the one-on-one "settlement talks" because of the inherent imbalance and unfairness of such discussions.

16.     When Ms. Newton refused to engage in the "one-on-one settlement negotiations" with her boss and continued to engage in the protected activity of litigating her claims against Defendant Louis Vuitton, Defendants retaliated against her in numerous ways, and publicly and humiliatingly fired her in December 2022, effective January 2023.

17.     Defendant Louis Vuitton's retaliation has continued unabated from the time that she formally reported sexual harassment and assault, through the present.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

18.     Jurisdiction of the Court is proper under 42 U.S.C. § 2000e *et seq*., and 28 U.S.C. §§ 1331 and 1343.

19.     The Court has supplemental jurisdiction over the claims of Ms. Newton brought under State law pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in the District pursuant to 28 U.S.C. § 1391(b), as the acts complained of herein occurred within the Southern District of New York.

21.     All conditions precedent to filing the instant action have been fulfilled. On or about May 19, 2023, Ms. Newton timely filed a Charge of Discrimination with the New York district office of the Equal Employment Opportunity Commission ("EEOC"). On or about November 24, 2023, the EEOC issued Ms. Newton a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## PARTIES

22.     Ms. Newton was a dedicated and hardworking Black and Afro-Latina female employee of Defendant Louis Vuitton.  Ms. Newton worked at Defendant Louis Vuitton's headquarters in New York County.  Ms. Newton was at all relevant times, and continues to be, a resident of the County of New York in the State of New York.

23.     At all times relevant to this case, Defendant Louis Vuitton was Ms. Newton's employer and the employer of the individual who harassed Ms. Newton under the New York State Human Rights Law, New York Executive Law §§ 290, et seq. ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code §§ 8-101, et seq. ("NYCHRL").  Defendant Louis

Vuitton is a foreign business corporation authorized to do business in New York State with its corporate headquarters at 19 East 57th Street, New York, New York 10022, New York County.

24.     Defendant Louis Vuitton is the United States subsidiary of the French multinational luxury goods conglomerate, LVMH Louis Vuitton Moët Hennessy SE, which sells, among other items, wines and spirits, fashion and leather goods, perfumes and cosmetics, watches and jewelry. Defendant Louis Vuitton's subsidiaries, brands, and affiliates include Defendant Louis Vuitton, Christian Dior, DFS, Le Bon Marché, La Grande Épicerie, Fendi, Marc Jacobs, Fenty Beauty by Rihanna, Givenchy, Sephora, Starboard Cruise Services, Berluti, Charles & Keith, Bulgari, Céline, Emilio Pucci, House of Bijan, Kenzo, Loewe, Loro Piana, Moynat, Nicholas Kirkwood, Rimowa, Chaumet, FRED, Guerlain, Kenzo, Fresh, Make Up For Ever, Hublot, TAG Heuer, Zenith, Acqua di Parma, Benefit Cosmetics, Givenchy Parfums, Kenzo Parfums, Parfums Christian Dior, Perfumes Loewe, Maison Francis Kurkdjian, Marc Jacobs Beauty, Kat Von D Beauty, Cheval Blanc (hotels), Caffe-Pasticceria Cova, Feadship, Les Échos, Hennessy, Belvedere, Veuve Clicquot, Dom Pérignon, Krug, Ruinart, and Moët & Chandon, among others.

25.     Defendant Rodney Pratt ("Defendant Pratt"), General Counsel, was at all relevant times relevant, an employee of Defendant Louis Vuitton who retaliated against Ms. Newton and subjected her to a hostile work environment and who, at all relevant times, had the ability to affect the terms and conditions of Ms. Newton's employment. As such, Defendant Pratt is Ms. Newton's employer under the NYSHRL and NYCHRL and is liable under the NYSHRL and the NYCHRL.

26.     Defendant Lloyd Doran ("Defendant Harasser Doran") was the Director, Property and Facility Operations at Defendant Louis Vuitton. Defendant Harasser Doran sexually harassed and assaulted Ms. Newton and is liable under the NYSHRL and NYCHRL. Following the sexual harassment, he was nonetheless promoted to "Senior Director."

7

27.     Upon information and belief, Defendant Harasser Doran, in his role as Director, Property and Facility Operations, had unfettered access to all security cameras and managed all security employees within LVMH, had been at Defendant Louis Vuitton for more than a decade, and had a staff of approximately 30 people and had very close relationships with upper management.

28.     Defendant Louise Firestone ("Defendant General Counsel Firestone") was the Senior Vice President of Legal Affairs and General Counsel at Defendant Louis Vuitton. Defendant Firestone was Ms. Newton's direct supervisor and had the ability to affect the terms and conditions of Ms. Newton's employment and was Ms. Newton's employer under the NYSHRL and NYCHRL.

29.     Defendant Frank Martinez ("Defendant Employment Counsel Martinez") was the Vice President, Legal Affairs and Employment Counsel at Defendant Louis Vuitton. Defendant Martinez had the ability to affect the terms and conditions of Ms. Newton's employment and was Ms. Newton's employer under the NYSHRL and NYCHRL.

30.     Defendant Anish Melwani ("Defendant CEO Melwani") is the Chief Executive Officer of LVMH. Defendant CEO Melwani had the ability to affect the terms and conditions of Ms. Newton's employment and is Ms. Newton's employer under the NYSHRL and NYCHRL.

31.     Defendant Gena Smith ("Defendant SVP of HR Smith") is the Senior Vice President Human Resources at Defendant Louis Vuitton. Defendant Smith had the ability to affect the terms and conditions of Ms. Newton's employment and is liable under the NYSHRL and NYCHRL.

**Formatted:** Normal, Line spacing:  single

8

**FACTUAL ALLEGATIONS**

**I.     BACKGROUND**

*Ms. Newton Joins and Excels at Defendant Louis Vuitton in New York as Director, Litigation Counsel*

~~25.~~32.   Ms. Newton has worked at the top of her industry as both an accountant and now an attorney for twenty years.

~~26.~~33.   Ms. Newton is a Black and Afro-Latina woman who graduated from Georgetown University with a Bachelor of Science in Business Administration with a minor in French. She also received a diploma for her studies in Business from Université de Lyon III (Jean Moulin) in Lyon, France. During college, Ms. Newton interned at Johnson & Johnson, including in its Paris offices.

~~27.~~34.   After college, Ms. Newton earned her license as a Certified Public Accountant and worked as a Senior Associate and Auditor for PricewaterhouseCoopers—the second largest professional services firm in the world—and as an Internal Control Analyst and Auditor at Estée Lauder—one of the world's leading manufacturers and marketers of luxury skin care, makeup, fragrance and hair care products.

~~28.~~35.   Ms. Newton then went on to receive dual law degrees in U.S. and French law from Cornell Law School and Université de Paris I Panthéon-Sorbonne a.k.a. La Sorbonne. During law school, Ms. Newton interned at the Paris office of a top U.S. law firm. After law school, she clerked for the First Vice President Judge Akua Kuenyehia at the International Criminal Court.

~~29.~~36.   Ms. Newton is fluent in French. In total, she studied and worked in France for two years, and has visited numerous times for extended periods since.

~~30.~~37.   After clerking, Ms. Newton spent eight years as an attorney at major law firms in the United States before joining Defendant Louis Vuitton as Director, Litigation Counsel in 2015.

31.38.  In her role, Ms. Newton managed litigations and legal disputes for more than 25 luxury brands within the Defendant Louis Vuitton umbrella.  Ms. Newton directed legal strategy and advised senior executives and general counsel in the United States, Europe, and Asia on legal disputes and litigations.

### *Ms. Newton Receives Exemplary Reviews and Praise*
### *for Her Performance and is Promoted*

32.39.  Ms. Newton was successful in her role and received universal praise from her supervisors for her judgment and effectiveness.

33.40.  Shortly after starting her employment with Defendant Louis Vuitton, Ms. Newton suffered a personal tragedy when her baby brother, who was more like a son to her because of their vast age difference, passed away unexpectedly at the age of 25. The events left Ms. Newton distraught and vulnerable. This personal tragedy notwithstanding, Ms. Newton was able to continue to be effective at her job.

34.41.  Ms. Newton's supervisor, General Counsel, Defendant Louise Firestone ("General Counsel FirestoneDefendant General Counsel Firestone") of Defendant Louis Vuitton, initially described Ms. Newton as "a client's dream; she is attentive to their needs, handles all matters efficiently and with a calm demeanor, yet she is tough with outside counsel on her clients' behalf."[2] Ms. Newton's supervisor further stated that Ms. Newton "reflects the highest degree of honesty and ethics in all she does."

35.42.  In March 2017, Ms. Newton was promoted to Vice President, Legal Affairs, in recognition of her outstanding performance.

---

[2] In the context of these comments, Ms. Newton's "clients" were C-suite executives and colleagues at LVMH's various brands and subsidiaries.

36.43.  Ms. Newton continued to go above and beyond in her role, managing all non-employment litigations on behalf of Defendant Louis Vuitton and most of its U.S. affiliates, achieving significant positive results in her matters, and developing strong relationships among Defendant Louis Vuitton's various groups.  Ms. Newton was also selected by her supervisor to create and spearhead Defendant Louis Vuitton's first pro bono initiative, which was a resounding success.

***Ms. Newton is Warmly Received by the Legal Team and Befriended by*** ~~*Employment Counsel Martinez*~~***Defendant Employment Counsel Martinez***

37.44.  Due to a shared love of singing opera and classical music, Ms. Newton and ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez quickly bonded and often relied on and confided in each other at work. They attended each other's musical performances, gave feedback on performance preparation and supported each other's arts-related efforts.

38.45.  As Employment Counsel, Martinez regularly handled internal employees' complaints of employment discrimination, and he routinely complained about Defendant Louis Vuitton and its brands' employees who reported discrimination, constantly suggesting that their claims were manufactured and exaggerated.  He also routinely shared confidential employee information with Ms. Newton.

39.46.  Ms. Newton also became friendly with the Vice President of Legal Affairs, Real Estate Counsel (referred to herein as "Real Estate Counsel Doe").

***Ms. Newton, the Only Black Executive, is both Undertitled and Underpaid***

40.47.  From February 2015 when Ms. Newton joined Defendant Louis Vuitton, through summer 2015, Defendant Louis Vuitton gave the two Black attorneys (both female) in the legal department, including Ms. Newton, lower titles (Director) than those given to the two non-Black

attorneys (Vice President), which *inter alia*, significantly impacts compensation and benefits employees receive.

~~41.~~48.   From spring 2015, after the departure of the other Black female attorney in or around spring 2015, through fall 2020, Ms. Newton was the only Black employee at the Director level or above at Defendant Louis Vuitton.

~~42.~~49.   When hiring an attorney to replace the other Black attorney in the legal department, Defendant Louis Vuitton granted that attorney (Real Estate Counsel) the title of VP.

~~43.~~50.   Thereafter, all three of Ms. Newton's Non-Black attorney colleagues (and her non-Black predecessor) had Vice President titles; but she did not.

~~44.~~51.   Upon information and belief, beginning in February 2015 when she joined Defendant Louis Vuitton, Ms. Newton was underpaid by at least $40,000-$60,000 compared to her non-Black colleagues (and her non-Black predecessor) even though she was charged with at least the same level of responsibilities and tasks, if not more.  That gap only widened each year after 2015.

~~45.~~52.   Defendant Louis Vuitton maintained Ms. Newton at a title (Director) that was lower than that of the other 3 non-Black attorneys in the Legal Department (Vice President) and lower than that possessed by Ms. Newton's Non-Black predecessor (Vice President).

~~46.~~53.   It was only after Ms. Newton's repeated pleadings, based on the duties, responsibilities, and performance with which she was charged, to change her title that Defendant Louis Vuitton finally acquiesced to her requests in March 2017.  Her compensation, however, remained significantly lower than her fellow attorneys' in the Legal Department and significantly lower than the male attorneys in the Legal Department.

47.54. On information and belief, Ms. Newton was the highest titled Black employee within Defendant Louis Vuitton's holding company from 2015 to 2020, and no Black employee possessed that title or higher in Defendant Louis Vuitton's entire history.

48.55. On information and belief, another Black former employee in a different department brought claims against Defendants for racial discrimination.

## II. THE CAMPAIGN OF SEXUAL HARASSMENT AGAINST MS. NEWTON

49.56. Shortly after Ms. Newton began working at Defendant Louis Vuitton, Harasser DoranDefendant Harasser Doran began to engage in a persistent and invasive campaign of sexual harassment against Ms. Newton. That harassment continued for years.

50.57. In or around May 2015, Ms. Newton had her first encounter with Harasser DoranDefendant Harasser Doran.

51.58. Harasser DoranDefendant Harasser Doran came to Ms. Newton's office to discuss making repairs and hanging framed artwork. Before leaving Ms. Newton's office, he lingered in the doorway, stared at Ms. Newton long enough that she began to feel uncomfortable, and stated: "You are so pretty. And that beautiful smile…I just can't get enough of it." Ms. Newton recoiled at this statement and immediately turned away from Harasser DoranDefendant Harasser Doran, who subsequently exited her office.

52.59. After this initial encounter, Harasser DoranDefendant Harasser Doran sexually harassed Ms. Newton for more than three years. Each and every time he saw her, he acted in a sexually suggestive manner. They came into contact at least once every 3 to 4 weeks.

53. Specifically, for example, Harasser DoranDefendant Harasser Doran began to linger outside of Ms. Newton's office despite the fact that his office was on a different floor. As he did each time he saw her, he would leer at Ms. Newton in a sexually suggestive manner that

made -- and was intended to make -- Ms. Newton feel as though he was undressing her with his eyes and thinking about her in a sexual manner.

***~~Harasser Doran~~Defendant Harasser Doran Physically Sexually Assaults Ms. Newton***

~~54.~~60.  In or around September 2015, ~~Harasser Doran~~Defendant Harasser Doran entered Ms. Newton's office again to discuss office repairs and the hanging of artwork.  Ms. Newton was facing the doorway, seated at her desk in front of her computer screen.  In the midst of his discussion with Ms. Newton, under the guise of having to call a colleague, he suddenly and without warning lunged his body across and on top of Ms. Newton's, thrusting his pelvis and genitals into her face and pressing his body firmly against hers as he reached across her body for her phone. Ms. Newton found herself pinned against her chair. The motion was completely unnatural and unnecessary and left Ms. Newton stunned and terrified. Leveraging the wheels of her office chair, she frantically pushed her body away from her desk and jumped up from her chair in horror, making clear that the contact was unwanted.  She chided ~~Harasser Doran~~Defendant Harasser Doran, but he did not even turn to face her as she did so.  Moments later, he slinked out of her office, without uttering a word to her.

***Ms. Newton Reports the Physical Sexual Harassment and Assault to ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez***

~~55.~~61.  Feeling violated and unsafe, Ms. Newton reported the escalating sexual harassment to ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez in front of Real Estate Counsel Doe, with whom she had also become friends. She mentioned that ~~Harasser Doran~~Defendant Harasser Doran regularly appeared by her office and acted in a creepy and sexual manner. She specifically stated that he was very weird to her and that he had even come to her office and placed his body over hers in an extremely weird way.

14

56.62.   ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez ignored Ms. Newton as if she had said nothing and quickly changed the subject.

57.63.   ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez did not ask for any details or even acknowledge Ms. Newton's discomfort with ~~Harasser Doran~~Defendant Harasser Doran's actions.

58.64.   ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez still failed to act, even after Ms. Newton reported Physical sexual harassment.

***~~Harasser Doran~~Defendant Harasser Doran Sexually Harasses Ms. Newton at a Company Event***

59.65.   Following this incident, ~~Harasser Doran~~Defendant Harasser Doran continued to appear outside Ms. Newton's office, where he would lurk, often for minutes on end, leering intently at Ms. Newton.  He likewise uncomfortably invaded her space at company events, before and after fire drills, in the elevator bank, and during chance encounters in the hallway, and on several occasions, in full view of other employees.

60.66.   At one company event, in or around 2015 or 2016, ~~Harasser Doran~~Defendant Harasser Doran, upon seeing Ms. Newton enter the room, walked across the room and directly approached the cocktail table at which Ms. Newton was standing, where she and a few female colleagues were conversing.  Upon arriving at the table, he made a point of kissing each woman twice—once on each cheek.

61.67.   After he had kissed each of the other women, he approached Ms. Newton last and attempted to kiss Ms. Newton on the cheeks as well. Ms. Newton leaned her face and body backwards so that he could not reach her.

15

62.68. In response to Ms. Newton's movement, ~~Harasser Doran~~Defendant Harasser Doran, who, upon information and belief, is white American, loudly exclaimed to everyone at the table: "What? No 'bises'[3] for me?" Ms. Newton sternly responded: "No" and kept her distance from ~~Harasser Doran~~Defendant Harasser Doran.

63.69. Despite Ms. Newton's two rejections of ~~Harasser Doran~~Defendant Harasser Doran's attempts to kiss her, he again persisted with his attempts loudly stating to everyone at the table: "Oh, come on, it's a celebration…" Ms. Newton gave him a look of disgust and quickly walked away.

***Plaintiff's Co-worker Observes ~~Harasser Doran~~Defendant Harasser Doran's Harassment***

64.70. In or about fall 2017, Ms. Newton was in her office having a discussion with Real Estate Counsel Doe, when ~~Harasser Doran~~Defendant Harasser Doran walked by Ms. Newton's office. After Real Estate Counsel Doe said "hello" ~~Harasser Doran~~Defendant Harasser Doran inexplicably entered Ms. Newton's office and stood there waiting to be included in the conversation and managing to get a few irrelevant sentences in. When ~~Harasser Doran~~Defendant Harasser Doran realized that both Real Estate Counsel Doe and Ms. Newton were not responding to his statements or engaging him in the conversation, he eventually left.

65.71. Once ~~Harasser Doran~~Defendant Harasser Doran finally left, Real Estate Counsel Doe told Ms. Newton that ~~Harasser Doran~~Defendant Harasser Doran's behavior had been "weird" and "creepy," and later described ~~Harasser Doran~~Defendant Harasser Doran as "lurking" and "lingering" around Ms. Newton's office.

---

[3] "Bises" are the pair of kisses that French people who are familiar with each other commonly use to greet each other or say goodbye.

66.72.  During the holiday party, after Ms. Newton realized she was seated at the same table as ~~Harasser Doran~~Defendant Harasser Doran, she became anxious, agitated, and distraught and complained to Real Estate Counsel Doe, in a panic, about how uncomfortable she felt being seated so close to ~~Harasser Doran~~Defendant Harasser Doran.

67.73.  For years, ~~Harasser Doran~~Defendant Harasser Doran continued his harassment, and Ms. Newton did everything she could to avoid him. Ms. Newton spent less time in her office, kept her door closed more frequently, avoided taking the stairs, and devised other ways to reduce the likelihood of seeing or interacting with him. However, even with these precautions, Ms. Newton was unable to avoid highly uncomfortable encounters with ~~Harasser Doran~~Defendant Harasser Doran.

68.74.  Ms. Newton was constantly nervous because she knew that ~~Harasser Doran~~Defendant Harasser Doran had the ability to view where she was at all times through Defendant Louis Vuitton's security cameras and had authority over all of the security staff. Ms. Newton was particularly concerned in the evenings that she had to work late and there would be fewer employees in the building.

69.75.  For example, on or about January 3, 2018, Defendant Louis Vuitton's headquarters flooded.  Employees, including Ms. Newton, rushed to clean up and protect her colleagues and supervisor's important files, business documents, and electronic equipment on the floor from destruction. ~~Harasser Doran~~Defendant Harasser Doran took this opportunity to stand nearby and leer at her.  He did not offer to help or provide any assistance.  He simply ogled Ms. Newton, staring suggestively at her body as she hastily tried to gather the documents.

70.76.  Ms. Newton continued to complain to ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez about ~~Harasser Doran~~Defendant Harasser Doran's sexual

harassment, but every time she did, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez ignored her complaints.

~~71.~~77.  As explained below, Ms. Newton repeatedly informed several colleagues of the behavior, and ultimately reported it to Human Resources, only to be retaliated against for her efforts to stop the harassment.

III.  **DEFENDANT LOUIS VUITTON IGNORES MS. NEWTON'S REPORTS OF SEXUAL HARASSMENT, RETALIATES AGAINST HER, AND INSTEAD TREATS ~~HARASSER DORAN~~DEFENDANT HARASSER DORAN AS THE VICTIM**

### ***Defendant Louis Vuitton Ignores Ms. Newton's Informal Reports of Harassment***

~~72.~~78.  Ms. Newton's complaints were in accordance with Defendant Louis Vuitton's Company policy, which allows a complaint of sexual harassment to be made to a "supervisor, any Company executive…" After an informal complaint, Defendant Louis Vuitton may "take action to address potential violations of this policy beyond an informal discussion."

~~73.~~79.  Ms. Newton had hoped that, by informally reporting the sexual harassment, Defendant Louis Vuitton would resolve the problem without the potential negative effects that could follow—and eventually did follow—from a formal report.  Ms. Newton was left with no other avenue to stop the sexual harassment, as ~~Harasser Doran~~Defendant Harasser Doran made it clear that he did not care how visibly uncomfortable his behavior made her, and he showed no signs of ceasing his harassment.

~~74.~~80.  Between late 2015 and 2018, Ms. Newton informally reported ~~Harasser Doran~~Defendant Harasser Doran's conduct to Defendant Louis Vuitton personnel on several occasions, including to Defendant Louis Vuitton's in-house employment counsel ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez and Real Estate Counsel, both executives with Defendant Louis Vuitton.

75.81.  In every instance, Defendant Louis Vuitton failed Ms. Newton, in violation of Defendant Louis Vuitton's employment policies.

76.82.  In an especially egregious failing, on May 30, 2018, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez coldly advised Ms. Newton that he could not report the conduct further within Defendant Louis Vuitton because he worked for the legal department, not HR, a statement which is flatly contradicted by Defendant Louis Vuitton's own Company policy—which upon information and belief ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez had assisted in creating.

77.83.  Upon information and belief, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez intended to and did send the message to Ms. Newton that he did not take her claims seriously, did not care if ~~Harasser Doran~~Defendant Harasser Doran was harassing her, Defendant Louis Vuitton did not take her claims seriously, did not care if ~~Harasser Doran~~Defendant Harasser Doran was harassing her, and Defendant Louis Vuitton would do nothing to stop the harassment.

***Ms. Newton Emails ~~Harasser Doran~~Defendant Harasser Doran on the Instruction of ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, and is Then Reprimanded for Her Email Telling ~~Harasser Doran~~Defendant Harasser Doran to Stop Harassing Her***

78.84.  Following a May 30, 2018, incident involving ~~Harasser Doran~~Defendant Harasser Doran once more lingering outside her office and leering at her, Ms. Newton e-mailed ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez and Real Estate Counsel Doe to complain again about ~~Harasser Doran~~Defendant Harasser Doran's behavior.  Her actions were in accordance with the complaint procedure outlined in Defendant Louis Vuitton's Company policy.

~~79.~~85.  When ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez failed to respond to Ms. Newton, she followed up and called him in his capacity as employment counsel of Defendant Louis Vuitton, pleading with him to do something to stop the harassment. She told him "I can't be the first or only person he's done this to.  It wouldn't make sense for him to start with me.".  ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez did not respond to Ms. Newton's statements and stated that he could not report the conduct Ms. Newton was reporting because he worked for the legal department, not HR, again, directly contradicting Company policy.  Instead of addressing the matter with ~~Harasser Doran~~Defendant Harasser Doran himself or encouraging Ms. Newton to file a formal report, he then suggested that Ms. Newton confront ~~Harasser Doran~~Defendant Harasser Doran and tell him to stay away.

~~80.~~86.  Ms. Newton responded that, as she had previously explained to ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, she had already made clear to ~~Harasser Doran~~Defendant Harasser Doran that his conduct was unwelcome, but it had not made a difference. She also explained that she feared interacting directly with him in person.  In response, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez nevertheless encouraged her to confront ~~Harasser Doran~~Defendant Harasser Doran in "no uncertain terms," as if she had not properly conveyed the fact that his sexual harassment was unwelcome and that it was her own fault that it had gone on for years.

~~81.~~87.  Following ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez's instruction, and because Ms. Newton feared having any interaction whatsoever, including being alone with ~~Harasser Doran~~Defendant Harasser Doran, Ms. Newton sent ~~Harasser Doran~~Defendant Harasser Doran an email.  In this email, Ms. Newton referred to ~~Harasser Doran~~Defendant Harasser Doran's past incidents, including "loitering," "leering," and "peering,"

remarks about Ms. Newton's physical appearance and smile, invading Ms. Newton's personal space, and "hanging around." Ms. Newton referred to this "ongoing pattern" of "inappropriate behavior" as "harassment" and told ~~Harasser Doran~~Defendant Harasser Doran to stop his inappropriate conduct and unequivocally stated it was "unwanted and unwelcome." She stated that "[i]t also ma[de] [her] concerned that [he] may have engaged in this type of behavior with others."

~~82.~~88.  In her email, Ms. Newton stated that if the behavior continued, she would report ~~Harasser Doran~~Defendant Harasser Doran to Human Resources.

~~83.~~89.  Ms. Newton forwarded this email to ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez and Defendant Louis Vuitton's in-house Real Estate Counsel.

***Martinez, Firestone, and Smith Immediately and Aggressively Begin Their Campaign of Retaliation Against Ms. Newton***

~~84.~~90.  Minutes after Ms. Newton forwarded the email, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez called Ms. Newton from his cell phone after he had left the office for the evening. He had never previously called her from his cell phone after hours, and Ms. Newton assumed that he had called to make sure that she was OK, or to otherwise assist her as Defendant Louis Vuitton's Employment Counsel. Instead, to Ms. Newton's grave shock, disappointment and immediate fear, he called to reprimand, diminish, insult and attack her.

~~85.~~91.  ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez was enraged and stated repeatedly in an accusatory tone that he "now ha[d] to report this," even though he previously claimed he could not report ~~Harasser Doran~~Defendant Harasser Doran's behavior.

~~86.~~92.  On the phone, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez initially denied having told Ms. Newton to confront ~~Harasser Doran~~Defendant Harasser Doran. He subsequently admitted that he had told her to confront ~~Harasser Doran~~Defendant Harasser Doran but insisted that he had not instructed her to do so in writing.

21

87.93.   ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez was upset about being presented with a written record of the harassment, the obligation that carried, and the past neglected obligations that revealed but he did not appear to have any care or concern at all for the harassment itself, or Ms. Newton.

88.94.   In addition to being angry about the writing, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez repeatedly expressed concern for how ~~Harasser Doran~~Defendant Harasser Doran would feel when he read the email.

89.95.   Outrageously, after making it seem like she had committed a terrible infraction by following his instructions to ask ~~Harasser Doran~~Defendant Harasser Doran to stop harassing her, he ended the call by telling Ms. Newton that they could "no longer be friends," and from that time on, ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez "unfriended" Ms. Newton and continued to act in a hostile manner towards her in retaliation for reporting the sexual harassment.

### *Defendant Louis Vuitton Conducts a Sham Internal Investigation*

90.96.   The following day, Ms. Newton received a phone call from Emma Ancelle, the then Senior Director, Talent Development at Defendant Louis Vuitton ("Senior Director of Talent Ancelle"), who had been tasked by Martinez, Firestone, and Senior Vice President of Human Resources, Defendant Gena Smith ("~~SVP of HR Smith~~Defendant SVP of HR Smith") with leading Defendant Louis Vuitton's internal investigation into Ms. Newton's email, under the supervision of ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, ~~SVP of HR Smith~~Defendant SVP of HR Smith and Ms. Newton's supervisor, ~~General Counsel Firestone~~Defendant General Counsel Firestone, and upon information and belief, outside counsel

22

Rex Sessions of Winston & Strawn. No explanation was given as to why independent outside counsel was not conducting the investigation.

~~91.~~97.  Upon information and belief, the outside counsel, SVP Smith, ~~General Counsel Firestone~~Defendant General Counsel Firestone, and ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez were guiding Senior Director of Talent Ancelle through the investigation because of ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez's failure to address Ms. Newton's prior complaints.

~~92.~~98.  Upon receiving this call, Ms. Newton became hopeful that Defendant Louis Vuitton was taking her complaint of ~~Harasser Doran~~Defendant Harasser Doran's sexual harassment seriously. Unfortunately, Ms. Newton quickly learned that Defendant Louis Vuitton had no interest in seriously investigating her complaints and in fact, was extremely angry at her for following their instructions to try to end the sexual harassment after ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez had refused to assist.

~~93.~~99.  Senior Director of Talent Ancelle informed Ms. Newton that she had read through the copy of Ms. Newton's email to ~~Harasser Doran~~Defendant Harasser Doran which she had requested of Ms. Newton, and summoned Ms. Newton to her office so they could talk "about the email." Previously, Senior Director of Talent Ancelle had always been extremely deferential and respectful to Ms. Newton and Ms. Newton was shocked by her obvious change in behavior towards her after she reported the sexual harassment.

~~94.~~100.  Later that day, Senior Director Talent Ancelle, to the embarrassment of Ms. Newton, had Ms. Newton wait outside her office on the Senior Executives' floor for an extended period of time but Senior Director of Talent Ancelle never appeared for the meeting.  The two subsequently had a brief meeting in Ms. Newton's office during which Senior Director of Talent

Ancelle questioned Ms. Newton regarding the email. When Ms. Newton stated that ~~Harasser Doran~~Defendant Harasser Doran had been sexually harassing her for years and had assaulted her once, Senior Director of Talent Ancelle asked if he had ever threatened Ms. Newton and asked a series of accusatory questions relating to Ms. Newton's choice of words in her email.

~~95.~~101.     Senior Director of Talent Ancelle, rather than asking about the sexual harassment or assault, asked Ms. Newton who else knew about the email she had sent, and demanded that Ms. Newton forward her any emails she had sent concerning the email to ~~Harasser Doran~~Defendant Harasser Doran. Senior Director of Talent Ancelle also completely disregarded when Ms. Newton told her that the Real Estate Counsel had witnessed some of the harassment.

~~96.~~102.     Senior Director of Talent Ancelle did not ask any follow-up questions regarding the sexual harassment that Ms. Newton had suffered and was uninterested in hearing about Ms. Newton's concerns. Senior Director of Talent Ancelle was far more concerned about how Ms. Newton's email could reflect on Defendant Louis Vuitton's "branding" and image than she was on the actual sexual harassment that Ms. Newton had experienced.

~~97.~~103.     The following day, Senior Director of Talent Ancelle requested another meeting with Ms. Newton.  At this meeting, Senior Director of Talent Ancelle informed Ms. Newton that she had met with ~~General Counsel Firestone~~Defendant General Counsel Firestone—Ms. Newton's supervisor, without first informing Ms. Newton as she had requested—and ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, ~~SVP of HR Smith~~Defendant SVP of HR Smith, and Rex Sessions of Winston & Strawn [inferred] to discuss Ms. Newton's claims before meeting with Ms. Newton.  Senior Director of Talent Ancelle also informed Ms. Newton that she had spoken to ~~Harasser Doran~~Defendant Harasser Doran and Real

Estate Counsel Doe and had concluded that this was all "just a misunderstanding" or "miscommunication," and that the matter was considered closed.

98.104.     Senior Director of Talent Ancelle described Harasser Doran Defendant Harasser Doran's behavior as "mere flirting" and told Ms. Newton that the incident in which he had attempted to kiss Ms. Newton was "what executives do in a French company," suggesting that Ms. Newton was unfamiliar with French culture and should simply tolerate the behavior. Ms. Newton found this excuse to be demeaning, not only because she was indeed very familiar with French culture after living and working in France for several years, but also because he had never greeted her that way before.

99.105.     Senior Director of Talent Ancelle completely ignored other instances of harassment, including, most egregiously, the incident in which Harasser Doran Defendant Harasser Doran had lunged at Ms. Newton and pressed his body against hers.

100.106.     Senior Director of Talent Ancelle then further retaliated against Ms. Newton by reprimanding her for the email she sent Harasser Doran Defendant Harasser Doran and suggesting that Ms. Newton apologize to her harasser. Senior Director Talent of Ancelle made the following statements to Ms. Newton:

   a) The company is placed in a bad light by your emails referring to Harasser Doran [Defendant Harasser Doran] as a stalker;

   b) You need to understand how [Harasser Doran Defendant Harasser Doran] feels;

   c) Harasser Doran [Defendant Harasser Doran] feels threatened;

   d) Harasser Doran [Defendant Harasser Doran] can't sleep or eat;

   e) Harasser Doran [Defendant Harasser Doran] is concerned that he might lose his job;

   f) Harasser Doran [Defendant Harasser Doran] is demanding an apology from you;

g) You should not have sent ~~Harasser Doran~~[Defendant Harasser Doran] an email; and

h) Your email was unjustifiably "attacking" ~~Harasser Doran~~[Defendant Harasser Doran].

~~101.~~107.      Senior Director Talent Ancelle did not express any concern for Ms. Newton even though Ms. Newton had informed her that she had been sexually harassed by ~~Harasser Doran~~Defendant Harasser Doran for years.

~~102.~~108.      Ms. Newton lived in constant fear that he would again sexually harass, assault, and/or retaliate against her for reporting him and for refusing to apologize to him as he had demanded and as Defendant Louis Vuitton had encouraged her to do.

~~103.~~109.      Ms. Newton was shocked and demoralized to watch Defendant Louis Vuitton turn the tables on her and retaliate against her, portraying her as the perpetrator and the perpetrator as the victim. Further, Ms. Newton could not believe she was actually being reprimanded simply for wanting to be free of sexual harassment and assault in her workplace and especially since ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez refused to intervene after she had repeatedly sought his help and after he had instructed her to resolve the matter herself.

~~104.~~110.      When Ms. Newton requested that the Company at least instruct ~~Harasser Doran~~Defendant Harasser Doran to stay away from her, Senior Director Talent Ancelle replied that ~~Harasser Doran~~Defendant Harasser Doran had to be able to do his job as he saw fit.

~~105.~~111.      Senior Director Talent Ancelle's internal "investigation" report, overseen by ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez and ~~General Counsel Firestone~~Defendant General Counsel Firestone and, upon information and belief, ~~SVP of HR Smith~~Defendant SVP of HR Smith and Rex Sessions of Winston & Strawn, is a clear reflection of

Defendant Louis Vuitton's intent to protect its image at the expense of Ms. Newton and other employees' well-being and safety.

106.112. Defendant Louis Vuitton was unconcerned that ~~Harasser Doran~~Defendant Harasser Doran had assaulted Ms. Newton and had engaged in inappropriate, sexually charged behavior which made Ms. Newton feel unsafe and emotionally distressed in her work environment. Instead, Defendant Louis Vuitton was concerned only with and completely focused on how Ms. Newton's email which Employment Counsel had instructed her to send, pleading with ~~Harasser Doran~~Defendant Harasser Doran to stop, would reflect on Defendant Louis Vuitton. Senior Director of Talent Ancelle's report was riddled with inaccuracies and altered Ms. Newton's statements to suit Defendant Louis Vuitton's narrative.

107.113. Senior Director of Talent Ancelle went on to further retaliate against Ms. Newton for reporting the sexual harassment by shaming her, as she had during her second meeting with Ms. Newton. She described Ms. Newton's use of words such as "creep" and "stalker" in an email as unprofessional, which was especially humiliating because it was Ms. Newton's job to instruct management on how emails should be written.

108.114. On information and belief, prior to this meeting, Senior Director of Talent Ancelle was directed by ~~General Counsel Firestone~~Defendant General Counsel Firestone (who was Ms. Newton's supervisor), ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, ~~SVP of HR Smith~~Defendant SVP of HR Smith, and Defendant Louis Vuitton's outside counsel Winston & Strawn—currently representing Defendant Louis Vuitton in this matter—to instruct Ms. Newton to apologize to ~~Harasser Doran~~Defendant Harasser Doran for sending the May 30, 2018, email.

***Ms. Newton Files a Formal Complaint with Human Resources,***
***Despite Being Retaliated Against and Discouraged from Doing so by*** ~~General Counsel Firestone~~ *Defendant General Counsel Firestone*

~~109.~~115.    The night before the following business day, on or about June 3, 2018, Ms. Newton emailed ~~General Counsel Firestone~~Defendant General Counsel Firestone describing the prior week's events and expressing concern that she had been treated like the perpetrator and her harasser like the victim.

~~110.~~116.    In her email to ~~General Counsel Firestone~~Defendant General Counsel Firestone, Ms. Newton revealed that she would be submitting a formal report to Human Resources because ~~Harasser Doran~~Defendant Harasser Doran's behavior had not stopped, the Company had failed to instruct him to stop, and Ms. Newton was troubled by the company's handling of the situation.

~~111.~~117.    On the same date, June 3, 2018, Ms. Newton filed a formal complaint with ~~SVP of HR Smith~~Defendant SVP of HR Smith. In her complaint, Ms. Newton described the sexual harassment and response of Defendant Louis Vuitton's legal counsel and Senior Director of Talent Ancelle. Ms. Newton requested an investigation by an "outside, impartial, and unbiased expert who has no personal or professional connection to anyone at the company" and requested that the company "refrain from further dismissing, diminishing, or criticizing [Ms. Newton's] concerns, and from taking further steps to prevent [her] from, or reprimand [her] for, raising them." ~~SVP of HR Smith~~Defendant SVP of HR Smith refused to provide Ms. Newton with Senior Director Talent Ancelle's report or any details regarding her "investigation."

~~112.~~118.    Ms. Newton only wanted Defendant Louis Vuitton to properly investigate her claims and stop ~~Harasser Doran~~Defendant Harasser Doran's sexual harassment, and requested the outside investigation because Defendant refused to grant her minimal requests and caused her concern that conflicts of interest were clouding their judgment.

113.119.     Ms. Newton believed that an outside investigation would show Defendant how little Ms. Newton was requesting and how easily Defendant could address her reports simply by having ~~Harasser Doran~~Defendant Harasser Doran stay away from her.

***Defendant** Louis Vuitton Continues to Retaliate Against Ms. Newton by Attempting to Pressure her to Drop her Complaint, Placing the Blame on Her, and Telling Her She Needs to Put Up with Harassment "As A Woman"*

114.120.     The following day, ~~General Counsel Firestone~~Defendant General Counsel Firestone called Ms. Newton to a meeting.  When Ms. Newton entered the room, ~~General Counsel Firestone~~Defendant General Counsel Firestone was already visibly upset with Ms. Newton and questioned why Ms. Newton would file a report, insinuating that by doing so Ms. Newton had harmed ~~General Counsel Firestone~~Defendant General Counsel Firestone.

115.121.     ~~General Counsel Firestone~~Defendant General Counsel Firestone then asserted that, based on the Company's internal investigation, there was clearly no violation of company policy or the law. When Ms. Newton pointed out that the "investigation" was inadequate and that the talent personnel had hardly asked her any questions, ~~General Counsel Firestone~~Defendant General Counsel Firestone asked why Ms. Newton, as a lawyer, did not ensure Defendant Louis Vuitton's talent personnel had asked better questions of her.

116.122.     ~~General Counsel Firestone~~Defendant General Counsel Firestone chastised Ms. Newton for supposedly not sending strong enough "cues" to ~~Harasser Doran~~Defendant Harasser Doran that she was not interested in his advances and shockingly went on to tell Ms. Newton that as professional women, there are "certain things we have to put up with" and "sacrifices we have to make."

117.123.     ~~General Counsel Firestone~~Defendant General Counsel Firestone declared that an outside investigator would be a waste of resources because they would reach the same

conclusion reached in Senior Director of Talent Ancelle's report but asked if Ms. Newton would "let things go" if an outside investigator determined that no sexual harassment had occurred. ~~General Counsel Firestone~~Defendant General Counsel Firestone claimed that Ms. Newton only requested an outside investigator because she "wasn't happy with the result" of Senior Director of Talent Ancelle's investigation and accused Ms. Newton of wanting "special treatment."

~~118.~~124.    Ms. Newton could not understand Defendant Louis Vuitton's inconsistency in demonstrating absolute trust in her with advising them and advocating on multi-million-dollar lawsuits on their behalf but so flagrantly ignore her factual statements about the sexual harassment she experienced.

~~119.~~125.    Ms. Newton maintained her request for an independent investigator and finally, a few days later, ~~General Counsel Firestone~~Defendant General Counsel Firestone and ~~SVP of HR Smith~~Defendant SVP of HR Smith suddenly announced to Ms. Newton that they were engaging an external investigator.

***Defendant Louis Vuitton Conducts a Sham External Investigation and Continues to Retaliate Against Ms. Newton for her Reports of Sexual Harassment***

~~120.~~126.    Defendant Louis Vuitton hired an outside investigator (the "Investigator") to conduct the external investigation without requesting any input from Ms. Newton about who the investigator should be. The investigation was merely an attempt to persuade Ms. Newton to stop pursuing her claims.

~~121.~~127.    On or about June 8, 2018, Ms. Newton was interviewed by the Investigator.

~~122.~~128.    The Investigator's comments during the interview made clear that the Investigator had been tasked with intimidating Ms. Newton, further retaliating against her on behalf of Defendant Louis Vuitton, and convincing her to put an end to the matter in favor of

Defendant Louis Vuitton, rather than using the interview as an opportunity to understand all the facts.

~~123.~~129.    The following are just a few of the comments the Investigator made during her "interview" of Ms. Newton:

a) As Ms. Newton described the sexual harassment and assault, the Investigator stated it would be "hard to prove;"

b) The Investigator stated: "I assume you like this job … you don't want to leave," suggesting Ms. Newton's claims could affect her employment;

c) The Investigator told Ms. Newton that if she continued to press her claims "people will say that you're very thin-skinned.  After all, he didn't really touch you."  When Ms. Newton reminded the Investigator of the time ~~Harasser Doran~~Defendant Harasser Doran assaulted her, the Investigator replied dismissively "… except for that one incident…;"

d) The Investigator asserted that, upon hearing about the sexual harassment, people would say: "alright, so he looked at her.  She's a good-looking girl.  So, what's so terrible?  She should be flattered …;"

e) The Investigator told Ms. Newton that if she pursues her claims she "will be viewed as, I don't know if I'd say a troublemaker, but you know, you don't get off scot-free;"

f) The Investigator stated to Ms. Newton: "you don't want him fired because … you know what happens once you get somebody fired … I want to say that to you, that it inures to your detriment, unfortunately … The one who gets somebody else fired, they look like a son of a bitch;"

g) The Investigator stated that because Defendant Louis Vuitton is part of "a French Company," they "look at these things differently;" and

h) The Investigator stated that she lived through the "McCarthy era" and that the #MeToo movement reminded her of McCarthyism.

~~124.~~130.    As a courtesy, Ms. Newton provided the Investigator with a few documents such as the email to ~~Harasser Doran~~Defendant Harasser Doran, a document summarizing the relevant individuals, and a document summarizing her professional background to assist the investigator in performing the investigation.

125.131.     The investigator enthusiastically accepted the documents and expressed appreciation of Ms. Newton's gesture.  Later, in her report, after consulting with the Company, the investigator did an about-face and instead of repeating her appreciation of the documents Ms. Newton provided as a courtesy to facilitate the investigator's investigation, the Investigator criticized Ms. Newton for providing the Investigator with this additional information.

126.132.     After publicly announcing Harasser DoranDefendant Harasser Doran's promotion at a Company event in late June, approximately one month later, on or about July 6, 2018, SVP of HR SmithDefendant SVP of HR Smith requested a meeting with Ms. Newton and informed her that the Investigator had not found a violation of the company's policy or the law.

127.133.     SVP of HR SmithDefendant SVP of HR Smith refused to provide Ms. Newton with the Investigator's report or any details regarding the investigation.

128.134.     SVP of HR SmithDefendant SVP of HR Smith did inform Ms. Newton that Real Estate Counsel Doe had confirmed that Harasser DoranDefendant Harasser Doran had "lingered" and "lurked" at Ms. Newton's office and that Ms. Newton expressed discomfort at being seated with him at the holiday party, but SVP of HR SmithDefendant SVP of HR Smith continued to maintain that there was "nothing wrong" with this problematic behavior.

129.135.     Ms. Newton repeated her concerns that she continued to fear for her safety and asked if the Company would do anything to stop Harasser DoranDefendant Harasser Doran's contact with her.  SVP of HR SmithDefendant SVP of HR Smith quipped in a sharp, annoyed tone that because Harasser DoranDefendant Harasser Doran had done "nothing wrong," the company would not issue any directive or instruction to him.

130.136.    Defendant Louis Vuitton's treatment of Ms. Newton was particularly troubling given the fact that this Defendant is a company whose customer base is mostly women and whose employees consist mostly of women.

131.137.    Likewise disappointing was Defendant Louis Vuitton's repeated attempts to deflect Ms. Newton's complaints of harassment by invoking false, negative stereotypes about "French" culture even though, on information and belief, none of the individual actors in this matter is, in fact, French. Specifically, in her "investigation" report and as noted above, Senior Director of Talent Ancelle wrote: "[a]s we are in a French Group, [Ms. Newton] should be aware that many executives may use the French greeting, as well as the US handshake, and she should be prepared to manage these interactions when they happen in a way that feels comfortable for her."

132.138.    The insinuation that Ms. Newton simply did not understand or fit in with the Company's "French" culture is laughable given that Ms. Newton had lived, worked, and studied in France for several years.[4]  Indeed, Defendant Louis Vuitton informed Ms. Newton that one of the main reasons they had hired her and considered her their "first choice candidate" was because of her vast experience with and knowledge of French culture.

133.139.    Ms. Newton had asked for nothing more than that Defendant Louis Vuitton instruct Harasser DoranDefendant Harasser Doran to stop sexually harassing her, but Defendant Louis Vuitton inexplicably bent over backwards to avoid granting her request and instead punished and blamed her for complaining and subjected her to ongoing retaliation.

---

[4] In addition, while employed with multiple companies in France, Ms. Newton had never been subjected to any similar behavior.

**IV. DEFENDANT LOUIS VUITTON'S RETALIATION AGAINST MS. NEWTON ESCALATES, CREATING AN ONGOING RETALIATORY HOSTILE WORK ENVIRONMENT**

~~134.~~140.    On or about June 21, 2018, in the midst of Defendant Louis Vuitton's purported external investigation into ~~Harasser Doran~~Defendant Harasser Doran's conduct and before Defendant Louis Vuitton had even discussed the results of the sham investigation with Ms. Newton, Defendant Louis Vuitton publicly announced at the company's annual summer party that ~~Harasser Doran~~Defendant Harasser Doran was being promoted.

~~135.~~141.    Soon after ~~Harasser Doran~~Defendant Harasser Doran was being celebrated, Ms. Newton began to be subjected to an ongoing retaliatory hostile work environment.

~~136.~~142.    Ms. Newton's supervisor, ~~General Counsel Firestone~~Defendant General Counsel Firestone, began singling out Ms. Newton, suddenly treating her differently to other employees and differently than she had treated Ms. Newton before Ms. Newton had made a formal complaint.

~~137.~~143.    Notwithstanding her previous glowing reviews of Ms. Newton, ~~General Counsel Firestone~~Defendant General Counsel Firestone began to chip away at Ms. Newton's autonomy in the office and was actively trying to take control of Ms. Newton's cases. ~~General Counsel Firestone~~Defendant General Counsel Firestone had also made comments that she is "watching" or "keeping an eye on" Ms. Newton despite her years of working independently with positive results.

~~138.~~144.    These acts of retaliation left Ms. Newton feeling isolated and targeted by Defendant Louis Vuitton and its employees, including ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez and ~~General Counsel Firestone~~Defendant General Counsel Firestone. Because of the actions taken by Defendant Louis Vuitton and its employees, Ms.

Newton believed that she was being pushed out of the Company as a direct result of having reported ~~Harasser Doran~~Defendant Harasser Doran's improper conduct.

~~139.~~145.     As noted above, in each of the three years preceding Ms. Newton's formal complaint regarding the sexual harassment, Defendant Louis Vuitton gave Ms. Newton flawless performance reviews, devoid of any criticism whatsoever of her performance.

~~140.~~146.     For example, in prior years, ~~General Counsel Firestone~~Defendant General Counsel Firestone wrote the following comments:

- In Ms. Newton's 2015-2016 Performance and Career Review:
    - "[Ms. Newton] has not shied away from dealing with complex matters, on the legal/technical side, as well as the complex inter-relationships between the brands and Paris HQ. She has ably handled all litigation matters that have come her way."
    - "[Ms. Newton] has brought much needed organization and strategic thinking to her role and is a valued member of the team."
- In Ms. Newton's 2016-2017 Performance and Career Review:
    - "[Ms. Newton] is a client's dream; she is attentive to their needs, handles all matters efficiently and with a calm demeanor, yet she is tough with outside counsel on her clients' behalf."
    - "Ms. Newton's understanding of the Group allows her to consistently handle [] uncertainty when it arises."
    - "Ms. Newton reflects the highest degree of honesty and ethics in all she does."
    - "Ms. Newton goes above and beyond to satisfy her cli[e]nts but also achieve consistent results across the Group. This is a very difficult task and requires a diplomatic touch as well as [] complete focus on the many moving parts litigations encompass."
- In Ms. Newton's 2017-2018 Performance and Career review:
    - That Ms. Newton had "excellent results."
    - "Pushing back against outside counsel is difficult and not without risk; brava."

> o "Ms. Newton continues to build confidence in our maisons as she handles what are stressful (and often costly) matters with aplomb. She is valued externally and internally for her intellect, ability and personal approach."

~~141.~~147.   Nevertheless, in an act of blatant retaliation for exercising her rights, ~~General Counsel Firestone~~Defendant General Counsel Firestone, on or about March 4, 2019, gave Ms. Newton—for the first time—a negative oral review, which was then memorialized in a written review Ms. Newton received on or about March 14, 2019 ("The Review").

~~142.~~148.   The Review contains false and inaccurate statements by ~~General Counsel Firestone~~Defendant General Counsel Firestone.  During her oral review, Ms. Newton requested, and ~~General Counsel Firestone~~Defendant General Counsel Firestone promised to provide, supporting documentation for the inaccurate and unfair characterizations of her performance. However, to date, Ms. Newton has not been provided with any such documentation.  This is because no such documentation exists. The Review also includes criticism blatantly inconsistent with performance evaluations ~~General Counsel Firestone~~Defendant General Counsel Firestone gave Ms. Newton in all prior years.

~~143.~~149.   In her prior reviews, Ms. Newton consistently received the highest rating available in multiple areas. For example, in her 2016-2017 Performance and Career Review, Ms. Newton received the highest available rating in the categories "coordinate management of litigations and claims involving several "maisons" and "manage outside counsel."  In her 2017-2018 Performance and Career Review, Ms. Newton similarly received the highest available rating in the categories "strategically manage new legal claims and issues" and "strengthen and continue to develop key internal and external business relationships."

~~144.~~150.   Nothing had changed about Ms. Newton's performance in that year.  The only thing that had changed is that Ms. Newton exercised her right to formally assert claims of

sexual harassment after Defendant Louis Vuitton repeatedly failed to address her previous claims and attempted to intimidate her out of pursuing them.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to Ongoing Retaliation, Making her Job as Difficult as Possible***

~~145.~~151.    Defendant Louis Vuitton continued the pattern of retaliation and hostility that included a variety of punishments meant to stifle Ms. Newton's career, including: (i) spoiling her relationships with her internal, international clients, co-workers, and partners; (ii) causing Ms. Newton humiliation, shame, and "otherness" at the office; (iii) treating her adversely by engaging in a variety of campaigns to stop Ms. Newton from playing quiet classical piano music in her office even though she had always been allowed to and even though other employees, including in-house employment counsel played much louder music in his office; (iv) excluding Ms. Newton from hiring decisions; (v) micromanaging and surveilling Ms. Newton; (vi) interfering with Ms. Newton's ability to attend legal conferences; (vii) giving Ms. Newton lower annual ratings inconsistently and disparately from the ratings of other employees for similar and lesser performance; (viii) lowering Ms. Newton's annual salary increases and bonus; (ix) issuing unsubstantiated negative feedback in her evaluations; and (x) intentionally failing and refusing to introduce Ms. Newton to new employees within the legal department.

~~146.~~152.    On or about April 17, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone continued to treat Ms. Newton differently from her peers by refusing to allow Ms. Newton to be involved with hiring a new intern, despite Ms. Newton's repeated requests to be involved in the process, in part because she would be working directly with the new intern.

~~147.~~153.    ~~General Counsel Firestone~~Defendant General Counsel Firestone intentionally failed to even introduce the new intern to Ms. Newton.

37

~~148.~~154.    ~~General Counsel Firestone~~Defendant General Counsel Firestone's actions became so unnecessarily hostile that ~~General Counsel Firestone~~Defendant General Counsel Firestone sent a "Thank You" note to Winston & Strawn's pro bono coordinator who assisted Ms. Newton on a pro bono event without notifying Ms. Newton or giving her a chance to sign the card. This was blatant retaliation as ~~General Counsel Firestone~~Defendant General Counsel Firestone usually seeks the signatures of all of the Legal Department members associated with certain projects on gifts/cards sent from the Legal Department, let alone the person she had selected to direct the Pro Bono Program.

~~149.~~155.    On April 22, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone began to escalate her retaliation by avoiding in person interactions with Ms. Newton in certain situations. For example, on one issue, ~~General Counsel Firestone~~Defendant General Counsel Firestone only communicated with Ms. Newton through the department's Legal Assistant. ~~General Counsel Firestone~~Defendant General Counsel Firestone would go out of her way, to the Legal Assistant's office, who was further than Ms. Newton's office, to give a document to the Legal Assistant with instructions to give it to Ms. Newton. There was no reason to involve the Legal Assistant outside of intentionally avoiding Ms. Newton.

***Defendant Louis Vuitton Celebrates ~~Harasser Doran~~Defendant Harasser Doran While Continually Subjecting Ms. Newton to Ongoing Retaliation***

~~150.~~156.    Not only did Defendant Louis Vuitton continuously retaliate against Ms. Newton and subject her to ongoing hostility, it also made a show of favoring and celebrating ~~Harasser Doran~~Defendant Harasser Doran. First, the Company promoted him and exonerated him from any wrongdoing in 2018, and even went so far as to sit him next to Defendant CEO Anish Melwani at the 2019 holiday party, even though there were approximately one hundred people—a message to Ms. Newton and to all Louis Vuitton employees that they should not report their sexual

38

harassers. Upon information and belief, Defendant CEO Melwani purposefully chose to have Defendant Harasser Doran sit next to him in an effort to humiliate and further ostracize Ms. Newton.

151. Following their outrageously public display of preference for ~~Harasser Doran~~Defendant Harasser Doran and their distaste for Ms. Newton, he became emboldened and frequently visited Ms. Newton's floor where he would talk loudly in the hallway outside of her office, visit ~~General Counsel Firestone~~Defendant General Counsel Firestone in her office only two doors down, and purposefully take the path that passed by Ms. Newton's office instead of the one that did not, and ~~General Counsel Firestone~~Defendant General Counsel Firestone encouraged his visits.

157.

***The Ongoing Retaliation Worsens after Ms. Newton Files a Complaint in Court and Defendant Louis Vuitton Publicly Retaliates Against Her***

~~152.~~159. After Ms. Newton filed a Complaint in New York State Supreme Court on April 23, 2019, Defendant Louis Vuitton spoke to the press,[5] falsely asserting the sham investigations performed did not find "… any evidence to support Ms. Newton's claims … [there was] no violation of company policy or the law."[6] Defendant Louis Vuitton also publicly stated that "There is no merit whatsoever to the allegations."[7]

~~153.~~159. The investigations Defendant Louis Vuitton publicly claimed found no violation were not sincere investigations at all, but rather an attempt by this Defendant to bully Ms. Newton out of pursuing her complaint and threaten her by telling her that she would be seen

---

[5] *See generally* https://www.law.com/newyorklawjournal/2019/04/24/senior-lawyer-at-luxury-brand-house-claims-sexual-harassment-retaliation/?slreturn=20210501095029

[6] https://hypebeast.com/2019/4/lvmh-sued-in-house-new-york-attorney-harrassment-retaliation-lawsuit

[7] https://www.thefashionlaw.com/lvmh-told-attractive-vp-litigator-to-simply-tolerate-years-of-sexual-harassment-per-lawsuit/

as a "thin-skinned" "son of a bitch" and a "troublemaker." Additionally, as stated above, Defendant Louis Vuitton refused to provide any report or documentation to support their claim that the investigation found no violation.

~~154.~~160.     Defendant Louis Vuitton intentionally misled the press to smear Ms. Newton in further retaliation for filing a Complaint in New York State Supreme Court.

***Defendant Louis Vuitton Further Retaliates Against Ms. Newton by Internally Smearing her***

~~155.~~161.     In response to her lawsuit, Defendant Louis Vuitton repeatedly publicly denounced Ms. Newton both internally and publicly to the media by repeatedly inferring that her allegations were false and she was a liar, despite charging her with responsibilities as a legal executive that required her to display the "highest degree of honesty," "ethics," and integrity for which they had previously lauded her.

~~156.~~162.     As if publicly vilifying Ms. Newton weren't enough, ~~CEO Melwani~~Defendant CEO Melwani even went so far as to take the unprecedented step of sending an email to all employees stating that Defendant Louis Vuitton had found no sexual harassment had occurred, creating the inference that Ms. Newton was a liar and directing them to "continue business as usual…" which for Ms. Newton meant enduring continued intense hostility against her.  This was despite Defendant Louis Vuitton's continuing to assign her executive-level responsibilities requiring "honesty," "ethics," and integrity.

~~157.~~163.     After this email was sent, more of Ms. Newton's coworkers, both in and outside her department, began to avoid her and refused to interact with her. When Ms. Newton would attempt to interact with coworkers with friendly greetings, they would ignore her or curtly respond with their head down and immediately walk away.

158.164.    Upon information and belief, specifically due to CEO MelwaniDefendant CEO Melwani's memo, coworkers were worried that Defendant Louis Vuitton would begin to retaliate against them if they were friendly or interacted with Ms. Newton.

159.165.    Outside the internal Legal Department, Defendant Louis Vuitton's outside counsel excluded Ms. Newton from a litigation matter after she attempted to give them pertinent information, instead responding directly to the internal client and excluding her. Ms. Newton did not know about this until the internal client approached her informing her that the outside counsel had met with them directly.

160.166.    Meanwhile, Ms. Newton continued to perform exceptional work at Defendant Louis Vuitton despite the continued overt discrimination and retaliation. Despite her multiple requests and Defendant Louis Vuitton telling Ms. Newton that Harasser DoranDefendant Harasser Doran was angry and offended by her requests, Harasser DoranDefendant Harasser Doran was allowed to come and go as he pleased, including, repeatedly, in the hallway directly in front of Ms. Newton's office.  Smith and Firestone also encouraged Ms. Newton to meet with Harasser DoranDefendant Harasser Doran and General Counsel FirestoneDefendant General Counsel Firestone invited him to meetings in her office, located two doors away from Ms. Newton's, on multiple occasions, knowing that would increase his opportunities to harass Ms. Newton. Upon information and belief, Defendant General Counsel Firestone met with Defendant Harasser Doran more often-and made a show of doing so-to send Ms. Newton and other Louis Vuitton employees the message that they should not report sexual harassment. Of course, they were also advising employees that claims of sexual harassment would not be taken seriously, thereby giving employees permission to sexually harass women at Louis Vuitton.

*Defendant Louis Vuitton Continues to Ostracize Ms. Newton in Retaliation for Her Complaints*

41

161.167.    Before a presentation on April 30, 2019, for Bloomberg Law legal research, upon information and belief, ~~General Counsel Firestone~~Defendant General Counsel Firestone told the presenter to not speak about the one area that would be applicable to Ms. Newton. The presenter even referenced how he had been told not to present on the topic by ~~General Counsel Firestone~~Defendant General Counsel Firestone during the presentation. There was no legitimate reason, outside of the continuing exclusion of Ms. Newton, not to present on the topic.

162.168.    On or about May 5, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone completely took over full control of a litigation matter which Ms. Newton had been handling without notifying Ms. Newton. ~~General Counsel Firestone~~Defendant General Counsel Firestone did not tell Ms. Newton she was off this matter, instead simply taking it over.

163.169.    On information and belief, ~~General Counsel Firestone~~Defendant General Counsel Firestone was doing everything possible to show Ms. Newton that she was not needed or wanted by Defendant Louis Vuitton.

***Defendant Louis Vuitton's Ongoing Retaliation Becomes so Severe, Pervasive, and Constant as to Create a Retaliatory Hostile Work Environment for Ms. Newton***

164.170.    Over the next several months, Ms. Newton's coworkers and ~~General Counsel Firestone~~Defendant General Counsel Firestone continued to retaliate against her and harass her, creating an intolerable, ongoing retaliatory hostile work environment. Some examples of the consistent hostility are:

- On May 13, 2019, General Counsel insisted on Ms. Newton interviewing a potential intern in a place where General Counsel could oversee and observe the interview-a stark departure from others' interviews.

- On or about May 23, 2019, an internal client snapped at Ms. Newton, blaming her for a mistake of another's, when, prior to her complaint and Defendant Louis Vuitton CEO's company-wide email inferring she lied, the client had treated Ms. Newton respectfully, pleasantly, and graciously in all of their interactions. Ms. Newton was forced to go on the defensive and prove that she acted appropriately, only to be met with the client's continued beratement of Ms. Newton.

- On May 27, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone openly ignored and fought against Ms. Newton's advice, despite outside counsel agreeing with Ms. Newton.

- On May 28, 2019, a colleague aggressively accused Ms. Newton of supposedly usurping a brand executive's role in a litigation claim. Again, prior to Ms. Newton's complaints and the company-wide email, this colleague was consistently friendly with Ms. Newton.

- On June 10, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone inexplicably started to micromanage and oversee a simple draft settlement agreement revision, instructing Ms. Newton to send her revisions to ~~General Counsel Firestone~~Defendant General Counsel Firestone before sending them to the internal client, never having instructed Ms. Newton to do that before. Notably, the settlement agreement pertained to a gender discrimination case. On information and belief, General Counsel specifically wanted to closely watch how Ms. Newton would respond to a gender discrimination settlement agreement.

- In or around June 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone and Employment Counsel excluded Ms. Newton from selecting a new

paralegal on whom Ms. Newton would be heavily relying, something which they repeatedly did during the entire, months-long hiring process.

- During a legal conference in Paris, France, the U.S. General Counsel of the Louis Vuitton brand ("LV Brand GC") owned by Defendant Louis Vuitton, who is very close to ~~General Counsel Firestone~~Defendant General Counsel Firestone, largely ignored Ms. Newton through the entire conference, and when she did acknowledge Ms. Newton, it was to cut her off mid-sentence, and walk away with another colleague while Ms. Newton was speaking so as to force her to stop talking out of embarrassment. She did it so blatantly that another employee looked shocked at how rude the LV Brand GC had been. Prior to the complaint, LV Brand GC was generally friendly with Ms. Newton, requesting lunches with Ms. Newton outside the office where they would exchange professional and personal stories, and would hug her when saying hello or goodbye, and encourage her to apply to General Counsel roles and offer to introduce her to General Counsel at other companies to expand her network and facilitate her career growth. The LV Brand GC subsequently avoided Ms. Newton generally and at Legal Group gatherings, rejected Ms. Newton's attempts to share potential work-related opportunities with her, and was overly aggressive with Ms. Newton in her interactions relating to the pro bono program.

- At the same legal conference, a coworker notified Ms. Newton that other colleagues had been making negative comments about Ms. Newton and her case.

- On July 18, 2019, Defendant Louis Vuitton excluded Ms. Newton from a company event.

- July 30, 2019, colleagues in the Legal Group were rude and hostile during a conference call while trying to convince Ms. Newton that she needed to perform duties which were not hers. When Ms. Newton told them to reach back out to the ~~Employment Counsel Martinez~~<u>Defendant Employment Counsel Martinez</u> who was responsible, the colleagues huffed, "Fine," and hung up on Ms. Newton.

- On August 18, 2019, while on a company-approved remote workday, ~~Employment Counsel Martinez~~<u>Defendant Employment Counsel Martinez</u> began to send multiple, unnecessary emails to make sure that Ms. Newton was actually performing work duties during the remote workday. There was no indication that Ms. Newton was not working.

- On August 20, 2019, ~~Employment Counsel Martinez~~<u>Defendant Employment Counsel Martinez</u> came into Ms. Newton's office upon her arrival for no reason other than to monitor what time she arrived.

- Later in the day, on August 20, 2019, ~~General Counsel Firestone~~<u>Defendant General Counsel Firestone</u> and Employment Counsel again refused to let Ms. Newton be involved in hiring an intern in the department.

- On September 9, 2019, ~~General Counsel Firestone~~<u>Defendant General Counsel Firestone</u> emailed Ms. Newton on a remote workday for an update on a matter which she had never done in that manner before. The only reason for General Counsel to email Ms. Newton was, again, to make sure that she was actually working on the remote workday.

- During an event on October 25, 2019, Ms. Newton approached a group of Defendant Louis Vuitton executives and said hello. When ~~SVP of HR Smith~~<u>Defendant SVP of</u>

HR Smith turned around, she physically jumped back in surprise, which immediately turned to a scowl and she turned back around, ignoring Ms. Newton.

- Defendant Louis Vuitton excluded Ms. Newton from an event where a colleague was receiving an award.

- On December 12, 2019, ~~General Counsel Firestone~~Defendant General Counsel Firestone began to communicate directly with Defendant Louis Vuitton's auditors, a job that ~~General Counsel Firestone~~Defendant General Counsel Firestone previous told Ms. Newton to handle independently, particularly based on Ms. Newton's previous career as an auditor. Again, ~~General Counsel Firestone~~Defendant General Counsel Firestone was micromanaging Ms. Newton and making it difficult for her to perform her duties.

- On December 12, 2019, the CFO of one of Defendant Louis Vuitton's brands was rude and condescending in an email Ms. Newton sent with important information he needed, and then inferred that Ms. Newton's assistance was not needed nor wanted. When Ms. Newton brought these exchanges to ~~General Counsel Firestone~~Defendant General Counsel Firestone's attention, she dismissively downplayed them, describing the CFO as "prickly."

- On December 14, 2019, during Defendant Louis Vuitton's holiday party, the most high-profile event of the year and an important opportunity for employees to network, Defendant Louis Vuitton intentionally seated Ms. Newton in a far corner behind a large pillar, completely blocking her from viewing the presenters during the event and preventing others from interacting with her. Defendant Louis Vuitton also seated Ms. Newton next to the same ~~SVP of HR Smith~~Defendant SVP of HR Smith who had co-

46

managed the sham investigations in 2018 and scowled at her at the October 2019 event and told Ms. Newton the results of the sham investigation and that the sexual harasser would not be reprimanded because "he didn't do anything wrong." Upon information and belief, Defendant Louis Vuitton intentionally sat Ms. Newton at this location to make her feel uncomfortable and monitor her during the holiday party.

- On January 7, 2020, Defendant Louis Vuitton tried to force Ms. Newton to work with her sexual harasser. Ms. Newton asked the outside counsel to primarily handle the matter because working with her harasser caused Ms. Newton extreme emotional distress. Despite this, ~~General Counsel Firestone~~Defendant General Counsel Firestone asked Ms. Newton if she would like to be more involved in the matter by being copied on emails from her harasser, knowing that Ms. Newton had repeatedly asked not to interact with her harasser and asked that her harasser physically stay away from her.

- The next day, on January 8, 2020, Ms. Newton's harasser copied her on an email even though he knew she did not want him to interact with her and that the outside counsel was handling the matter. Upon information and belief, both ~~General Counsel Firestone~~Defendant General Counsel Firestone's and ~~Harasser Doran~~Defendant Harasser Doran's behavior was meant to intimidate and harass Ms. Newton.

- On January 22, 2020, after Ms. Newton had requested some vacation days, ~~General Counsel Firestone~~Defendant General Counsel Firestone came into Ms. Newton's office yelling such that the paralegals, assistant, and other attorneys could hear, and flailing her arms around to reprimand Ms. Newton. ~~General Counsel Firestone~~Defendant General Counsel Firestone said that Ms. Newton was using a remote workday as a vacation day because the date was not included in the vacation request but the days

47

before and after were. Ms. Newton calmly explained the day she had not requested to use a vacation day was a holiday, not a remote workday. ~~General Counsel Firestone~~Defendant General Counsel Firestone merely responded, "oh, I didn't check," and left Ms. Newton's office. It was obvious to Ms. Newton that ~~General Counsel Firestone~~Defendant General Counsel Firestone was actively looking for any reason to publicly reprimand Ms. Newton.

- The next day, on January 23, 2020, the General Counsel again stormed into Ms. Newton's office to reprimand her for the way Ms. Newton phrased an email response. There was no reason for ~~General Counsel Firestone~~Defendant General Counsel Firestone to be micromanaging Ms. Newton in this manner and ~~General Counsel Firestone~~Defendant General Counsel Firestone did not treat employees who did not complain of sexual harassment in this manner.

~~165.~~171.    On information and belief, Defendant Louis Vuitton constantly targeted Ms. Newton and continually retaliated against her for her complaints of sexual harassment and harassed her to create such an ongoing retaliatory hostile environment to attempt to get her to resign from her position and in retaliation for her complaints.

***Defendant Louis Vuitton Appeals NY Supreme Court's Decision Denying Their Motion to Compel Arbitration of Her State Supreme Court Case Alleging Sex Discrimination***

~~166.~~172.    On or about April 23, 2019, Ms. Newton filed a Complaint in New York state court alleging sexual harassment, assault, and retaliation in violation of the New York State and City Human Rights Laws.

~~167.~~173.    Eight days after Ms. Newton filed her sexual harassment, assault, and retaliation lawsuit against Defendant Louis Vuitton in State Supreme Court, County of New York, Defendant Louis Vuitton filed a motion to compel arbitration on May 1, 2019.  Defendant Louis

48

Vuitton published Ms. Newton's salary and home address in their motion to compel arbitration, jeopardizing her safety and her career. Upon information and belief, they did so on purpose.

168.174.    After the State Supreme Court denied Defendant's motion to compel arbitration on July 10, 2020, Defendant Louis Vuitton appealed.  On March 18, 2021, the Appellate Division, First Department reversed the order of State Supreme Court and ordered that Ms. Newton's claims be adjudicated in arbitration. This ruling was issued prior to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").  Ms. Newton's disputes with Defendant Louis Vuitton have remained in arbitration since that time.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Setting Her Up to Fail with a Client and Transferring Additional Work to Her***

169.175.    On February 12, 2020, during Ms. Newton's annual evaluation meeting, General Counsel FirestoneDefendant General Counsel Firestone acknowledged how much work Ms. Newton had done in 2019, handling approximately 245 matters – a number which surprised General Counsel FirestoneDefendant General Counsel Firestone, which Ms. Newton had completed despite the ongoing retaliatory hostile work environment that Defendant had created.

170.176.    However, after acknowledging how much work Ms. Newton was doing, General Counsel FirestoneDefendant General Counsel Firestone told Ms. Newton that she would be taking over a set of matters from a colleague. Even though Ms. Newton's colleague had done considerable work on the project, General Counsel FirestoneDefendant General Counsel Firestone insisted on the file being transferred to Ms. Newton.

171.177.    To add to Ms. Newton's workload and stress levels, her colleague did not send Ms. Newton any of the relevant file documents, so Ms. Newton did not know what type of advice her colleague had previously rendered on the matters.

172.178.     Ms. Newton repeatedly asked for the file, to no avail.

173.179.     Despite knowing that Ms. Newton did not have any information about the file or have access to any relevant information, Ms. Newton's colleague sent Ms. Newton, copying General Counsel FirestoneDefendant General Counsel Firestone, an inquiry from the client regarding the matter, expecting Ms. Newton to address the client's concern while simultaneously not providing Ms. Newton with any of the relevant information.

174.180.     Ms. Newton had no way of responding to the client because she had no information on what had previously been advised.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Giving Her an Unwarranted Negative Performance Review***

175.181.     On March 12, 2020, Defendant Louis Vuitton told all employees that they may work remotely due to the COVID-19 pandemic.

176.182.     On March 13, 2020, Ms. Newton emailed Defendant Louis Vuitton requesting that she be able to work remotely due to underlying medical conditions which made her high risk with regards to COVID-19.

177.183.     Defendant Louis Vuitton approved Ms. Newton's request to work remotely.

178.184.     That same day, on March 13, 2020, General Counsel FirestoneDefendant General Counsel Firestone submitted her comments to Ms. Newton's self-evaluation, which Ms. Newton had previously completed.

179.185.     General Counsel FirestoneDefendant General Counsel Firestone's comments were negative and completely without merit or downplayed her accomplishments, intended to further antagonize Ms. Newton.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment***

50

180.186.    Throughout the rest of 2020, Ms. Newton's colleagues and General Counsel Firestone Defendant General Counsel Firestone continued to subject her to an ongoing retaliatory hostile work environment by continuing to micromanage, harass, and refuse to cooperate with Ms. Newton, making it incredibly difficult for her to perform the functions of her job. Examples of this include:

- On April 27, 2020, Ms. Newton's colleagues intentionally left her out of discussions regarding a litigation matter under Ms. Newton's purview, and then incorrectly accused Ms. Newton during conferences of not doing her job correctly, forcing her to have to repeatedly defend herself against the untrue accusations.

- In July 2020, Defendant Louis Vuitton continued to tell the media that "the allegations in this matter were thoroughly investigated and are entirely without merit," even though the investigations referred to were shams meant only to intimidate Ms. Newton.

- In July 2020, citing budget cuts, General Counsel Firestone Defendant General Counsel Firestone denied Ms. Newton's request to attend a virtual legal conference, which was a benefit offered to employees by Defendant Louis Vuitton, while, upon information and belief, approving Ms. Newton's colleague to attend a different, costly in-person legal conference.

- On or about September 9, 2020, Defendant Louis Vuitton excluded Ms. Newton from a high-profile litigation matter even though it fell squarely within her role and responsibilities. On information and belief, Defendant Louis Vuitton did not want the employee who complained of and reported sexual harassment, assault, and retaliation being seen to be involved in a high-profile case.

- On or about September 24, 2020, Ms. Newton complained about being excluded from the high-profile litigation to ~~General Counsel Firestone~~Defendant General Counsel Firestone. ~~General Counsel Firestone~~Defendant General Counsel Firestone dismissed Ms. Newton's complaint and attempted to make up excuses as to why she was excluded on a case that clearly fell within her role. After Ms. Newton pressed back against ~~General Counsel Firestone~~Defendant General Counsel Firestone's excuses, ~~General Counsel Firestone~~Defendant General Counsel Firestone unprofessionally snapped at Ms. Newton, "Andowah – Stop!" When Ms. Newton asked why ~~General Counsel Firestone~~Defendant General Counsel Firestone had reprimanded her in that manner, and continued to explain she thought it was wrong to be excluded, ~~General Counsel Firestone~~Defendant General Counsel Firestone coldly stated that Ms. Newton had "made it clear" that she felt that way.

~~181.~~187.　　Despite this constant barrage of retaliation, Ms. Newton continued to perform her duties diligently and effectively.

### *Ms. Newton Requests a Reasonable Accommodation*

~~182.~~188.　　On September 30, 2020, Defendant Louis Vuitton notified the employees that they would return to the office two days per week unless they had medical issues. At a regularly- scheduled conference call around the same time, Defendant Louis Vuitton told employees that anyone with childcare or medical issues would be able to get an accommodation, including being able to work remotely.

~~183.~~189.　　On October 1, 2020, Ms. Newton emailed HR Benefits Manager, Andrea Kuglstatter ("HR Manager Kuglstatter") that she had medical issues and would like to continue

working remotely two days per week but come into the office from time-to-time for important meetings or to collect important documents.

184.190.     Ms. Newton had been hospitalized on two separate occasions for several days at a time earlier in the year due to a medical condition, which she expressed to HR Manager Kuglstatter was one of the reasons she believed she was at a higher risk for COVID-19. She elaborated that she could come to the office for short periods of time as needed.

185.191.     HR Manager Kuglstatter responded that Defendant Louis Vuitton would need a note from Ms. Newton's health care provider regarding the nature of the medical condition and the nature and duration of any restrictions/reasonable accommodations. HR Manager Kuglstatter requested that Ms. Newton provide the note within the next week, knowing that Ms. Newton would be on an approved vacation during that time and would not be able to see her healthcare provider within the requested timeframe.

186.192.     Ms. Newton responded that she would not be able to get a note to Defendant Louis Vuitton during that time period because of her pre-scheduled vacation and offered to provide the note as soon as she could.

187.193.     On October 14, 2020, while HR Manager Kuglstatter knew Ms. Newton was on vacation, she emailed Ms. Newton asking if Ms. Newton had obtained a note from her provider, even though Ms. Newton had told HR Manager Kuglstatter that she would not be able to until she returned from her vacation.

188.194.     On information and belief, Defendant Louis Vuitton did not insist that other employees who needed the accommodation of working remotely provide a note from their health care providers, or if they did, not as quickly as Defendant Louis Vuitton was insisting Ms. Newton provide one.

53

189.195.    On information and belief, employees who did not complain about discrimination and sexual harassment were able to easily request and be approved to work remotely, including from other areas of the country.

190.196.    When Ms. Newton returned to work on October 19, 2020, she immediately notified HR Manager Kuglstatter that her provider would be able to get her a note the next day.

191.197.    On October 19, 2020, Ms. Newton provided Defendant Louis Vuitton with the note from her provider requesting the reasonable accommodation of working remotely.

192.198.    Several hours later on the morning of October 20, 2020, Defendant Louis Vuitton granted Ms. Newton's reasonable accommodation request through January 21, 2021, at which point HR Manager Kuglstatter told Ms. Newton she would need an updated note from her provider.

193.199.    HR Manager Kuglstatter told Ms. Newton that she would need to notify General Counsel FirestoneDefendant General Counsel Firestone that her request had been approved.

### *Defendant Louis Vuitton Continues to Create A Sexually Hostile Work Environment*

194.200.    On October 28, 2020, during Defendant Louis Vuitton's annual Fall Assembly, the SVP of Architecture, Harasser DoranDefendant Harasser Doran's supervisor, introduced a new, female employee approximately 50 years old. On information and belief, this employee would be replacing Ms. Newton's harasser, as he was retiring from Defendant Louis Vuitton. When the SVP of Architecture introduced the woman, he made a comment regarding the

woman being hired being "far better-looking" than Ms. Newton's harasser. Ms. Newton's harasser replied that he "didn't know" about that.

195.201. This entire exchange, which took place with the permission of ~~CEO Melwani~~Defendant CEO Melwani who was standing near both ~~Harasser Doran~~Defendant Harasser Doran and his supervisor at the front of the room, made Ms. Newton incredibly uncomfortable because the SVP of Architecture was openly joking about the looks of the man who sexually harassed Ms. Newton and the woman recently hired to replace that man.

196.202. Ms. Newton felt the senior executives at Defendant Louis Vuitton were acting as though ~~Harasser Doran~~Defendant Harasser Doran's sexual assault and harassment never happened, or worse, that they were mocking or making light of it.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Failing to Match Donations to the Charity She Founded in Memory of Her Baby Brother***

197.203. Defendant Louis Vuitton provides a benefit to employees by matching donations made by the employee to various charitable organizations.

198.204. Ms. Newton regularly donates to a nonprofit that she founded in honor of her youngest brother who had passed away at the age of 25, The Ryan Andrews Newton Fund.

199.205. In 2019 and 2020, Ms. Newton donated to The Ryan Andrews Newton Fund and provided the documents necessary for Defendant Louis Vuitton to match her donation.

200.206. On November 11, 2020, the Treasurer of The Ryan Andrews Newton Fund reached out directly to HR Manager Kuglstatter because the Fund never received the 2019 matching donation.

201.207. Despite HR Manager Kuglstatter informing the Treasurer that she would look into the donation, she did not do so for approximately one month.

202.208.     Finally, after multiple attempts to follow-up on the donation match by the Fund and Ms. Newton providing HR Manager Kuglstatter with the application forms, HR Manager Kuglstatter reached out to Ms. Newton on December 15, 2020, and requested additional paperwork to complete the donation match.

203.209.     Defendant Louis Vuitton had never requested these additional documents for donation matches including other donation matches made by Ms. Newton, and on information and belief did not request them of any other employees who were seeking to have their donations matched by Defendant Louis Vuitton to the charities of their choice.

204.210.     On January 25, 2021, The Ryan Andrews Newton Fund Treasurer again reached out to HR Manager Kuglstatter, after supplying the extra documentation, in an attempt to obtain the matching donation but HR Manager Kuglstatter did not respond.

205.211.     Defendant Louis Vuitton failed to submit matching donations and then required unnecessary documents when it finally looked into the matter.  After numerous requests by Ms. Newton and a Board member of The Ryan Andrews Newton Fund, Defendant Louis Vuitton finally made the matching donations to The Ryan Andrews Newton Fund, over a year and several months, respectively, after they were initially requested and long after Defendant Louis Vuitton made the matching donation to another organization to which Ms. Newton had donated.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Fighting All Requests Made by her and Giving her a Negative <u>Performance Review</u>***

206.212.     On January 3, 2021, Defendant Louis Vuitton closed its offices due to the resurgence of COVID levels, and HR Manager Kuglstatter told Ms. Newton she no longer needed to provide a medical note, because all of the employees were working remotely.

207.213. On January 6, 2021, in an effort to continually subject Ms. Newton to an ongoing retaliatory hostile work environment, ~~General Counsel Firestone~~Defendant General Counsel Firestone delayed the processing of Ms. Newton's expense report for remote working expenses during the pandemic, despite Defendant Louis Vuitton repeatedly encouraging all employees to seek reimbursement for remote working expenses during the pandemic.

208.214. ~~General Counsel Firestone~~Defendant General Counsel Firestone insisted that Ms. Newton "walk her through" Ms. Newton's expense report, something that ~~General Counsel Firestone~~Defendant General Counsel Firestone had never asked Ms. Newton to do and, on information and belief, did not require other employees to do.

209.215. Only after Ms. Newton provided a detailed list of each expense and documents supporting the expenses, repeating information already on the originally submitted expense report, did ~~General Counsel Firestone~~Defendant General Counsel Firestone approve the reimbursement.

210.216. On February 1, 2021, Defendant Louis Vuitton informed all employees that it would be reinstating the two-day in-office work requirement on February 16, 2021. At this time, HR Manager Kuglstatter requested that Ms. Newton provide a second note from her medical provider by February 12, 2021. Ms. Newton immediately responded that she would provide the note.

211.217. On January 7, 2021, while Defendant Louis Vuitton's mandatory remote working order was still in place, Ms. Newton reserved a trip beginning on February 6, 2021, to work remotely and take pre-approved vacation days.

212.218.    On February 12, 2021, Ms. Newton sent HR Manager Kuglstatter the updated note requesting the reasonable accommodation for working remotely, the same request she made in October 2020.

213.219.    On February 16, 2021, four days after Ms. Newton submitted her second reasonable accommodation request, ~~General Counsel Firestone~~Defendant General Counsel Firestone gave Ms. Newton a negative performance review.

214.220.    During a video conference regarding Ms. Newton's performance evaluation, ~~General Counsel Firestone~~Defendant General Counsel Firestone minimized Ms. Newton's accomplishments and continually stated that her work was not as good as her colleagues' work.

215.221.    The evaluation was in stark contrast from performance reviews Ms. Newton had received prior to her complaint of sexual harassment, assault, and retaliation, as described above.

216.222.    ~~General Counsel Firestone~~Defendant General Counsel Firestone also suggested that Ms. Newton revise the following-year goals portion of the annual evaluation to include, among other things, that she put together an in-house panel for diverse law students. Ms. Newton had previously told ~~General Counsel Firestone~~Defendant General Counsel Firestone that, as the sole Black attorney in the legal department, she did not feel comfortable creating this panel because she would then become, in addition to the Pro Bono Program Director, the office's de-facto point person for all diversity matters, a role she thought was inappropriate for her to be tasked with given the documented research concerning employers' "taxing" Black and other underrepresented employees with additional responsibilities and obligations related to diversity

initiatives, some of which research Ms. Newton provided to ~~General Counsel Firestone~~Defendant General Counsel Firestone.

217.223. During this conference, Ms. Newton also informed ~~General Counsel Firestone~~Defendant General Counsel Firestone that the location to which she'd traveled instituted a COVID-related "pause," so Ms. Newton would postpone her scheduled vacation days to a date after the pause was lifted, and instead she would continue to work remotely, as she had been successfully doing.

218.224. ~~General Counsel Firestone~~Defendant General Counsel Firestone did not object to Ms. Newton's plan, only saying that she "do[es] not feel sorry for [Ms. Newton]."

### ***Defendant Louis Vuitton Pre-textually Reprimands Ms. Newton for Working Remotely***

219.225. After Ms. Newton submitted the exact same request for reasonable accommodation on February 12, 2021, as she had in October 2020, HR Manager Kuglstatter unexpectedly told Ms. Newton that an additional note was required.

220.226. On February 23, 2021, HR Manager Kuglstatter told Ms. Newton that Defendant Louis Vuitton needed the additional physician's note because it just found out that Ms. Newton had been working from the remote location, despite ~~General Counsel Firestone~~Defendant General Counsel Firestone and Ms. Newton discussing this weeks before and Ms. Newton successfully competing all of her tasks.

221.227. HR Manager Kuglstatter then condescendingly and aggressively stated that Ms. Newton working remotely from the remote location was inconsistent with Ms. Newton's reasonable accommodation request and the note Ms. Newton provided.

222.228. Ms. Newton explained that was inaccurate, but HR Manager Kuglstatter disregarded Ms. Newton and continued to robotically repeat the need for a third medical note.

223.229.    HR Manager Kuglstatter told Ms. Newton she needed to provide the note by March 8, 2021, which was also during her scheduled vacation.

224.230.    During the call, Ms. Newton again notified HR Manager Kuglstatter that The Ryan Andrews Newton Fund had still not received the matching donations, and again, HR Manager Kuglstatter dismissed Ms. Newton's request.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Lowering Her Annual Compensation Increase***

225.231.    On February 24, 2021, based on the pretextual negative performance evaluation, ~~General Counsel Firestone~~Defendant General Counsel Firestone told Ms. Newton that her salary would again increase by one-third less than her annual salary increases prior to her complaint of sexual harassment and that her bonus compensation would also decrease by one third, ultimately decreasing Ms. Newton's anticipated compensation by approximately $20,000 annually.

226.232.    This reduction resulted in Ms. Newton receiving even less compensation than her male peers.

***Defendant Louis Vuitton Continues to Subject Ms. Newton to an Ongoing Retaliatory Hostile Work Environment by Continuously Pre-Textually Reprimanding her***

227.233.    On March 1, 2021, while Defendant Louis Vuitton knew that Ms. Newton was on an approved vacation, HR Manager Kuglstatter sent Ms. Newton an email incorrectly stating that Ms. Newton working in the remote location was inconsistent with her reasonable accommodation request.

228.234.    The email baselessly asserted that Ms. Newton's travel was in direct conflict with her reasonable accommodation request because it involved "a significant degree of exposure to the general public."

229.235.     This was factually inaccurate as the location had required negative PCR testing and in-room quarantines by all entrants and had been on a COVID-related "pause" for most of Ms. Newton's time there, which Defendant Louis Vuitton knew, and Ms. Newton had been working from where she was staying, avoiding interactions with the public. She had to quarantine in her hotel room initially, then when she was later permitted to leave her room, she stayed on the hotel property and adjoined land, which was nearly empty.

230.236.     On information and belief, Defendant Louis Vuitton was using the fact that Ms. Newton was working remotely from another location as another excuse to reprimand her in its continued efforts to subject her to a retaliatory hostile work environment for her complaints of sexual harassment.

231.237.     Despite the blatant misrepresentations by Defendant Louis Vuitton about Ms. Newton's travel making it necessary to provide a third physician's note, Ms. Newton actively tried to provide the requested note.

232.238.     While Ms. Newton was on a pre-approved vacation, Defendant Louis Vuitton agreed that she could provide the third note when she finished her vacation, after the March 8, 2021 deadline.

233.239.     Even though Defendant Louis Vuitton agreed that Ms. Newton could supply her note after March 8, 2021, on March 9, 2021, after not receiving the note, Defendant Louis Vuitton emailed Ms. Newton reprimanding her for not supplying the note by March 8, 2021.

234.240.     At this point, Defendant Louis Vuitton was so preoccupied with finding pretextual ways to reprimand Ms. Newton to further subject her to an ongoing retaliatory hostile work environment, it was reprimanding her for things it had actively approved.

61

***Defendant Louis Vuitton Denies Ms. Newton's Request for a Reasonable Accommodation in an effort to Further Subject her to an Ongoing Retaliatory Hostile Work Environment for her Complaints of Sexual Harassment, Violates Her Privacy, and Humiliates and Triggers Her Trauma by Making Unreasonable Requests for Details about Her Medical Condition and Denying that the Sexual Harassment and Assault Occurred, Forcing Her to Take Disability Leave***

235.241.     Upon Ms. Newton's return to New York, she immediately emailed Defendant Louis Vuitton to say she had reached out to her physician for a third accommodation request and reiterated that her remote work during her trip and her vacation were not in conflict with her previous accommodation request.

236.242.     At this time, Ms. Newton also complained that Defendant Louis Vuitton's continued insistence on a third physician's note was continued retaliation for her complaints of sexual harassment.

237.243.     On March 19, 2021, Ms. Newton provided two notes from her therapists requesting the reasonable accommodation of working remotely due to her "significant anxiety as a result of a pattern of harassment towards her since she filed a formal internal complaint in 2018," and "depression related to her workplace environment."

238.244.     Even though Defendant Louis Vuitton had received two therapist notes from Ms. Newton, in addition to the two it had already received from her medical doctor, requesting she work remotely, on March 22, 2021, Defendant Louis Vuitton escalated her request to SVP of HR SmithDefendant SVP of HR Smith, on information and belief to intimidate Ms. Newton. SVP of HR SmithDefendant SVP of HR Smith reprimanded Ms. Newton for not having submitted a physician's note and required her to provide an onslaught of unnecessarily detailed

and humiliating information in her request—which necessarily referred to conduct by ~~SVP of HR Smith~~Defendant SVP of HR Smith, ~~General Counsel Firestone~~Defendant General Counsel Firestone, and ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez—in an attempt to make it as difficult and demeaning as possible for Ms. Newton to obtain her reasonable accommodation.

~~239.~~245.　　Upon information and belief, this communication as well as all of the other communications beginning in February 2021 and relating to Ms. Newton's accommodation request were drafted by ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, whose conduct, along with ~~SVP of HR Smith~~Defendant SVP of HR Smith and Firestone's, was among the bases Ms. Newton's therapists had identified for her medical condition -- of which Defendant Louis Vuitton was made aware by the first set of therapist notes.

~~240.~~246.　　In 2021, Defendant Louis Vuitton requested that Ms. Newton inform the Company about all of the alleged retaliation since 2018, the names of the employees who were retaliating, the dates on which the retaliation occurred, and an explanation of the harassment which was referenced in the notes submitted from Ms. Newton's therapists. It had not done the same with the previous notes she submitted for a physical condition.

~~241.~~247.　　~~SVP of HR Smith~~Defendant SVP of HR Smith's email even went so far as to instruct Ms. Newton to "keep in mind" when providing her therapists' notes that the sham investigations Defendant Louis Vuitton had done in 2018—organized by ~~SVP of HR Smith~~Defendant SVP of HR Smith herself—"found no basis for your alleged claims of harassment," even though those investigations completely disregarded Ms. Newton and her colleague's statements about the harassment, Ms. Newton's statements about the assault and never

investigated the ongoing retaliation she was being subjected to as a result of her complaints of sexual harassment, and about which Ms. Newton was now complaining.

242.248. These details had nothing to do with and were not needed to approve Ms. Newton's reasonable accommodation request as she was requesting a reasonable accommodation due to being high risk for COVID-19 and because she was suffering from anxiety and depression–Defendant Louis Vuitton's opinion as to what was and was not retaliation or misconduct by their employee was irrelevant to any interactive process regarding Ms. Newton's therapists' confirmed disabilities.

243.249. This email required Ms. Newton to submit the note and responses—containing information regarding retaliation inflicted by the very people requesting the additional information—to Defendant Louis Vuitton's questions within five days and that if Ms. Newton did not meet the deadline, Defendant Louis Vuitton would deny Ms. Newton's reasonable accommodation request.

244.250. On information and belief, Defendant Louis Vuitton was not requiring such excessively detailed and intrusive documentation from Ms. Newton's peers who requested to work remotely. In fact, based on emails sent at the beginning of the pandemic, Defendant Louis Vuitton was readily allowing other employees to work remotely from locations the same distance away as the location Ms. Newton had selected.

245.251. Ms. Newton responded to Defendant Louis Vuitton by reiterating her complaints of continued retaliation. She pointed out the multiple factual inaccuracies of Defendant Louis Vuitton's previous emails and questioned what exactly was needed in the third medical note request because SVP of HR SmithDefendant SVP of HR Smith's previous emails focused on her

complaints of retaliation, not her medical condition or request for accommodation, and Defendant Louis Vuitton had now received two notes from a physician and two notes from two therapists.

246.252.     On March 30, 2021, instead of engaging in any form of interactive process with Ms. Newton or clarifying its request, Defendant Louis Vuitton stated that it was granting but effectively denied Ms. Newton's request for a reasonable accommodation based on her physical medical condition and mandated that Ms. Newton needed to "resume working in the office two days per week," beginning on April 1, 2021 but tolled that start date while it requested even further information on her mental health medical condition.  Defendant Louis Vuitton's March 30 email also required Ms. Newton to submit the additional notes and responses—again knowing they would contain information regarding retaliation inflicted by the very people requesting the additional information.  Ms. Newton responded to Defendant Louis Vuitton by reiterating her complaints of continued retaliation.

247.253.     Ms. Newton complied with Defendant Louis Vuitton's unreasonable requests and provided two more additional notes from two different medical providers.  She pointed out the multiple factual inaccuracies Defendant Louis Vuitton repeated regarding her accommodation request based on her physical medical condition as well as the conflicts of interest, violations of privacy, HIPAA issues, and attorneys' ethics violations raised by Defendant Louis Vuitton's renewed additional requests regarding her mental health medical condition.  Defendant Louis Vuitton totally ignored Ms. Newton's suggestion that her accommodation request be reviewed by a third party due to those concerns and issues.  It also ignored her request Defendant Louis Vuitton take steps to protect her privacy and confidentiality regarding her medical conditions.

248.254.     On April 20, 2021, Defendant Louis Vuitton denied Ms. Newton's request for a reasonable accommodation based on her mental health medical condition and mandated she needed to "resume working in the office two days per week," beginning the following week.  In total, Defendant Louis Vuitton had received six separate detailed medical notes from three different medical providers validating and emphasizing the need for Ms. Newton to work remotely.

249.255.     Defendant Louis Vuitton refused to engage in any form of interactive process regarding Ms. Newton's request to work remotely due to her anxiety and depression, and used the interactive process regarding her request to work remotely as a vehicle to further subject her to an ongoing retaliatory hostile work environment, aggressively arguing their defenses to her claims of retaliation, humiliate her, and retrigger her trauma.

250.256.     On information and belief, Defendant Louis Vuitton was still allowing Ms. Newton's peers to work remotely, including from areas far outside of the New York region but requiring significantly less information.

251.257.     Due to the ongoing retaliatory hostile work environment and Defendant Louis Vuitton's continued retaliatory actions violating her privacy, humiliating her, and retriggering her trauma in connection with her reasonable accommodation request, Ms. Newton was forced to go on disability leave on April 21, 2021, through mid-July 2021.

252.258.     While on disability leave, Defendant Louis Vuitton continued to send Ms. Newton work to be performed.

***Ms. Newton Returns to the Ongoing Retaliatory Hostile Work Environment at Defendant Louis Vuitton***

253.259.     On or about July 13, 2021, Ms. Newton returned from leave, only to continue to be subjected to an ongoing retaliatory hostile work environment.

***Ms. Newton Requests Reasonable Disability Accommodations***

254.260.      In or about September 2021, Defendant Louis Vuitton increased its in-office working requirement from 2 days to 3 days per week.

255.261.      On or about October 20, 2021, outside counsel Rex Sessions of Winston & Strawn excluded Ms. Newton from an email invitation to attend a Zoom program by his firm, which he sent to all of Ms. Newton's attorney VP colleagues in Defendant Louis Vuitton's legal department, including Employment Counsel MartinezDefendant Employment Counsel Martinez, as well the Compliance Department.

256.262.      Ms. Newton began to experience such extreme and severe anxiety while present in the office that her health care providers diagnosed her with PTSD and again determined that she should be working remotely.

257.263.      On or about November 5, 2021, Ms. Newton submitted a reasonable accommodation request based on her PTSD diagnosis, requesting to work remotely for 6 months.

258.264.      In addition, Ms. Newton submitted a detailed medical note from her psychiatrist—which included her PTSD diagnosis and the detrimental effect her current office work environment had on her mental health—recommending that Ms. Newton be allowed to work remotely for at least 6 months while she underwent treatment.

259.265.      On or about November 9, 2021, Defendant Louis Vuitton responded to Ms. Newton's request for disability accommodations and psychiatry note, insisting they were insufficient and requesting further information.

***Ms. Newton Testifies Before Congress About the Sexual Harassment and the Ongoing Retaliation She Continues to Endure at Defendant Louis Vuitton***

260.266.      On or about November 16, 2021, Ms. Newton, together with three other survivors of sexual harassment, assault, and retaliation in the workplace, complied with Congress's subpoena and engaged in the protected activity of speaking out against and objecting to the

ongoing retaliatory hostile work environment she was being subjected to as a result of her complaints of sexual harassment and assault by testifying before Congress about the sexual harassment and assault she endured at Defendant Louis Vuitton, Defendant Louis Vuitton's refusal to protect her from sexual harassment and assault, and the ongoing retaliatory hostile work environment she continued to face as a then employee of Defendant Louis Vuitton.

261.267.    Following her Congressional testimony, the ongoing retaliatory hostile work environment that Ms. Newton had long suffered worsened and grew even more hostile and she began to feel extreme exclusion and venomous dislike from Defendant Louis Vuitton senior management and the vast majority of her co-workers.

***Defendant Louis Vuitton Subjects Ms. Newton to a Worsened Ongoing Retaliatory Hostile Work Environment After she Testifies Before Congress About the Ongoing Retaliation She Continues to Endure at Defendant Louis Vuitton***

262.268.    After Ms. Newton's testimony before Congress, Defendant Louis Vuitton's challenges to her request for a reasonable accommodation intensified.

263.269.    For the next several months, Defendant Louis Vuitton engaged in a long series of delay tactics, extended periods of non-response, dismissiveness, and outrageous actions including:

- gaslighting Ms. Newton by suggesting that the harassment and assault never occurred;

- unlawfully disclosing her PHI to coworkers despite her explicit instructions to the contrary;

- requiring her psychiatrist to produce a series of no less than five separate, detailed medical notes when the first one was sufficient on its face, causing her to incur thousands of dollars in unnecessary additional expenditures; and

- stating nonsensical, dismissive, and demeaning things like "the Company [Defendant Louis Vuitton] continues to have doubts about the existence of a disability requiring accommodation" even after receiving five detailed notes from her psychiatrist.

***Defendants Decide to Terminate Plaintiff's Employment in Retaliation for Her Testimony***

270.    Upon information and belief, shortly after Ms. Newton testified before Congress, Defendant Louis Vuitton decided to terminate her employment.

271.    Upon information and belief, shortly after Ms. Newton testified before Congress, Defendant Louis Vuitton decided to replace Defendant Firestone with a new General Counsel so that it could use her retirement to bring in a new General Counsel and create a pre-textual restructuring of the department for the sole purpose of terminating Ms. Newton's employment.

272.    Upon information and belief, soon after Ms. Newton testified before Congress, Defendant Firestone agreed to retire in or about July 2022.

***The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act Becomes Law and Defendant Louis Vuitton Subjects Ms. Newton to a Worsened Ongoing Retaliatory Hostile Work Environment***

~~264.~~273.    Ms. Newton's testimony, together with that of three other survivors, was critical to changing the law regarding the arbitrability of claims related to sexual harassment and led to the enactment of the EFAA on March 3, 2022.

274.    Ms. Newton was invited to and attended the White House's Bill Signing Ceremony, where the President of the United States asked Ms. Newton and the three other survivor-witnesses to stand up and be publicly recognized as one of the four "courageous survivors who led this historic reform."[8] The President and Vice President also met with Ms. Newton and the three other survivor-witnesses before the Bill Signing Ceremony.

---

[8]   https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/03/03/remarks-by-president-biden-at-signing-of-h-r-4445-ending-forced-arbitration-of-sexual-assault-and-sexual-harassment-act-of-2021/.

265.275. The day after the EFAA was signed into law, and Ms. Newton was invited by the President to participate in the Bill Signing Ceremony at The White House, Defendant Firestone told Ms. Newton that Defendant Firestone would be retiring and that Defendant Louis Vuitton was searching for a new General Counsel to replace her.

266.276. Following the enactment of the EFAA, Defendant Louis Vuitton subjected Ms. Newton to a worsened ongoing retaliatory hostile work environment, while she continued to perform her job in an exemplary manner.

267.277. On or about March 25, 2022, Defendant Louis Vuitton inexplicably denied Ms. Newton reasonable accommodation to work remotely in violation of Ms. Newton's rights under the law. Upon information and belief, her reasonable accommodation was denied in retaliation for asserting her rights to be free from gender discrimination by her employer and reporting, speaking out at Congress and elsewhere, against, and objecting to the ongoing retaliatory hostile work environment and continuing to object to sexual harassment, assault, and retaliation.

268.278. On or about March 25, 2022, Defendant Louis Vuitton refused to consider Ms. Newton for a promotion for which she was qualified by making up unnecessary criteria after she attempted to apply.

***Defendant Louis Vuitton Attempts to Exclude Ms. Newton From an April 2022 Defendant Louis Vuitton Legal Retreat***

269.279. In 2022, General Counsel FirestoneDefendant General Counsel Firestone asked the law firm of Winston & Strawn to host and lead Defendant Louis Vuitton's annual Legal Group retreat in Dallas, Texas in April 2022 even though they have actively represented Defendant Louis Vuitton and Firestone against Ms. Newton since 2018.

270.280. Upon information and belief, General Counsel FirestoneDefendant General Counsel Firestone did this to further retaliate against Ms. Newton.

271.281.     Immediately prior to the Winston & Strawn-hosted Legal Group retreat, upon information and belief, ~~General Counsel Firestone~~Defendant General Counsel Firestone and/or ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez, acting through the HR manager, attempted to prevent Ms. Newton from attending the Legal Group retreat, stating that because she had been ill in March, she could not travel until after the Legal Group retreat ended.

272.282.     Only after Ms. Newton provided a doctor's note stating that she could safely travel before and during the dates of the Legal Group retreat was she allowed to attend.

273.283.     During the conference, Defendants' employees continued to display outwardly hostile attitudes towards Ms. Newton, such as avoiding greeting her, giving her disdainful looks, and loudly remarking to her colleagues, "Why is *she* here?" and "What is she *doing* here?" in reference to Ms. Newton.

274.284.     Ms. Newton suffered extensive anxiety and stress as a result of the humiliating and hateful way she was treated at the retreat.

### ***Defendant Louis Vuitton's Retaliation Continues throughout Fall 2022***

275.285.     This campaign to "ice out" Ms. Newton continued to be part of the course and sadly routine.

276.286.     Throughout Spring, Summer, and Fall 2022 Ms. Newton was frequently specifically targeted for exclusion, ignored, at best, and often publicly scorned and humiliated by her colleagues.

277.287.     In or about April 2022, Ms. Newton learned that she had not even been introduced to the department intern.

278.288.    Throughout May 2022, ~~General Counsel Firestone~~Defendant General Counsel Firestone repeatedly berated and falsely and inaccurately accused Ms. Newton of dropping the ball on one of her assigned matters.

279.289.    In June 2022, she specifically gave Ms. Newton a time-consuming assignment while Ms. Newton was on vacation.

280.290.    In July 2022, Defendant Louis Vuitton and Winston & Strawn planned a farewell dinner in NYC for ~~General Counsel Firestone~~Defendant General Counsel Firestone, inviting Ms. Newton's colleagues from all across the country but excluding Ms. Newton.  Ms. Newton was the only attorney on her team who was not invited.

### *Defendant Pratt Begins Working at Defendant Louis Vuitton and Immediately Begins Retaliating Against Ms. Newton in Summer 2022*

281.291.    On July 25, 2022, Defendant Rodney Pratt began his tenure at Defendant Louis Vuitton as SVP, Chief Legal Officer, and became Ms. Newton's direct supervisor, replacing ~~General Counsel Firestone~~Defendant General Counsel Firestone.

282.292.    Defendant Pratt informed the team that he did not want to be copied on most emails because he did not want to become too involved, nor undermine his direct reports authority with internal clients and colleagues. Initially, Defendant Pratt did not engage in much interaction with Ms. Newton, but he was reasonably pleasant.

### *Ms. Newton Rejects Her Boss Defendant Pratt's Demand to Have "One on One Settlement Discussions" about her Sexual Harassment, Assault, and Retaliation Claims*

283.293.    In August 2022, Defendant Pratt requested a "one on one" meeting with Ms. Newton without attorneys present to "discuss or negotiate a settlement" of her claims against Defendant Louis Vuitton.

284.294.    Scared and appalled that her new boss was pressuring her to meet one on one without her attorneys present to settle her sexual harassment and retaliation claims against

72

Defendant Louis Vuitton, Ms. Newton refused Defendant Pratt's request. She continued to assert her rights to be free from gender discrimination by her employer and continued to engage in the protected activity of pursuing her sexual harassment, assault, and retaliation claims against Defendant Louis Vuitton, thereby infuriating Defendant Pratt.

***Defendant Pratt Worsens the Ongoing Retaliatory Hostile Work Environment After Ms. Newton Rejects his Demand to Meet "One on One" to Settle her Sexual Harassment, Assault, & Retaliation Claims Without Attorneys Present***

~~285.~~295.	After she did not respond to his request, Defendant Pratt suddenly and drastically changed the rules for Ms. Newton, thereby contributing to and joining in on the ongoing retaliatory hostile work environment.

~~286.~~296.	On August 25, 2022, Defendant Pratt informed Ms. Newton that he would require manager preapproval before she agreed to speak on any panel or at any conference, something that had never previously been required.

~~287.~~297.	In or around September or October 2022, Defendants objected to Ms. Newton speaking on a keynote panel at the Women Influence & Power in the Law conference in which she would be asserting her rights to be free from gender discrimination by her employer.

~~288.~~298.	The Crime Victims Treatment Center presented Ms. Newton with its Advocacy and Awareness Award in October 2022 for reporting about her sexual harassment, assault and retaliation experiences at Defendant Louis Vuitton. In her acceptance speech, she asserted her—and all women's—rights to be free from gender discrimination by their employers.

~~289.~~299.	In October 2022, Ms. Newton spoke on a keynote panel at the Women, Influence, and Power in the Law conference entitled *Leading by Example: How Women Successfully Passed the Most Bipartisan, Transformational Law Ending the Silencing of Sexual*

*Misconduct Claims*.  Her remarks asserted her—and all women's---rights to be free from gender discrimination by their employers.

~~290.~~300.    On the 1-year anniversary of her testimony, from October 2022 through November 16, 2022, Ms. Newton protested her employment conditions and asserted her right to be free from gender discrimination by sharing 2 posts on LinkedIn, approximately 20 posts on Instagram, and 2 posts on Twitter about testifying before Congress about her sexual assault and the unlawful retaliation she endured at Defendant Louis Vuitton after she reported it and continued to oppose it.

~~291.~~301.    In or around October 2022, Ms. Newton realized that Defendant Pratt was inserting himself in communications on her matters while simultaneously excluding her from other very important communications on her matters. Ms. Newton learned of these communications only when Ms. Newton's internal clients forwarded Defendant Pratt's communications to her, often expressing confusion as to why she had not been included.

~~292.~~302.    In or around late October and early November 2022, during weekly one-on-one meetings, Defendant Pratt generally ignored her while she spoke, except to sometimes agitatedly criticize her.

~~293.~~303.    On October 26, 2022, Defendant Pratt informed the Legal Department during a team meeting that ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez would be leaving the company, and that his last day would be November 18, 2022.

~~294.~~304.    Following ~~Employment Counsel Martinez~~Defendant Employment Counsel Martinez's departure, a farewell dinner was hosted by Winston & Strawn and Defendant Louis Vuitton on November 30, 2022. Defendant Louis Vuitton excluded Ms. Newton from the dinner. Upon information and belief, Defendant Pratt approved and ensured that every other attorney in

74

the Legal Department was invited to attend, except for Ms. Newton. All of the attorneys on her team attended the dinner.

295.305.      On November 30, 2022, Defendant Louis Vuitton held a sale open to employees, which Ms. Newton was entitled to attend as a major part of her employee benefits. Defendant Louis Vuitton, however, went out of its way to exclude and not invite Ms. Newton, leaving her humiliated when forced to respond to colleagues in ignorance when asked why she had not been present.

***Defendants Fire Ms. Newton in December 2022, Effective January 2023, After 8 Years of Employment***

296.306.      On or about November 28, 2022, for the first time ever, Defendant Pratt scheduled a mandatory in-person team meeting for the entire Legal Department on Thursday, December 1, 2022.  Everyone in the Legal Department except for Defendant Pratt had selected Thursdays as one of their remote working days per company policy.  As a result, each team member had to rearrange their schedules, including modifying travel plans, to be able to attend the December 1, 2022 meeting in person.

297.307.      On or about November 30, 2022, Defendant Pratt rescheduled his regular one-on-one meeting with Ms. Newton to December 1, 2022. At the last minute, Defendant Pratt moved the meeting to a conference room on a different floor.  When Ms. Newton arrived at the meeting, she noted that Defendant Louis Vuitton's Human Resources Director Jolie Shehadeh was also present.

298.308.      At the December 1, 2022 meeting, Defendant Pratt informed Ms. Newton that her employment would be terminated effective January 1, 2023. Ms. Newton was instructed to exit the office "within the hour," by 5 PM, and to leave her work devices and badge in the office.

299.309.	At the discharge meeting, Defendant Pratt explicitly stated that Ms. Newton's firing was completely unrelated to her performance.

300.310.	Upon information and belief, Defendant Louis Vuitton's protocol was to terminate previous executives on Fridays at 8 AM, specifically so that no one else would see or hear, and to avoid their humiliation in front of their colleagues. Defendant Louis Vuitton decided to use a different practice when firing Ms. Newton as Defendant Louis Vuitton intended to—and did—humiliate her by making her firing as public as possible.

301.311.	In fact, to make sure that Ms. Newton was as publicly demeaned and dehumanized as possible, and so that other employees could be reminded of what happens to employees who report sexual harassment and retaliation, Defendant Pratt scheduled the unprecedented, highly unusual, mandatory, in-person team meeting for 4 PM that very Thursday, immediately after the meeting in which he fired Ms. Newton, with the express intent of making sure that all of her colleagues were present to watch her  public humiliation.

302.312.	Defendant Louis Vuitton's intended effect took place—when the team meeting finished, her colleagues returned from the meeting just in time to see her frantically packing up her personal items, sweating profusely, while the HR and building staff assigned to monitor her packing barked their countdown at her: "7 minutes!…2 minutes!…30 seconds!"

303.313.	Upon information and belief, Defendant Louis Vuitton provided previous executives with a vehicle service home with their personal effects. Although they told Ms. Newton that a car had been called for her, the car never arrived.  Instead, Defendant Louis Vuitton intentionally made a spectacle of Ms. Newton.  They forced her stand outside of the building in shame, made to wait an entire hour in 30-degree weather with a large trolley piled with boxes of

her belongings in front of her, at rush hour—5:00 pm on a Thursday, as her then colleagues from the holding company and the affiliates gawked at her as they walked in and out of work.



304.314.    Defendant Louis Vuitton created a scene and made it obvious to all of their employees and affiliate employees leaving and entering the building that she had just been fired.

315.    This is how Defendant Louis Vuitton punishes women who report sexual harassment and retaliation.

305.316.    At the time Defendant Louis Vuitton terminated Ms. Newton's employment, only a single other employee within the legal department was terminated. Defendant Louis Vuitton's GC told Ms. Newton, however, that he was "restructuring" the entire department. On information and belief, Defendant Louis Vuitton and Defendant Pratt terminated a single other employee to support their pre-textual "restructuring" so they could terminate Ms. Newton.

***Defendant Louis Vuitton Cannot Resist the Urge to Continue Retaliating Against Ms. Newton<br>Even After Firing Her***

306.317.	After firing Ms. Newton, for eighteen days, Defendant Louis Vuitton illegally took and retained possession of her personal effects, including framed diplomas and valuable personal items, despite repeated requests for their return by Ms. Newton and her attorneys, and even though Defendant Louis Vuitton had promised to ship her items to her the day after they fired her.  Only after her attorneys were forced to repeatedly threaten legal action against Defendant Louis Vuitton did they finally return Ms. Newton's personal items but even then, they returned some items in damaged condition.

307.318.	Defendant Louis Vuitton intentionally deprived Ms. Newton of all of the annual bonus she had earned for 2022, which was projected to be 25% of her annual salary on documents with which Defendant Louis Vuitton had provided her.

308.319.	In December 2022, Defendant Louis Vuitton also intentionally refused to provide a charitable match for the nonprofit organization she founded in memory of her baby brother, rescinded the sale of items she had purchased through a Company sale in November as one of her benefits, refused to reimburse expenses such as attorney registration fees, as well as expenses previously authorized by Defendant Pratt for change and cancellation fees incurred because of his last-minute demand for an in-person team meeting so that he could fire Ms. Newton essentially in front of her colleagues, and withheld her COBRA information for 47 days. Defendant Louis Vuitton returned holiday gifts sent to her from colleagues outside the Company.  Upon information and belief, Defendant Louis Vuitton threw away dozens of holiday cards and gifts Ms. Newton typically received from internal and external colleagues each December.

309.320.	In December 2022 and January 2023, Defendant Louis Vuitton intentionally deprived Ms. Newton of life insurance and Accidental Death and Dismemberment continuation information by providing the information in such disarray such that Ms. Newton did not see it until

January 21, 2023, 51 days after the December 1, 2022 firing meeting. Defendant Louis Vuitton's delay caused Ms. Newton to miss the enrollment period.

321.    Due to Defendants' unlawful firing of Ms. Newton for reporting sexual harassment and assault, conference organizers have revoked their invitations to Ms. Newton to be a guest speaker at or attend their conferences as recently as November 2023, and an invitation to join the Board of a major nonprofit has been revoked, thereby depriving her of career-enhancing opportunities that could have led to her securing a new job and earning an income.

322.    In 2023, Defendant Louis Vuitton forced Ms. Newton to change her title on her LinkedIn profile to affirmatively indicate that she no longer was employed by Defendant Louis Vuitton.

323.    Defendant Louis Vuitton did not ask the only other employee terminated at the time Ms. Newton was terminated to change her employment status on her LinkedIn Profile, singling out [and discriminating against] Ms. Newton.

324.    On information and belief, on or about December 15, 2023, Defendant Louis Vuitton forced Instagram to take down Ms. Newton's post in which she briefly mentioned her termination and, in the remaining 94% of the post, proceeded to describe her education, qualifications, experience, and the type of work she was searching for, in an effort to find new employment.

310.325.    Ms. Newton had to request that Instagram reinstate the post but by the time it did several hours later, the post appeared on a late Friday afternoon just before the holidays--a time when most viewers did not view it, thereby thwarting Ms. Newton's efforts to obtain new employment.

**IV.    DEFENDANT LOUIS VUITTON HAS A PATTERN AND PRACTICE OF DISCRIMINATION AND SEXUAL HARASSMENT**

311.326.    Although Defendant Louis Vuitton and its corporate affiliates have been accused of workplace misconduct in other public filings, these filings likely represent only a small fraction of the actual workplace harassment, discrimination and retaliation Defendant Louis Vuitton employees face. On Glassdoor.com, a website where a company's employees can anonymously post reviews about their employer, Defendant Louis Vuitton employees across the globe have identified strikingly similar conduct by Defendant Louis Vuitton to the conduct Ms. Newton has experienced. The reviews describe a company with a negative, outdated, and discriminatory culture. These reviews include numerous claims that Defendant Louis Vuitton engages in "discrimination," "favoritism," "xenophobia," "nepotism," "bias," and "bullying." The reviews explain that "[e]mployees are exploited, humiliated, abused, [and] women are sexually harassed." The reviews further state that there is "toxic behavior within the executive leadership," including "abusive" managers. These problems can be attributed to Defendant Louis Vuitton's perceived oppressive and negatively-viewed "culture" coupled with Defendant Louis Vuitton's pervasive failure to promote women into executive positions.

312.327.    The claims asserted on Glassdoor about Defendant Louis Vuitton's Human Resources departments are even more relevant to Ms. Newton's claims. Many reviewers describe Defendant Louis Vuitton's HR departments as "corrupted" and "useless." The reviews state that Defendant Louis Vuitton's HR representatives "really do not care about their employees," "don't know what they are doing," and HR "is only there to protect the company and not the employees" and "does not have the employees['] best interest[s]" in mind. Unsurprisingly, reviewers state that Defendant Louis Vuitton "HR teams are less interested in personal development than the development of the brand or business as a whole" and "[c]urrent and potential employees are constantly discriminated [against]" but "HR team members take pride in being ignorant." The

80

employee reviewers aptly note that "HR Managers are out of touch with [the] reality of what goes on in each location" and need to actually "[l]isten and act on employee concerns" and "[e]ducate...employees on how to interact in an international and multicultural workplace."

## V. MS. NEWTON HAS SUFFERED EMOTIONAL DISTRESS AS A RESULT OF THE HARASSMENT AND DEFENDANT LOUIS VUITTON'S RETALIATION

~~313.~~328.       For years, Ms. Newton has experienced severe distress and anxiety as a result of the sexual harassment and retaliation she suffered at Defendant Louis Vuitton. Ms. Newton has shaken uncontrollably, felt tightness in her chest, and has panicked about her safety. Due to Defendant Louis Vuitton's continued retaliatory acts, Ms. Newton continues to suffer from PTSD and recently has had panic attacks and suffered sleep issues due to their continued retaliation.

~~314.~~329.       Ms. Newton often cannot sleep and has had her eating patterns disrupted because of the trauma she has experienced as a result of the harassment, assault, and retaliation, reminders of the harassment, and Defendant Louis Vuitton's reaction to her claims, including attempts to isolate her, lie about her, and destroy the career and life she has worked so hard to build.   Ms. Newton's constant anxiety at work only increased as a result of the Company's retaliation against her and refusal to instruct ~~Harasser Doran~~Defendant Harasser Doran to stay away from Ms. Newton.

~~315.~~330.       For the first time in her life, Ms. Newton has been forced to seek a significant amount of one-on-one therapy since 2018 to deal with the emotional trauma she has and continues to suffer as a result of the harassment, assault, and retaliation inflicted on her by Defendant Louis Vuitton.

~~316.~~331.       Ms. Newton also suffered from a medical condition that had been treated successfully until 2018.  Several months later, after Ms. Newton began suffering retaliation at the

hands of Defendant Louis Vuitton, the condition returned through the end of 2022. Upon information and belief, this resulted from the stress caused by Defendant Louis Vuitton's conduct. Since then, Ms. Newton has been hospitalized twice for several days at a time for a second physical medical condition that is triggered by stress. In 2021 and 2022, Ms. Newton began suffering from two additional physical medical conditions/injuries, likely caused or exacerbated by Defendant Louis Vuitton's retaliation and hostile work environment, conditions and injuries for which she continues to be treated to this day.

### AS AND FOR A FIRST CAUSE OF ACTION
*Retaliation in Violation of Title VII*
*(Against Defendant Louis Vuitton)*

~~317.~~332.      Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

~~318.~~333.      Ms. Newton repeatedly reported and actively opposed the sexual harassment, assault, and retaliation that occurred and filed a lawsuit against Defendant Louis Vuitton for claims of sexual harassment, assault, and retaliation.

~~319.~~334.      Ms. Newton has actively engaged in the protected activity of objecting to the sexual harassment and retaliation since 2018 by internally reporting, complaining about, actively pursuing her legal rights, testifying about the sexual harassment and retaliation, publicly objecting to the sexual harassment and retaliation, and refusing to engage in settlement discussions with Defendants.

~~320.~~335.      In retaliation for her active reports of and opposition to the sexual harassment and assault she had endured, Defendant Louis Vuitton subjected Ms. Newton to a continuing series of adverse employment actions including but not limited to subjecting her to

82

changes in workplace treatment, harassment, a retaliatory hostile work environment, and disparate treatment in comparison to employees who were not engaged in protected activity.

321.336.    Defendant unlawfully and without cause retaliated against Ms. Newton for engaging in protected activity under Title VII.

322.337.    Later, Ms. Newton again engaged in protected activity under Title VII when she publicly reported about the sexual harassment, assault, and ongoing retaliatory hostile work environment she was subjected to when she testified before Congress and spoke out on social media after her testimony before Congress which led to the passage of the EFAA.

323.338.    In retaliation, Defendant Louis Vuitton's ongoing retaliation against Ms. Newton worsened, as Defendant Louis Vuitton further subjected Ms. Newton to a series of adverse employment actions including but not limited to refusing to grant her reasonable accommodation request, subjecting her to changes in workplace treatment, harassment, a worsened hostile work environment, disparate treatment in comparison to employees who were not engaged in protected activity, and termination of her employment of eight years at Defendant Louis Vuitton.

324.339.    Defendant Louis Vuitton unlawfully and without cause retaliated against Ms. Newton for engaging in protected activity under Title VII.

325.340.    The retaliation Ms. Newton suffered while employed with Defendant was severe and pervasive, unwelcome by Ms. Newton, and would be offensive to a reasonable person.

326.341.    The retaliation Ms. Newton suffered while employed at Defendant severely affected the terms and conditions of her employment.

327.342.    Defendant Louis Vuitton's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Newton.

328.343. As a result of Defendant Louis Vuitton's conduct alleged in this Complaint, Ms. Newton has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

329.344. By reason of Defendant Louis Vuitton's retaliation, Ms. Newton is entitled to all remedies available for violations of Title VII.

**<u>AS AND FOR A SECOND CAUSE OF ACTION</u>**
*Retaliation in Violation of the New York State Human Rights Law and
the New York City Human Rights Law
(Against <u>All</u> Defendant~~s Pratt~~)*

330.345. Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

331.346. Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107, *et seq.,* prohibits retaliation against an employee who seeks to assert rights under the Human Rights Laws. Defendants are Ms. Newton's employer within the meaning of those laws.

332.347. Ms. Newton complained to Defendants about the sexual harassment inflicted upon her by an employee of Defendant Louis Vuitton and has repeatedly publicly complained about the sexual harassment and the retaliation she suffered. In response to her protected activity, Defendant Pratt retaliated against Ms. Newton in the terms and conditions of her employment by giving her changes in workplace treatment, treating her disparately from other employees, and ultimately terminating her employment.

333.348. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

349.    As a direct and proximate result of Defendants' discriminatory conduct, Ms. Newton has suffered adverse employment consequences.  Ms. Newton has also been forced to endure severe emotional pain and trauma and the physical effects thereof, all to her detriment.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
*Sexual Harassment: Hostile Workplace in Violation of*
*The New York State Human Rights Law and the New York City Human Rights Law*
*(Against All Defendants)*

350.    Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

351.    Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 et seq., and Title 8 of the New York City Administrative Code, § 8-107, prohibit sexual harassment in employment.  Defendants were Ms. Newton's employer within the meaning of those laws.

352.    Defendants have allowed and continues to allow a hostile, intolerable workplace based on sexual harassment that was imposed on Ms. Newton by the conduct of Defendant Louis Vuitton's employee of which Defendants were aware.

353.    Defendants' employee made unwanted sexual advances to Ms. Newton and engaged in other unwanted verbal and physical conduct of a sexual nature.

354.    Defendants did nothing to correct this behavior when made aware of it.  Instead, Defendants accused Ms. Newton of harming Defendant Harasser Doran when she followed Defendant Martinez Employment Counsel's instructions to try to stop the harassing behavior after he refused to intervene.  Defendants suggested that Ms. Newton apologize to Defendant Harasser Doran for calling out his misconduct pursuant to Defendant Martinez's instructions.

355.    Defendants then further discriminated against Ms. Newton by retaliating against her in response to her complaints.

356.   Defendants' actions were taken under circumstances giving rise to an inference of discrimination.  Ms. Newton was treated differently, and less well, because of her gender.

357.   As a direct and proximate result of Defendants' discriminatory conduct, Ms. Newton has suffered, and continues to suffer adverse employment consequences.  Ms. Newton has been ostracized by her coworkers, forced to abide by different rules than her coworkers, and has suffered adverse employment consequences that have damaged her professional opportunities and impaired her potential for growth at LVMH.  Ms. Newton has also been forced to endure severe emotional pain and trauma, all to her detriment.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*Aider and Abettor Liability*
*(Against Individual Defendants)*

358.   Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

359.   New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

360.   New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

361.   Individual Defendants aided and abetted the gender discrimination and retaliation against Ms. Newton.

362.   Defendant Louis Vuitton fosters, and throughout Ms. Newton's employment fostered, an environment where women do not feel comfortable reporting gender discrimination and are retaliated against for doing so.

86

363. Defendant Louis Vuitton has, and through Ms. Newton's employment had, a continuous practice or policy of failing to properly investigate complaints of gender harassment and discrimination.

364. The Individual Defendants aided and abetted the gender discrimination and retaliation by, among other things, subjecting Ms. Newton to said discrimination, allowing said discrimination to occur, blaming Ms. Newton for said discrimination, failing to investigate said discrimination, and by creating a hostile work environment for Ms. Newton.

365. As a direct and proximate result of this unlawful conduct, Ms. Newton has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Unequal Pay in Violation of the Equal Pay Act*
*(Against All Defendants)*

366. Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

367. At all times relevant to this action, Ms. Newton was employed by Defendants within the meaning of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 201 et seq., as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) et seq.

368. At all times relevant to this action, Defendants were employers within the meaning of the FLSA and the Equal Pay Act.

369. The acts, practices and policies of Defendants, as set forth above, constitute discrimination against Ms. Newton, in violation of the FLSA and the Equal Pay Act, by unlawfully paying female employees, especially female Black employees, less than male employees for equal work.

370. Upon information and belief, Defendants were aware of Defendants' unfair pay practices, but did not rectify or investigate its unlawful pay practices.

371. Defendants' violations of the Equal Pay Act were willful and/or reckless, entitling Ms. Newton to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

**AS AND FOR A SIXTH CAUSE OF ACTION**
*Unequal Pay in Violation of the New York Equal Pay Act*
*(Against All Defendants)*

372. Ms. Newton re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

373. At all times relevant to this action, Ms. Newton was employed by Defendants within the meaning of Article 6 of the New York Labor Law §§ 190, et seq.

374. Upon information and belief, women of color are underpaid, under-titled and underpromoted at Defendant Louis Vuitton.

375. Defendants violated the rights of Ms. Newton to be paid the same as male employees performing equal work, in violation of New York Labor Law § 194.

376. The acts, practices and policies of Defendants, as set forth above, constitute discrimination against Ms. Newton, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, et seq. Upon information and belief, Defendants were aware of Defendants' unfair pay practices, but did not rectify or investigate its unlawful pay practices.

334.377. Defendants' violations of the New York Labor Law §§ 190, et seq., were therefore willful within the meaning of N.Y. Labor Law § 198, entitling Ms. Newton to liquidated damages.

88

335. Accordingly, Defendant Rodney Pratt discriminated against Ms. Newton by subjecting her to a retaliatory hostile work environment and terminating her employment in violation of her statutory rights as guaranteed by the New York State Human Rights Law and the New York City Human Rights Law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.     Declaring that Defendants and all of their affiliates', subsidiaries', practices, policies and procedures subjected Ms. Newton to sexual harassment, retaliation, a hostile work environment, and unequal pay engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*, Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et se*q. and Title 8 of the New York City Administrative Code, § 8-107, *et seq.*

B.     Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.     Awarding Ms. Newton damages under the Equal Pay Act and New York Equal Pay Act;

D.     Awarding Ms. Newton liquidated damages under the Equal Pay Act and the New York Equal Pay Act;

E.     Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

F.     Awarding Plaintiff punitive damages;

89

G.	Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

H.	Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices and conduct.

Dated: New York, New York
~~December 19~~March 13, 202~~3~~				Respectfully submitted,

GODDARD LAW PLLC

By: */s/ Megan S. Goddard*
	Megan S. Goddard, Esq.
	Siobhan Klassen, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: (646) 964-1178
Fax: (202) 208-2914
Megan@goddardlawnyc.com
Siobhan@goddardlawnyc.com

BERGSTEIN & ULLRICH

By: */s/ Stephen Bergstein*
	Stephen Bergstein, Esq.
5 Paradies Lane
New Paltz, New York 12561
Office: (845) 419-2250
Steve@tbulaw.com

CHARNY & WHEELER P.C.

By: */s/ Nathaniel K. Charny*
	Nathaniel K. Charny
42 West Market Street
Rhinebeck, New York 12572
Office: (845) 876-7500
ncharny@charnywheeler.com

*Attorneys for Ms. Newton*